**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ATERES BAIS YAAKOV ACADEMY OF
ROCKLAND,

       Plaintiff,

v.                                                   Civil Action No. _____

TOWN OF CLARKSTOWN, GEORGE
HOEHMANN, CUPON INC., CITIZENS          **COMPLAINT AND JURY DEMAND**
UNITED TO PROTECT OUR
NEIGHBORHOODS OF GREATER
NANUET INC.,

       Defendants.


       Plaintiff Ateres Bais Yaakov Academy of Rockland ("ABY"), by and through its

undersigned counsel, respectfully alleges as follows:

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ...........................................................................4

II.     PARTIES AND KEY PEOPLE AND ORGANIZATIONS ...............................6

III.    JURISDICTION AND VENUE .........................................................................9

IV.     BACKGROUND .................................................................................................9

        A.      THE PROPERTY ....................................................................................9

        B.      ENACTMENT OF LOCAL LAW NO. 5............................................13

        C.      ABY ENTERS INTO A CONTRACT TO PURCHASE THE
                PROPERTY, BUT FACES A FIRESTORM OF LOCAL OPPOSITION
                AND DISCRIMINATION.......................................................................17

        D.      ABY PERSISTS IN THE FACE OF DEFENDANTS' CONSPIRACY
                AGAINST IT ..........................................................................................22

                1.      Section 290-20.I(7) is a *Bulk* Requirement, Not a *Use* Requirement .......25

                2.      § 290-20.I(7) Does *Not* Apply to Schools in the R-10 District .................27

        E.      THE TOWN HAD AN AFFIRMATIVE DUTY UNDER
                WELL-SETTLED NEW YORK LAW TO ACCOMMODATE ABY'S
                PLANNED RELIGIOUS USE AND TO SUGGEST MEASURES TO
                ENSURE A VARIANCE COULD BE GRANTED ..............................29

        F.      ABY SUBMITS APPEAL AND APPLICATION FOR AN AREA
                VARIANCE TO THE ZBA, AND RATHER THAN HELP ABY OR
                ACCOMMODATE IT, THE ZBA THREW UP ROADBLOCKS.....................30

        G.      ABY IS UNABLE TO OBTAIN FINANCING AS A RESULT OF THE
                TOWN'S DISCRIMINATORY CONDUCT AND THE CONTRACT IS
                TERMINATED........................................................................................33

        H.      ZBA REFUSES TO HEAR ABY'S APPEAL AND APPLICATION FOR
                AN AREA VARIANCE, AND THE TOWN BELATEDLY TRIES TO
                "FIX" THE GLARING DEFECTS IN ITS ZONING POSITION WITH
                INVIDIOUS INTENT .............................................................................38

        I.      THE TOWN OBSTRUCTS ABY'S FOIL DEMAND FOR
                DOCUMENTS.........................................................................................41

        J.      ABY FILES AN ARTICLE 78 PETITION AND DECLARATORY
                JUDGMENT COMPLAINT...................................................................45

        K.      THE TOWN SEEKS TO PURCHASE THE PROPERTY FOR ITSELF ...........46

        L.      THE SUPREME COURT ISSUES ITS OPINION IN THE ARTICLE 78
                PROCEEDING, AND ABY APPEALS.................................................49

        M.      GBC PETITIONS THE SUPREME COURT FOR APPROVAL OF THE
                SALE OF THE PROPERTY TO THE TOWN ......................................50

N.       ABY'S MONETARY DAMAGES ........................................................52

V.     CLAIMS AGAINST THE DEFENDANTS ...........................................................54

FIRST COUNT – RLUIPA ................................................................ 54

SECOND COUNT – SECTION 1983 ................................................. 56

THIRD COUNT – SECTION 1985 ..................................................... 57

FOURTH COUNT – NEW YORK CONSTITUTION ......................................... 58

FIFTH COUNT – TORTIOUS INTERFERENCE WITH CONTRACT ............ 58

VI.    RELIEF REQUESTED.............................................................................................59

APPENDIX A – EXHIBIT LIST ...........................................................................62

APPENDIX B – ARTICLES LIST..........................................................................64

## I.   PRELIMINARY STATEMENT

1.     This is an action to redress violations of ABY's constitutional and civil rights under the First and Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. sections 1983 and 1985, the New York Constitution, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and New York State law caused by the Town of Clarkstown's (the "Town" or "Clarkstown") calculated and discriminatory efforts to prevent a registered Orthodox Jewish school from closing on its purchase of a Baptist school and church – the Grace Baptist Church (the "Property" or "GBC"). As set forth in detail below, in interfering with and depriving ABY of its right to freely exercise religion in Clarkstown, the Town acted in coordination with a citizens' group called "Citizens United to Protect Our Neighborhood," or CUPON of Greater Nanuet ("CUPON"), which was formed for the express purpose of preventing ABY from operating its school.

2.     In early January 2019, in reaction to ABY's pending permit application following its entry into a contract for the purchase of the Property, Clarkstown Supervisor George Hoehmann, other Clarkstown officials and members of a Rockland County political party, members of CUPON, and CUPON's counsel met to concoct a plan to prevent ABY's purchase of the Property.

3.     In parallel to the manufactured public pressure from CUPON, the Town denied ABY's permit application through a blatant misapplication of its zoning laws – a misapplication the Town has *effectively conceded* due to its subsequent attempt (and failure) to amend its zoning code to align with its desired misapplication. These efforts directly caused ABY to lose its financing for the purchase of the Property.

4.      Furthermore, Clarkstown's Zoning Board of Appeals (the "ZBA") refused to hear ABY's appeal of the Clarkstown Building Department's (the "Building Department") erroneous decision denying ABY's request for a building permit and, in the alternative, its application for an area variance. The ZBA's decision was arbitrary and capricious, unsupported by law and fact, and failed to provide any accommodation, let alone a reasonable accommodation, for the free exercise of religion, as required by New York law and the First Amendment.

5.      The Town and ZBA knew all they needed was time to come up with a permanent solution, so the ZBA continued repelling ABY's efforts to secure a decision on the merits, and the Town kept delaying responding to ABY's demands for information and documents under New York's Freedom of Information Law ("FOIL").

6.      Following its knowing interference with and evisceration of ABY's contract to purchase the Property and months of delay, the Town purchased the Property *for itself.* For the Town, this is but the latest example in a demonstrable pattern of wreaking havoc on religious property applicants to prevent their engagement in the Clarkstown community. Ultimately, the Town's purchase of the Property capped its coordinated effort with CUPON to prevent Orthodox Jewish girls from going to school in Clarkstown under the façade of zoning code compliance, concerns for overdevelopment, parking, and traffic.

7.      Even now, Clarkstown has no idea what it wants to do with the Property, demonstrating that its primary purpose was to keep ABY out of the Town. It considered buying the Property "for general municipal purposes," approved $4.6 million in bonds to purchase the Property "for general municipal purposes," and finally authorized the purchase of the Property "for general municipal purposes." And after closing, it established a "Vision Committee" to figure out to do with this $4.6 million piece of property. Tellingly, despite its purported concerns

about "parking" in connection with ABY's purchase of the Property, all the ideas floated have entailed the Town using the Property for parking.

8.     The administrative actions taken by the Town and its agents, including its Building Department and ZBA, against ABY, and its subsequent purchase of the Property, were all knowingly conducted with the intent to deprive ABY of its constitutional and civil rights to the free exercise of religion. The Town has thus violated the U.S. Constitution, federal civil rights statutes, RLUIPA, and New York State law. Furthermore, the Town, Defendant Hoehmann, and Defendant CUPON (collectively, the "Defendants") have conspired to deprive ABY of its constitutionally protected free exercise and equal protection rights and have tortiously interfered with ABY's contract to, and ability to, purchase the Property.

9.     The Town's unjustifiable delays and obstruction have put severe financial stress on ABY. In order for ABY to continue to exist and fulfill its mission to give young Orthodox Jewish girls a rigorous secular and religious education, it seeks compensatory and punitive damages, and attorneys' fees for Defendants' egregious violations of federal and New York State law. In addition, ABY seeks injunctive relief in the form of an order compelling the Town both to turn over the Property to ABY for the same price it paid and to grant it the building permit or variance it should have awarded a year ago.

## II.    PARTIES AND KEY PEOPLE AND ORGANIZATIONS

10.     Plaintiff ABY is a New York State chartered education corporation providing both secular and Orthodox Jewish religious instruction to girls in grades pre-K through 12 since 2000. Previously, ABY was located at 236 Cherry Lane in the Village of Airmont. ABY currently occupies temporary quarters in the Village of New Hempstead (the "New Hempstead Property"). Those quarters are made up of two modular buildings comprised of manufactured modules. ABY's permit to remain at that site, having already been extended, expires at the

conclusion of the 2019-20 school year, at which time the modular buildings must be removed. This has forced ABY to raise yet additional funds to work out yet another solution to keep the school open, creating yet additional damage as a direct result of the Defendants' wrongful conduct.

11.     Rabbi Aaron Fink is the founder and Dean of ABY. A graduate of Johns Hopkins University with a Master's Degree in Education and an alumnus of Ner Israel Rabbinical College in Maryland, Rabbi Fink's vision for educational excellence and positive personal growth has left its mark on multiple communities in the United States. He has been committed to children's education for over 38 years. Rabbi Fink founded ABY in 2000. ABY's mission is to provide academic excellence and personal development, crystalizing the potential of each student. ABY girls graduate with distinction and a sense of purpose, all a reflection of Rabbi Fink's vision. A visionary and down-to-earth mentor, Rabbi Fink continues to teach and is an active lecturer, educational consultant and mentor. He conducts workshops on the latest trends in education, building positivity in students and creating a climate conducive for spiritual and academic growth.

12.     Defendant Clarkstown is a municipality in Rockland County existing by virtue of the laws of the State of New York and is empowered to act through its governing body, its officials, employees, and official bodies. It maintains its office and principal place of business at 10 Maple Avenue, New City, NY 10956.

13.     Defendant George Hoehmann took office as Supervisor of Clarkstown in January 2016 and recently won re-election.

14.     The ZBA is the duly constituted Zoning Board of Appeals of the Town, organized and existing pursuant to the laws of the State of New York. The ZBA is authorized by the Town

to hear appeals from determinations of the Building Inspector, to interpret the Town Zoning Code, and to grant variances from the provisions of the Town Zoning Code.

15.     The Building Department is a duly constituted agency of the Town, organized and existing pursuant to the laws of the State of New York, charged, in part, with interpreting the Town Zoning Code (subject to review by the ZBA) and issuing building permits and certificates of occupancy.

16.     Defendant CUPON Inc.[1] is an organization "formed to orchestrate awareness of changes that adversely affect the character of our diverse [Rockland] Community."[2] In late 2018, CUPON Inc. formed a chapter, Citizens United to Protect Our Neighborhoods of Greater Nanuet Inc. ("CUPON of Greater Nanuet"), "to orchestrate awareness of changes that adversely impact [its] diverse community" and "interface[s] with state, county and local governments and agencies, and first responders to identify unsustainable, unsafe, and/or unlawful proposed development, as well as illegal housing practices."[3] As detailed below, this chapter had a specific target: it was formed by a vocal minority of the Town in direct opposition to ABY's contract to purchase and convert the Property into an Orthodox Jewish all-girls school. *See infra* ¶¶ 60, 146. Among CUPON of Greater Nanuet's founding goals was to "spearhead any legal action needed to guarantee" its objectives in relation to the Property, which it promptly celebrated the day of the Town's closing on its acquisition of the Property. Ex. A; Ex. B ("There is power in numbers, as we've learned firsthand through our Grace Baptist Church experience and by renewing your membership you are helping to use that power for the good of Nanuet and Rockland County.").

---

[1] New York Department of State ID 5294645.

[2] *About Us*, CUPON INC., https://www.cuponrockland.org/about.

[3] *CUPON of Nanuet Mission*, CUPON OF GREATER NANUET, https://cuponnanuet.org/about-cupon/cupon-of-greater-nanuet-mission.

On April 12, 2019, in the middle of the events of this suit, CUPON of Greater Nanuet became a legally independent entity.[4] Throughout this Complaint, "Defendant CUPON" will refer to both when used generally, and to CUPON Inc. pre-April 12th and to CUPON of Greater Nanuet April 12th and beyond.

## III.   JURISDICTION AND VENUE

17.    Subject matter jurisdiction over this action is conferred upon this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

18.    Personal jurisdiction over this action is conferred upon this Court because Defendants are located in this District and because the acts complained of occurred in this District.

19.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all of the Defendants are located in this District and because the events giving rise to the claim occurred in this District.

## IV.   BACKGROUND

### A.   THE PROPERTY

20.    The Property is located at 22 Demarest Avenue, 24 Demarest Avenue, 26 Demarest Avenue, and 9 Highview Avenue, Nanuet, New York.[5]

21.    The Property is located in an R-10 residential zoning district within the Nanuet Hamlet Overlay District.

22.    According to Table 1 of the Clarkstown Zoning Code, "schools of general instruction" are permitted uses, as of right, in the R-10 district. A "school of general instruction"

---

[4] New York Department of State ID 5532918.

[5] 20 Demarest Avenue, Nanuet, New York is GBC's principal location and is occupied as a parsonage (the "Parsonage"). The Parsonage was not part of ABY's contract to purchase the Property, but the Town also purchased it.

is defined by Town Code § 290-3 as "[a]ny public or private nursery, elementary, junior high, high school or college offering courses in general instruction and accredited by the New York State Education Department, offering courses at least five days per week and seven months per year."

23.     "School[]" is defined in the Town Code as "[a]ny public school under the jurisdiction of the Commissioner of Education of the State of New York; any parochial school operated and maintained by any religious corporation authorized to perform its corporate functions in the State of New York; or any school chartered by the Board of Regents of the University of the State of New York." Town Code § 290-3.

24.     "Nursery School" is defined in the Town Code as "[a] school designed to provide daytime care or instruction for two or more children from two to five years of age, inclusive, and operated on a regular basis." Town Code § 290-3.

25.     The only "schools" defined in Article 1 of the Town Code are "schools," "schools of general instruction," and "nursery school[s]." All three definitions apply to ABY. ABY is a "school" in that it is a "school chartered by the Board of Regents of the University of the State of New York." ABY is also a "school of general instruction" in that it meets the definition through its course offerings. ABY is also a "nursery school" in that it provides pre-K "instruction" for children "five years of age."

26.     The Property consists of the following tax lots: 64.09-1-47, 48, 50 and 51. It is generally bounded by the following roads: Demarest Avenue, Orchard Street, Highview Avenue, and Church Street. As is relevant to the discussion below, none of these roads is a "state or county major or secondary road[]." *See infra* Section B.

27.     In a sworn affidavit submitted by Rev. William French – GBC's pastor – to the Building Department on December 26, 2018 in connection with ABY's application for a building permit (the "French Affidavit"), Pastor French chronicled GBC's history on the Property. *See* Ex. C. According to Pastor French, since 1860, GBC has continuously and regularly conducted worship services of various Christian faiths and has provided religious education consistent with their Christian beliefs. And, at least until mid-2019, both religious and educational uses continued on the Property.

28.     Pastor French also described the buildings and additions that were constructed on the Property over the years. He notes that "[t]he original 1860 building, housing the old sanctuary, still exists, and has been added to over time. The first addition, initially used as an educational wing and now housing the nursery and library, was built in 1928. The new educational wing was built in 1955. The new sanctuary was added in 1965."

29.     As noted above, GBC built an educational wing in 1955, which it has used continuously ever since. The building, which contains nine large classrooms and forty smaller classrooms within the large ones, was built specifically for a school use. The building and the Property have continued to be used for educational and religious purposes by both GBC and other resident religious institutions.

30.     There is no dispute that a school use was permitted at its inception and for many decades thereafter: indeed, the certificate of occupancy issued by the Town, dated June 4, 1965, expressly references the following uses: "Church[es], Office[s], and Bible School[s]."

31.     As Pastor French attested, the Property was being used and had been used as a school continuously for a long time.

4. [R]eligious educational programs [were conducted by GBC and outside churches] on various days and at various times during the day, throughout the week.

6. [GBC used the Property for] regular worship services, bible studies, musical and theological instruction, ministries, membership and baptism classes, vacation bible school, and other religious and religious education programs.

9. Daily Vacation Bible School was introduced in the 1920s and continued until 2016.

12. [S]tudents from Lakeside School in Spring Valley were transported to the campus for Sunday School.

13. Beyond Sunday School programs and Vacation Bible School, the campus hosted released-time classes during the week for children of church members.

GBC kept specific records of its own activities during the years 2015–18, which included:

- Musical and Theological Instruction [2016–18]

- Wednesday Morning Bible Study [2015–18]

- Wednesday Night Bible Study [2015–18]

- Membership and Baptism Classes [2015–17]

- Children's Korean Language Instruction [2015–17]

- Men's [and Women's] Ministry with Breakfast, Biblical and Theological Education, Prayer [2015–17].

32.     In fact, on information and belief, the ***Town itself*** rented and used the Property in a manner that satisfied the definition of a "nursery school." *See supra* ¶ 24. As Pastor French attested:

the town of Clarkstown Park Board and Recreation Commission rented two classrooms in "the Educational Building", beginning in September 1988 for a "Pre-school Recreational Program", to be used 8:30 am to 12:30 pm, any day but Sunday.

**B.      ENACTMENT OF LOCAL LAW NO. 5**

33.     In 2016, Clarkstown adopted Local Law No. 5 of 2016 ("LL5"), which covered a number of matters relating to the Zoning Code of the Town (the "Town Code").

34.     LL5, attached hereto as Exhibit D, added Section 290-20.I(7) to the Town Code, which provides that in residential districts, "[a]ll uses other than single-family residences shall have minimum frontage of 100 feet and access to either a state or county major or secondary road as classified on the Town Official Map."

35.     LL5 also added the following Note 48 to the Bulk Table: "These uses shall have minimum frontage of 100 feet and access to either a state or county major or secondary road as classified on the Town Official Map." The Uses to which Note 48 refers are, generally, all uses other than single-family dwellings in residential districts. However, in the relevant R-10 district, Note 48 applies ***only to two-family dwellings*** (Use Group N), but not to any other allowed uses (*e.g.*, Use Groups M [single-family residences] and O [all other uses]).

36.     As described in more detail below, the Town maintains that this provision now renders GBC's century and a half of continued use at the Property illegal.

37.     LL5 was purportedly enacted to "[p]reserve the suburban and remaining semi-rural character of the Town," "[d]evelop zoning and building regulations that reduce or restrict odors, sounds, commercial traffic, light pollution and other negative environmental impacts on residential areas," and "[e]xpand initiatives to safeguard neighborhoods from inappropriately scaled development." *See* Ex. D.

38.     Yet these platitudes try to hide the law's real motive: the enactment of LL5 was a direct attempt to limit religious institutions within the R-10 district.[6] Since the Town was established in 1791 through 2016, there was no need to limit the location of schools and religious institutions to "State or County major or secondary roads". In addition, LL5 did not require institutions that did not meet the location requirements to relocate. In fact, of twenty-one public schools in the Town, *eighteen* are on ineligible roads. *See* Ex. E. That is, *86%* of the Town's own schools fail the very requirement the Town has used as a means of preventing ABY from closing on the Property. Another four of eleven local private schools have a similar deficiency, but continue to operate as grandfathered institutions. *See* Ex. E.

39.     Betraying the utter inconsistency of the Town's position, Highview Elementary School, operated by the Nanuet Union Free School District ("Nanuet UFSD"), is *directly across* Church Street from GBC on the same purportedly disqualifying streets. Remarkably, even after the Town denied ABY's building permit for fear that ABY might use GBC's parking lot for school parking, Supervisor Hoehmann has said that Highview Elementary School might use GBC's parking lot for school parking.[7]

40.     Farther to the East along Church Street are two other schools operated by the Nanuet UFSD: A. MacArthur Barr Middle School and Nanuet High School. Because these schools are public schools, the Town claims they are exempt from the restrictions of the Town

---

[6] The New York Court of Appeals has repeatedly found that churches and schools have an "inherently beneficial nature . . . to the public." *See, e.g.*, *Cornell Univ. v. Bagnardi*, 503 N.E.2d 509, 514 (N.Y. 1986) ("[S]chools, public, parochial and private, by their very nature, singularly serve the public's welfare and morals.").

[7] Robert Brum, *Grace Baptist Church purchase part of Clarkstown's bid to revitalize Nanuet's center*, ROCKLAND/WESTCHESTER JOURNAL NEWS (Oct. 3, 2019), https://www.lohud.com/story/news/local/rockland/nanuet/2019/10/03/grace-baptist-church-purchase-part-plan-revitalize-nanuets-center/3846664002.

Code. If any of them were to be sold to a private school, they would automatically be deemed unlawful and non-conforming.

41.     Thus, LL5 was clearly aimed at limiting, if not eliminating, the number and location of new religious institutions within the Town. Old and established religious institutions and private schools were grandfathered, at least so long as they did not change hands.

42.     As local news reported, the first test of this new law came when a handful of families of a minority religious community applied to build a church on land it purchased for that very purpose only a couple years before the enactment of LL5.[8] St. Peter's Syro-Malankara Catholic Church was composed of only 26 families.[9] Their practice of the Catholic faith comes through the apostle Thomas's mission to southern India. Thus, nearly all Syro-Malankaras are Indian or of Indian descent.[10] In 2013, this handful of families bought a few acres in Clarkstown in the hopes of someday raising enough money to build a church of their own. Many even took out personal loans to fund the purchase.[11] The passage of LL5 in 2016, however, cut off the Syro-Malankaras' access to a building permit without a variance. Nevertheless, after finally getting to the point where the community was confident it could afford to build a church of its

---

[8] Robert Brum, *Clarkstown buys land to stop proposed church*, LOHUD (Nov. 2, 2017), https://www.lohud.com/story/news/local/rockland/clarkstown/2017/11/02/clarkstown-proposed-church/825360001; Lanning Taliaferro, *Clarkstown Buys Church Land On Mountainview Road*, PATCH (Nov. 2, 2017), https://patch.com/new-york/newcity/clarkstown-buys-church-mountainview-road.

[9] St. Peter's Syro-Malankara Catholic Church, http://www.stpetersny.org/history.php.

[10] *See The Syro-Malankara Catholic Church*, CNEWA, http://www.cnewa.org/default.aspx?ID=66&pagetypeID=9&sitecode=hq&pageno=1 (giving a history of the Church).

[11] Michael D'Onofrio, *New Clarkstown law may sink Catholic church plan*, LOHUD (May 5, 2017), https://www.lohud.com/story/news/local/rockland/clarkstown/2017/05/05/clarkstown-catholic-church-overdevelopment/101194558.

own, the Syro-Malankaras applied for a variance to build a church with a mere 55 parking spots.[12]

43.     That modest request, though, was met with resistance. A neighborhood coalition, the Mountainview Preservation Group, sprung up to fight the Syro-Malankaras off their own land.[13] They said the church would "increase traffic," was not suited to the area, and would disturb the wetlands.[14] On information and belief, the Town Building Inspector then denied the permit and the ZBA denied the petition for a variance.[15] This coordinated campaign culminated in the Syro-Malankaras conceding and selling their property *to the Town*. In announcing the purchase, Supervisor Hoehmann stated that keeping the Syro-Malankaras from building a tiny church with a single weekend mass was a "**bold step**" for "**protecting** the **quality of life** our residents demand and **deserve**."[16] In the face of this obstruction, the Syro-Malankara community was never able to find a home in Clarkstown.[17]

44.     Not only was LL5 designed and enforced to prevent new houses of worship, it also specifically targeted religious schools. As further proof of Clarkstown's animus, LL5 added a new school definition—"school of general instruction"—discussed above, which only includes schools accredited by the New York State Education Department.[18] Such schools, per Table 1,

---

[12] *See* D'Onofrio, *New Clarkstown Law*, LOHUD. For reference, the condominium across the street has more parking spots for residents than the community wanted for one mass once a week. *See* St. Peter's Syro-Malankara Catholic Church, http://www.stpetersny.org, accessed Dec. 27, 2019 (advertising one mass time on Sundays).

[13] *See* D'Onofrio, *supra* note 11.

[14] *See id.*

[15] *See id.*

[16] Brum, *supra* note 8 (emphasis added).

[17] *Blessing of St. Peter's Syro-Malankara Catholic Church Rockland*, St. Mary, Queen of Peace Syro-Malankara Catholic Eparchy in USA and Canada (Jan. 1, 2020), http://syromalankarausa.org/node/8921 (noting St. Peter's fulfilled its "long-cherished dream" of blessing its own church on November 23, 2019).

[18] The Education Department does not accredit any school so the Town either made a mistake in drafting this definition or intentionally excluded all non-public schools from residential districts. New York State Education

are permitted as of right in all R districts except R-160, as well as all multi-family districts. Schools that are not "schools of general instruction" are not permitted in any residential district. Because the New York State Education Department does not require accreditation for all private schools, many private religious schools remain unaccredited. This amendment to LL5 further exposes Clarkstown's carefully constructed plan to keep religious institutions from entering its borders. Only a few months ago, Clarkstown's Building Department raised this provision as an obstacle for a proposed religious elementary school. *See* Ex. F at 1, 3.

45.     As discussed above, Clarkstown's stated purpose in amending LL5 was to preserve the suburban nature of the Town and to safeguard neighborhoods from development. Thus, according to Clarkstown, religious and other unaccredited schools impinge on its suburban nature, whereas schools that go through the (voluntary) New York State accreditation process do not. That is an absurd result.

## C.     ABY ENTERS INTO A CONTRACT TO PURCHASE THE PROPERTY, BUT FACES A FIRESTORM OF LOCAL OPPOSITION AND DISCRIMINATION

46.     The enactment of LL5 came at a particularly inopportune time for GBC. Its membership was declining and it was having difficulty generating sufficient revenue to maintain its campus. GBC thus decided to sell.

47.     After a brief effort to sell the Property to the Town and Nanuet UFSD, GBC went to the open real estate market. It was able to attract only one or potentially two serious prospects before ABY. The first was a Buddhist religious group, which intended to use the Property for Buddhist religious worship services and education. Supervisor Hoehmann suggested there was a

---

Department, *Voluntary Registration* in MANUAL FOR NEW ADMINISTRATORS OF NONPUBLIC SCHOOLS, http://www.p12.nysed.gov/nonpub/manualfornewadministratorsofnps/statereqs.html; *see Cornell University v. Bagnardi*, 68 N.Y.2d 583, 594, 510 N.Y.S.2d 861 (1986) ("the total exclusion of [educational] institutions from a residential district serves no end that is reasonably related to the morals, health, welfare and safety of the community . . . [and] is beyond the scope of the localities' zoning authority"). Rather, it is the Board of Regents that accredits nursery schools, kindergartens, and secondary schools, and "[t]here is no registration program [whatsoever] for elementary schools." New York State Education Department, *supra*.

second one, though the Town has yet to identify it seven months after they were required by law to do so. *See* Ex. G at 8; *infra* Section I (discussing ABY's FOIL demand). The Town had invited both to discuss "the potential usage of the property," and on learning the Town's thoughts on the matter, were driven away. Ex. G at 8.

48.     On October 17, 2018, ABY entered into a contract with GBC to purchase the Property. Ex. H.

49.     Upon entering into the contract, ABY applied to the Rockland Economic Assistance Corporation ("REAC") – which is administered by the Rockland County Industrial Development Agency ("IDA") – for permission to receive tax-exempt bonds.[19] ABY had successfully navigated the IDA process in 2016, when it obtained $8 million in tax-exempt bonds to fund the construction of a school building on the New Hempstead Property, though ABY ultimately did not go through with the construction.

50.     On November 15, 2018, the REAC informally voted to transfer that earlier approval to ABY's purchase of the Property, pending a public hearing, which it scheduled for January 15, 2019.

51.     On December 11, 2018, ABY secured a Letter of Intent from Investors Bank expressing the bank's interest in providing ABY financing up to $5 million for the purchase of the Property. Ex. I.

52.     News of ABY's interest in the Property did not sit well with various vocal members of the Nanuet community, certain Clarkstown residents, and local political figures, who called ABY's move to Nanuet a "***hostile invasion***." While some residents carefully couched their

---

[19] Robert Brum, *Nanuet Grace Baptist Church sale: Public hearing set on buyer's $5M financing plan*, ROCKLAND/WESTCHESTER JOURNAL NEWS (Dec. 6, 2018), https://www.lohud.com/story/news/local/rockland/nanuet/2018/12/06/nanuet-church-sale-public-hearing/2200935002.

objections in terms of "increased traffic" (an unsupported concern given ABY's size and its offer

to work with the Town to alter its school hours), others barely contained their hostility, shouting

at raucous public meetings "***go away, we don't want you, go back to Ramapo***."[20] Pastor French

was also publicly criticized for agreeing to sell the Property to an Orthodox Jewish institution.

Joe Rand, Partner of RAND Commercial Realty, who represented GBC in this transaction, has

also complained about the "anonymous threats" he received against him and his family for

brokering the sale to ABY. Ex. G at 13–14.

53.     As detailed below, ABY endured a firestorm of local opposition and

discrimination from the moment news of its proposed purchase of the Property surfaced. For

example, on November 26, 2018, representatives from ABY and GBC voluntarily appeared at an

informal, informational meeting called by Pastor French to try to assuage some of the

community's concerns about the sale of the Property to ABY. At the signal of one woman in the

front two minutes into Rabbi Fink's presentation, a third of those gathered stood up, turned their

backs on him, put on their coats, and walked out. ABY went on to explain that its curriculum

was virtually identical to the curricula of other local religious schools such as Albertus Magnus

High School and St. Anthony's Elementary School (both of which are affiliated with the Roman

Catholic Church). Three of ABY's accomplished graduates were introduced: the owner of a

small business in the fashion industry, a pre-med student, and an MBA candidate.

54.     Yet even the complaints about "increased traffic" were plainly pretextual. As

ABY repeatedly explained, all students would be transported in a mere eight buses, and none

would be allowed to drive. Additionally, only 35 faculty and staff members would ever be on

---

[20] *SHOCKING FOOTAGE: Angry Residents Shout "We Don't Want You" at Rabbi Trying to Build Girls School in Nanuet – "That Was The Attitude in PITTSBURGH"*, YESHIVA WORLD (Nov. 27, 2018),
https://www.theyeshivaworld.com/news/general/1631889/shocking-footage-angry-residents-shout-we-dont-want-you-at-rabbi-trying-to-build-girls-school-in-nanuet-that-was-the-attitude-in-pittsburgh.html, at 2:34. Ramapo is a nearby Town with a large Jewish community.

campus at the same time. The Superintendent of the Nanuet USFD also expressed concern for traffic along Church Street, but as ABY stated multiple times over, arriving vehicles would likely never use Church Street and would instead turn off Main Street onto Orchard Street to get to the school. *See* Ex. J at 29–31 (identifying ABY's intended bus route filed with the ZBA). ABY also continuously offered to coordinate with Nanuet UFSD on start and end times to avoid any potential conflicts.

55.     Further, according to the Town's own Transit Report, the addition of hundreds of homes and dozens of additional commercial units nearby would not cause the Main Street-Orchard Street intersection to operate any differently, so the addition of eight buses and thirty-five cars would have no noticeable effect. *See* Ex. K at 62–63.[21] The same study identified the peak traffic hours as 7:30–8:30 AM and 5:00–6:00 PM, but ABY's end time was before the evening peak and ABY offered to adjust its start time according to the local community's needs. *See* Ex. K at 43. Any "parking" and "traffic" concerns, therefore, were merely pretextual.

56.     On November 27, 2018, at a Town Board Meeting (minutes of which are attached hereto as Exhibit G), Supervisor Hoehmann stated that while it would be "illegal and inappropriate" for the Town to "interfere with a private property matter between two parties," the "Town will strongly enforce our zoning laws and our building code within the entire Town of Clarkstown." The audience roared in approval. Supervisor Hoehmann added that ABY's purchase would "NOT occur in the Town of Clarkstown without ALL approvals," and that in enforcing its zoning code, the Town would "**issue search warrants if necessary**" (emphasis

---

[21] At the November 27, 2018 Town Board Meeting, Supervisor Hoehmann repeatedly said "There has been no Traffic Study." Ex. G at 17. This report to the "Town of Clarkstown Town Board," which studied traffic patterns and the impact of development on traffic in the immediate vicinity, was published in early October 2018 and presented at a public hearing two weeks before the Town Board Meeting. *See* Ex. K at 1–2. Therefore, this statement by Hoehmann was not accurate.

added). Hoehmann also noted that "there is definitely an interest in this property for Town usage and the school district is interested in the parking located there."

57.     Supervisor Hoehmann even foreshadowed the grounds on which the Building Inspector would deny ABY's application, saying that because the Town did not have any record of a fire inspection since 1991, therefore, GBC had not been a school since then. Yet the **Town itself** had been using the Property as a "nursery school" since 1988, which is incorporated in the definition of a "school of general instruction." *See supra* ¶¶ 22, 24, 27, 32. Notwithstanding the Town's own use of the Property, simply talking to Pastor French would have exposed the disingenuousness of this statement: the Property was built as a school and the approximately 50 classrooms had been used continuously for at least religious education since the 1950s. *See supra* ¶¶ 29–31; Ex. C at 4–6 (internal map of GBC).

58.     Public comments of Town residents at this same meeting included inappropriate questions about how Rabbi Fink was getting the money for the Property and rhetorical questions about what happens "[i]f this God-awful deal does go through." There were also *ad hominem* statements about not wanting "Nanuet to turn into Ramapo," and calls for the Town to "have worked harder" to purchase the Property.

59.     As noted above, the local opposition also formed a citizens' group called CUPON of Greater Nanuet for the express purpose of preventing ABY from educating young Jewish girls in the Town. CUPON of Greater Nanuet is a local chapter of CUPON Rockland, an organization notorious for its anti-Semitic agenda to prevent Orthodox Jews from moving into communities throughout Rockland County under the façade of "overdevelopment" and preserving the "character" of the community.

60.     On December 12, 2018, CUPON also started a "GoFundMe" campaign. It has raised a total of $13,340 to date. *See* Ex. L. CUPON's foundational purpose, as per its original fundraising page, was and is to prevent ABY's purchase of the Property: "Nanuet has become united in its efforts to ensure that the sale of the Grace Baptist Church is one that makes sense for the town, its residents, and their children's future." *See* Ex. A. Indeed, upon its establishment, CUPON created a petition on Change.org entitled, "Petition against Grace Baptist Church becoming a school." As of February 12, 2020, the petition has been signed by 4,823 people. *See* Ex. M.

61.     On or about December 18, 2018 – amid this heated public opposition to the sale of the Property to ABY – the REAC canceled the public hearing. IDA's executive director explained that holding a hearing before ABY had received preliminary permits or approvals from the Town would be "putting the cart before the horse."[22] Notably, while such meetings are typically sparsely attended, the REAC knew that ABY's hearing was likely to attract hundreds.[23]

**D.     ABY PERSISTS IN THE FACE OF DEFENDANTS' CONSPIRACY AGAINST IT**

62.     Despite this hostile climate, ABY persisted. On December 26, 2018, in conformance with the procedures of the Town's Building Department ABY submitted an application to the Building Department for a permit to make some needed improvements to the buildings (the "Building Permit Application"). The Building Permit Application, attached hereto as Exhibit N, was accompanied by a description of ABY's proposed use of the Property, the

---

[22] Robert Brum, *Nanuet church $5M sale: Hearing shelved amid lack of approvals*, ROCKLAND/WESTCHESTER JOURNAL NEWS (Dec. 18, 2018), https://www.lohud.com/story/news/local/rockland/nanuet/2018/12/18/nanuetchurch-sale-hearing-shelved/2337405002.

[23] *Id*.

sworn French Affidavit describing the history of the Property, and an opinion letter from ABY's land use counsel regarding the applicable law.

63.     On January 10, 2019, CUPON held a meeting at a public school operated by the Nanuet UFSD, at which Supervisor Hoehmann both attended and offered closing remarks. At this meeting, CUPON's counsel engaged in an in-depth training session advising CUPON members and Town representatives – including Supervisor Hoehmann – on how to appear "facially neutral" – in other words, how to mask the organization's underlying discriminatory motives. Counsel for CUPON exhorted its members, for example, that they had "adversaries," not "enemies," and that they should not operate on the basis of "hate." But, he told the crowd, "[i]f you can't get that hate out of your heart, then please keep your mouth shut."[24] On information and belief, counsel advised the attendees to focus their complaints on innocuous topics like traffic and avoid overt complaints that it was Orthodox Jews that wanted to purchase and operate the Property for the benefit of young female students.

64.     The next day, in a post on its official Facebook page, the Rockland County committee of a major political party summarized the CUPON meeting as a "respectful and professional 2 hour presentation that focused on how the community can protect themselves from a *hostile invasion*." *See* Ex. O (emphasis added). As if that xenophobic smear needed elaboration, a commenter doubled down on the hatred:

- Let's all be honest and verbal about the term **"hostile invasion."** (Which is **maybe a bit harsh, but not by alot**.)

- The residents of Nanuet and Orangetown do not want to see our towns . . . **over come with Yeshivas**, and the private homes that are not taxed because they are all **yeshivas**, not responsible for taxes, but we pay for their bussing and more, **for Hasidics to infiltrate our local governments** at the town, . . . seeing what we have all worked so

---

[24] A video of Stephen Mogel, Esq's presentation was posted to CUPON of Greater Nanuet's Facebook page at https://www.facebook.com/CTWTDWYTK/videos/2222326208086174, at 3:10.

hard for, continue to do so, **go down the drain to the tune of the raping of our school budgets** . . . .

- The people that **suffer when the hasidics come into our community** are students . . . .

- So there you go. . . . **Nanuet and Orangetown residents do not want Hasidic communities here.** (ellipsis in original)

*See* Ex. O (emphasis added). The post and response remain on the party's Facebook page.

65.    That very same day, the Town's Building Inspector denied ABY's Building Permit Application (the "Denial Letter"). *See* Ex. P. He summarily concluded that because the Building Department had no records of a New York State Fire Inspection on the Property since 1990, GBC's school use at the Property had ceased under Town Code Section 290-29(C). And, because the Building Inspector interpreted Town Code Section 290-20.I(7) to create new use requirements – a determination that is wholly erroneous and contrary to applicable law – he concluded that "[a] variance from the [ZBA] would be required for the use of the school of general instruction." Ex. P. However, the record was clear that GBC had operated a school on the Property continuously since 1990. *See* Ex. C; *see supra* ¶¶ 29–32. Notably, as discussed further *infra* ¶¶ 106–114, the Town has effectively conceded its unlawful misapplication of the law, evidenced by its subsequent attempt (and failure) to amend its Town Code to align with its desired misapplication.

66.    Specifically, in his Denial Letter, the Building Inspector stated:

> A variance from the Clarkstown Zoning Board of Appeals would be required for the use of the school of general instruction. Our records show the last required NY State Fire Safety inspection for a school of general instruction on this property was conducted on December 11, 1990. Clarkstown Town Code section 290-29C (non-conforming use) "Discontinuance of use. If active and continuous operations are not carried on with respect to a nonconforming use during a continuous period of one year, the building or land where such nonconforming use previously existed shall thereafter be occupied and used only for a conforming use." Clarkstown Town Code section 290-20I(7) additional regulations, All uses other than single family residences shall have minimum frontage of 100

feet and access to either a state or county major or secondary road as
classified on the Town Official Map.

Ex. P.

67.     The Building Inspector's decision was wrong for at least two reasons: *first*,
Section 290-20.I(7) is a *bulk* requirement rather than a *use* requirement, and thus the "cessation
of use" provision of § 290-29.C does not apply; and *second*, § 290-20.I(7) does not apply to
schools in the R-10 Zoning District because the only Use Group to which this requirement
applies in that district consists **solely of two-family houses (i.e., not schools).**

**1.     Section 290-20.I(7) is a *Bulk* Requirement, Not a *Use* Requirement**

68.     Section 290-20.I(7) was added by LL5. It is part of Article V ("Bulk Regulation")
and contained in a larger section entitled, "Additional Bulk Regulations." Among the other bulk
regulations included in § 290-20 are: "Additional required yard regulations," bulk requirements
for "Lots divided by district boundary" and "Lots within 25 feet of the boundary for a more
restrictive district," "Courts," "Spacing of buildings," bulk requirements for multi-family
residences ("MF") and active adult residential districts ("AAR"); bulk requirements for regional
shopping districts ("RS"); and bulk requirements for home occupations, "keeping domestic
animals" and "[r]etail/commercial agriculture allowable operations" in residential districts.

69.     LL5 also added Note 48 to the *Bulk* Table, which provides: "These uses shall
have minimum frontage of 100 feet and access to either a state or county major or secondary
road as classified on the Town Official Map." Critically, however, the *Use* Tables, which were
also amended by LL5, do not contain this provision.

70.     Moreover, by inserting a special provision applying this location restriction to
**only one** specific type of use – loading docks for **dormitories**[25] – the drafters further evidenced

---

[25] § 290-17.BB(8)(b)[1], enacted in LL5, § 13.

their intent to make § 290-20.I(7) a *bulk* requirement rather than a *use* requirement. For these specific loading docks, "Ingress and egress roads shall be from a county major or secondary road. A variance from this provision shall be deemed a *use* variance" (emphasis added).

71.    In short, because § 290-20.I(7) is a *bulk* requirement, not a *use* requirement, the Building Inspector's reliance on § 290-29.C was improper and contrary to applicable law.

72.    § 290-29.C reads:

> Discontinuance of ***use***. If active and continuous operations are not carried on with respect to a nonconforming use during a continuous period of one year, the building or land where such nonconforming use previously existed shall thereafter be occupied and used only for a conforming use. Intent to resume active operations shall not affect the foregoing. (Emphasis added).

73.    This section stands in stark contrast to § 290-28, which reads:

> Buildings with nonconforming ***bulk***. Buildings with nonconforming bulk may receive routine maintenance or repairs and interior structural alteration. Relocation or enlargement is permitted, provided that no new nonconforming bulk is added to such building. "Nonconforming bulk" shall mean any portion of the building which is located within a required front, rear or side yard. Additional nonconforming bulk shall be deemed to occur if any additional floor area or projection into a required front, rear or side yard is proposed. In the event that a building with prior nonconforming bulk is damaged by casualty or voluntarily demolished, any new or replacement construction shall be required to conform to the then existing general bulk regulations unless excepted by the provisions of § 290-29E. In all cases involving reconstruction, alteration or enlargement, site plan approval, if required by § 290-31C, shall be obtained prior to the issuance of a building permit. (Emphasis added).

74.    Not only does the Town itself regard § 290-20.I(7) as a bulk requirement (that is, other than in its litigation position), New York caselaw is in unmistakable agreement.[26] The caselaw clearly delineates between a non-conforming *use* and a non-complying *bulk*, and § 290-

---

[26] *Matter of Route 17K Real Estate v. Town of Newburgh Zoning Board of Appeals*, 168 A.D.3d 1065 (2d Dep't 2019); *Real Holding Corp. v. Lehigh*, 2 N.Y.3d 297, 299 (2004); *Dawson v. Zoning Board of Appeals of Southold*, 12 A.D.3d 444 (2d Dep't 2004); *Amzalak v. Inc. Village of Valley Stream*, 220 N.Y.S.2d 113, 114 (Sup. Ct., Nassau Cty. 1961).

20.I(7) is unquestionably a *bulk* requirement. While non-conforming uses may be lost as a result of cessation of use, such cessation has no impact on the *bulk* or dimensional requirements. As such, even if true that GBC was missing certain inspections for its school, as a matter of law, that does not magically change GBC into a non-school. And the Town's reliance on this incorrect position proves its discrimination.

### 2. § 290-20.I(7) Does *Not* Apply to Schools in the R-10 District

75.     The location requirement of § 290-20.I(7) is embodied in Note 48 to the Bulk Table. The Use Groups to which Note 48 refers are, generally, all uses other than single-family dwellings in residential districts. However, in the relevant R-10 district, Note 48 applies *only* to **two-family dwellings** (Use Group N), but not to any other allowed uses (*i.e.*, Use Groups M [single-family residences] and O [all other uses]). Below is an excerpted copy of the Bulk Table. Each of the Use Groups to which Note 48 applies is circled:

| 1 | 2 | 3 |
|---|---|---|
| District | Group | **For Uses Listed Below**<br>**(Uses herein refer in abbreviated form**<br>**to the uses listed in detail in**<br>**Use Table Cols. 2 and 3)** |
| R-160 | A | Single-family residences |
| | (C) | All other uses for which standards are not otherwise specified<br>(See Note No. 48) |
| R-80 | A | Single-family residences |
| | (C) | All other uses for which standards are not otherwise specified<br>(See Note No. 48) |
| R-40 | D | Single-family residences |
| | (F) | Same as Group C<br>(See Note No. 48) |
| R-22 | G | Single-family residences |
| | (I) | Same as Group C<br>(See Note No. 48) |
| R-15 | J | Single-family residences |
| | (L) | Same as Group C<br>(See Note No. 48) |
| R-10 | M | Single-family residences |
| | (N) | Two-family residence<br>(See Note No. 48) |
| | O | All other uses for which standards are not otherwise specified |

76.     As clearly depicted above, within the R-10 district, the text of LL5 expressly applies Note 48 *only* to Use Group N (*i.e.*, "Two-family residences").

77.     Moreover, even assuming that Section 290-20.I(7) was applicable to Use Group O in the R-10 district – and it is not – it would *still* not apply to the school use on the Property. That is because, under Section 290-27 of the Town Code, non-conforming uses that ***were legal when initiated*** may continue despite their subsequent non-conformity. Here, as set forth above and as detailed in the French Affidavit, the Property has been continuously used as a school (and also a church and office) since at least 1860. Indeed, its use as a school continued at least until mid-

2019. If the Building Inspector was correct about its interpretation, GBC would not be allowed to sell the Property to anyone except a government institution, such as the Town itself. As such, the Town baldly relied on an inapplicable provision to keep ABY away, further proving its discriminatory intent.

**E.    THE TOWN HAD AN AFFIRMATIVE DUTY UNDER WELL-SETTLED NEW YORK LAW TO ACCOMMODATE ABY'S PLANNED RELIGIOUS USE AND TO SUGGEST MEASURES TO ENSURE A VARIANCE COULD BE GRANTED**

78.    Even if the Building Inspector had been correct about the facts and law, none of the failings would be more than mere technicalities that, in a normal process, should have been easy to overcome. The Property was built and approved by the Town, in part, as a school, and ABY wanted to use it as a school. Zoning should not have been a problem.

79.    Moreover, under well-settled New York law, the Town had an affirmative duty both to assist ABY as a religious institution through the approval process and to give it greater flexibility in meeting zoning requirements. For decades, New York has repeatedly reaffirmed this obligation.

- "[A] municipality **may not deny such a variance** to a religious institution on the basis of factors which would justify the exclusion or restriction of commercial establishments, **including traffic hazards and decreased enjoyment of neighboring properties**. . . . There is an **affirmative duty** on the part of a local zoning board **to suggest measures to accommodate the planned religious use, without causing the religious institution to incur excessive additional costs.**" *Islamic Society of Westchester and Rockland, Inc. v. Foley*, 96 A.D.2d 536, 537 (2d Dep't 1983) (emphasis added).

- "[E]very effort** must be made **to accommodate** the religious use subject to conditions reasonably related to land use." *Matter of Harrison Orthodox Minyan, Inc. v. Town Board of Harrison*, 159 A.D.2d 572, 573 (2d Dep't 1990) (emphasis added).

- "It is well settled that, while religious institutions are not exempt from local zoning laws, **greater flexibility** is required in evaluating an application for a religious use than an application for another use and **every effort to accommodate** the religious use must be made." *Genesis Assembly of God v. Davies*, 208 A.D. 627, 628 (2d Dep't 1994) (emphasis added).

- The Board of Appeals decision "was arbitrary, capricious, and an abuse of discretion and was properly annulled" where the Board of Appeals did not suggest any measures to accommodate the proposed religious use. *St. Thomas Malankara Orthodox Church, Inc. Long Island v. Board of Appeals, Town of Hempstead*, 23 A.D. 3d 666, 667 (2d Dep't 2005).

- "[W]hile religious institutions are not exempt from local zoning laws, **greater flexibility** is required in evaluating an application for a religious use than an application for another use and **every effort to accommodate** the religious use must be made." *Capriola v. Wright,* 73 A.D. 3d 1043, 1045 (2d Dep't 2010) (citing *Genesis Assembly*) (emphasis added).

- The court annulled the Zoning Board's determinations where the Board failed to suggest measures to accommodate the proposed religious use. *Tabernacle of Victory Pentecostal Church v. Weiss*, 101 A.D. 3d 738, 740-41 (2d Dep't 2012).

80.    The Town was, thus, legally obligated to help ABY but, as laid out in detail below, it did no such thing. It would have been easy for the Town to grant a variance, even though none was required, and to recognize the reality that the school at GBC did not suddenly transform to a non-school simply by virtue of a missing fire certificate, which obviously has nothing to do with the presence or absence of education at GBC. This was the bare minimum the Town could have done, but it did not even do that. Instead, it dug into its incorrect and indefensible positions until GBC could no longer resist selling to the Town at a below-competitive price. Indeed, at that point, the Town was the only possible buyer.

F.    **ABY SUBMITS APPEAL AND APPLICATION FOR AN AREA VARIANCE TO THE ZBA, AND RATHER THAN HELP ABY OR ACCOMMODATE IT, THE ZBA THREW UP ROADBLOCKS**

81.    On March 8, 2019, following the denial of its Building Permit Application, ABY submitted an appeal to the ZBA. *See* Ex. J. ABY's appeal contended that the Building Inspector's application of Section 290-20.I(7) and Note 48 to ABY was wholly improper and contrary to applicable law. ABY also sought, in the alternative, an area variance from the requirements of Section 290-20.I(7), allowing the use of the Property as a school and house of worship without having frontage on, and access to, a "state or county major or secondary road."

ABY made clear that it had no plans to erect new buildings, add on to the existing buildings, or demolish the existing buildings. It also had no plans to alter the existing parking area or street grid. ABY explained that other than a few cosmetic changes and the removal of non-Jewish religious symbols, it wished only to modify the interior to meet its educational needs. The ***only*** change to the neighborhood would be the use of a school building and its accompanying sanctuaries by a Jewish entity, rather than a Christian one.

82.    In ABY's cover letter, it alerted the ZBA that it was not including a survey because

> [t]he relief requested bears no relationship to the location of features or structures within the site; rather, it relates to the location of the site relative to the Official Map of the Town of Clarkstown. Appropriate mapping is included with the Narrative Summary. Further, to the applicant's knowledge, no current survey is available.

*See* Ex. S. The results of a survey would not help the ZBA in any way. All that was being asked was for permission for a school to buy and use classrooms as a school. Since nothing in the Town Code or the ZBA's published rules required a survey, not including one should not have been any problem. *See* Town Code § 290 (Zoning); *id*. § 290-8 ("The areas and boundaries of such districts are hereby established [a]s shown on a map entitled 'Zoning Map of the Town of Clarkstown' . . . ."); *id*. § A295 (Board of Appeal Rules). Thus, this requirement was nothing more than an attempt to further delay the process in the hopes that ABY would not be able to close and GBC would lose their resolve and sell to the Town.

83.    Mere days after its appeal, ABY faced additional discriminatory backlash. Certain residents took to social media to voice their hatred:

- "***They are nothing but parasites!*** They don't want to follow the rules, ***they are disgusting!*** Unfortunately what [] said was pretty close to what will happen! They will hire lawyers for the ***cult*** and tirelessly drag it through the courts until they get the desired results! #monseycowboys #parasites #hopetheyallgetmeasles." (emphasis added)

- "[Y]ou better before the[y] *infest* Pearl River! Good luck!" (emphasis added)

- "I was waiting for this. What Rockland County needs is an awesome lawyer to argue before the Supreme Court that RLUIPA is unconstitutional. And we need that lawyer now."

- "Of course they are appealing. Of course they blame the Nanuet community. Of course they hired RLUIPA lawyers. Nanuet welcome to the game, you will be labeled anti-Semitic. You will all be harassed and intimidated on social media, at your work place, and at public forums."

Ex. Q (emphasis added).

84.     On March 19, 2019, even though ABY's appeal included all elements and documents required by the Town Code and the ZBA's own published rules, the Building Inspector inexplicably declined to *even schedule a hearing*. Instead, he placed on ABY the additional and unnecessary burden of submitting a survey of the Property. *See* Ex. R. The Town knew this would further delay proceedings and harm ABY's ability to close on the Property.

85.     On April 4, 2019, ABY agreed to commission a survey even though one was not required. Ex. S. Because the Building Inspector's March 19th email only said the survey was missing, ABY informed him it expected the application would be deemed complete and the matter would be placed on the next available agenda of the ZBA.

86.     On April 10, 2019, ABY requested a response to its April 4th email. Ex. T.

87.     On April 15, 2019, the Building Inspector confirmed ABY's application would be processed on receipt of the surveys. *Id.*

88.     On May 7, 2019, ABY sent Catherine Cirrone at the ZBA twenty-five copies of the survey. Ex. U. ABY then asked for the date of the hearing. No response ever came. Because the ZBA never even considered ABY's appeal – and has made it clear that it will never do so – the Building Inspector's denial of ABY's Building Permit Application was a final land-use decision as to how the Property can be used. Given the Town's unreasonable and unjust actions,

including but not limited to its purchase of the Property for itself, any further efforts by ABY to pursue municipal approvals would be entirely futile.

## G. ABY IS UNABLE TO OBTAIN FINANCING AS A RESULT OF THE TOWN'S DISCRIMINATORY CONDUCT AND THE CONTRACT IS TERMINATED

89.     As a direct result of the Building Inspector's denial of ABY's Building Permit Application and the ZBA's undue delay in scheduling a hearing, Investors Bank revoked its Letter of Intent to provide ABY with financing to purchase the Property. *See* Ex. V, ¶ 12. ABY was unable to obtain alternative means of financing the acquisition of the Property because lenders feared that ABY would not be able to overcome the Town's manifest hostility and clear interest in preventing an Orthodox-Jewish school from "invading" their Town.[27]

90.     On April 11, 2019, ABY received a letter from GBC notifying ABY that they were scheduling the closing of the transaction for May 16, 2019 at 10:00 am, time being of the essence, and that if the closing did not occur at that time, the contract would "terminate automatically." Ex. W.

91.     By the time May 16, 2019 came, ABY had suffered six-months of continuous public harassment, governmental obstruction, and overt discrimination. As set forth above:

- At a voluntary, explanatory meeting, someone shouted "go away, we don't want you, go back to Ramapo" and a third of the audience left in protest at a pre-arranged signal shortly after Rabbi Fink began speaking. Even after those left, many of the remaining citizens continued shouting at Rabbi Fink.

---

[27] Because Clarkstown continued (and continues) to persist in denying ABY a permit, ABY did not have the financing necessary to close. Even now, ABY has financing available "subject to ABY obtaining the necessary building permits from the Town." *See* Ex. X, ¶ 5. ABY has been working closely with David Teiler, a senior underwriter at Alliance Private Capital, a commercial real estate mortgage brokerage firm based in Brooklyn, NY that provides brokerage services to the real estate industry, including not-for-profits. *Id.* ¶ 1. Mr. Teiler has confirmed that "[i]n order that ABY be able to [purchase the Property], and subject to ABY obtaining the necessary building permits from the Town, Alliance Private Capital is ready, willing, and able to arrange bank financing to ABY to fund the acquisition of the Property." *Id.* ¶ 5. Mr. Teiler is also "aware of sufficient financing sources that would permit ABY to purchase the Property at the appraisal value." *Id.*

- At a public town meeting, numerous citizens openly expressed their racist disgust. Supervisor Hoehmann threatened to "issue search warrants" against ABY to enforce its zoning code. He also publically foreshadowed the baseless rationale for denying ABY's permit.

- CUPON created a GoFundMe campaign to oppose ABY's purchase in the courts and a petition to do similarly.

- The Town cut off ABY's access to its planned and provisionally secured funding.

- CUPON held its first public meeting to teach members to disguise their "hate." Supervisor Hoehmann gave the closing remarks.

- The next day, Supervisor Hoehmann's own local political party described the meeting as a presentation "focused on how the community can protect themselves from a *hostile invasion*."

- The Building Inspector denied ABY's Building Permit Application with no basis in law or fact, triggering what he, Hoehmann, and the Town knew would be an exceedingly long and drawn out appeal process. He found that because there were no fire inspection records, GBC was not being used as a school, and so a use-variance, would be required for a bulk-requirement.

- The public harassment discrimination continued online: "They are nothing but parasites!"

- In the face of the Town's clear and undeniable duty to accommodate ABY's religious use and to assist ABY through the process, the Building Inspector required ABY to commission a new survey of the Property at great expense and to no purpose, even though there was no such rule or requirement in the Town Code or the ZBA's published rules.

- Neither the Town nor the ZBA nor the Building Inspector ever even acknowledged receipt of the final (unnecessary) condition precedent for hearing the appeal, much less actually schedule the appeal.

92. Thus, on May 16, 2019, ABY had no choice. Under those circumstances, closing on that day would have required ABY to pay more than $4 million in cash for a Property it could not use and, if the Town had its way, would never be able to use. Closing that day would have put ABY in immediate financial ruin and destroyed any chance of ABY being able to keep its school open for the 2019-20 school year – a chance ABY was understandably not willing to take.

Because ABY was unable to close by the time of the essence date set by GBC, the contract was terminated.[28] GBC simultaneously filed a letter with the ZBA "revok[ing] any consent to land use applications" relating to the Property. Ex. Z.

93.     That same day, Supervisor Hoehmann publicly stated that "the [T]own has interest in the property and will evaluate its options in the coming weeks."[29]

94.     On May 30, 2019, CUPON announced on its official Facebook page an upcoming meeting in which Supervisor Hoehmann would "stop by and may be able to update [CUPON] on Town activities." *See* Ex. AA. Upon information and belief, throughout the process of ABY's Building Permit Application and subsequent appeal, Supervisor Hoehmann attended numerous CUPON meetings like this one and actively coordinated with CUPON concerning the latest developments, all in a calculated plot to prevent ABY's purchase of the Property and pave the way for the Town's eventual purchase.

95.     On June 4, 2019, Supervisor Hoehmann left no doubt about the Town's intentions: "I am excited about the prospects for the acquisition of Grace Baptist Church. . . . All options are on the table and I look forward to the involvement of the school district and potentially the private sector to create something unique for the benefit of all residents."[30]

96.     On June 6, 2019, ABY filed a FOIL demand, requesting documents the Town had in its possession pertaining to the Property and the Town's interest in purchasing the same. Ex. BB. The events related to this aspect of the Town's dilatory tactics are discussed below in

---

[28] On May 16, 2019, ABY received a letter from GBC terminating the contract. Ex. Y.

[29] Robert Brum, *Nanuet: Grace Baptist Church terminates sale to Ateres Bais Yaacov*, ROCKLAND/WESTCHESTER JOURNAL NEWS (MAY 16, 2019), https://www.lohud.com/story/news/local/rockland/nanuet/2019/05/16/grace-baptist-church-terminates-sale-yeshiva-nanuet/3665127002.

[30] Robert Brum, *Nanuet: Town, school district exploring Grace Baptist Church purchase*, ROCKLAND/WESTCHESTER JOURNAL NEWS (June 4, 2019), https://www.lohud.com/story/news/local/rockland/nanuet/2019/06/04/nanuet-town-school-district-exploring-grace-baptist-church-purchase/1342961001.

Section I. Indeed at this time, the Town was secretly negotiating directly with GBC and at the same time, lying to ABY that it had no records about these very negotiations.

97.    Also on June 6, 2019, ABY filed a letter with the ZBA objecting to GBC's withdrawal of consent and urging the ZBA to schedule a hearing in the coming weeks. Ex. CC. ABY articulated in its letter that the Town's interference was the direct cause of ABY losing its financing resources. ABY attached a special memorandum of law concerning religious discrimination from its *pro bono* attorneys, which focused upon how the Building Inspector's denial of its building permit infringed upon ABY's religious liberties, and ran contrary to Second Department Law requiring municipalities and zoning authorities to reasonably accommodate the free exercise of religion, which is inherently beneficial.[31]

98.    ABY emphasized that the ZBA was still lawfully obligated to continue to hear ABY's appeal because declaratory relief on the misapplication of Town Code sections 290-29(C) and 290-20.I(7) and/or grant of an area variance would necessarily bind those interested in purchasing the Property in the future (whether that be ABY or otherwise) and would also affect other properties to which these sections of the Town Code have been or will be similarly misapplied. ABY noted that this was especially true because the Town's own actions conveniently left *itself* as one of the few, if not the only, viable purchasers of the Property.

99.    ABY further contended that its appeal and application for an area variance was not moot because the nature of the action is capable of repetition yet evading review. ABY argued that public policy should not incentivize towns to engage in delay and xenophobic tactics. Were it otherwise, towns and their zoning officials could do exactly what Clarkstown has done here: delay proceedings, misapply their zoning ordinances, create uncertainty in the marketplace,

---

[31] *See supra* Section E.

and cause interested parties to lose their prospective or current property interests *before* exhausting their respective zoning appeals.

100.    ABY also emphasized that – as guaranteed by the First Amendment of the U.S. Constitution and Article I, Section 3 of the New York State Constitution – the ZBA was required to reasonably accommodate ABY's free exercise rights through its intended operation of a Jewish school on the Property. ABY also reminded the ZBA that if it places ABY on unequal terms with other applicants and/or substantially burdens ABY's religious exercise, it would subject the Town to potential violations of both the First Amendment and RLUIPA.

101.    All the while, the anti-Semitic rants from local residents and CUPON members continued unabated. For example, one resident posted on Facebook:

> "We have laws and those laws protect the people from the ridiculous situation they have created!!!! Take a ride or research how many times these so called religious have been caught doing crimes or violating laws!!!! About time this happened and the law abiding citizens will not stand for any false lawsuit or pressure to have a ***religious phony school!!! Go back to Europe or whatever country your from!!!***"[32]

102.    On June 7, 2019, notwithstanding the Town's affirmative duty to reasonably accommodate religious land use, Supervisor Hoehmann told the local press that "[w]e will continue to vigorously enforce our building and zoning codes irrespective of the background of the owner," and that ABY "was treated just like any other applicant."[33]

103.    On June 18, 2019 – nearly two weeks after ABY's submission to the ZBA – in a phone conversation regarding ABY's FOIL request, ZBA Secretary Catherine Cirrone informed ABY's counsel that the ZBA had taken no further action with respect to ABY's appeal.

---

[32] Ex. EE (emphasis added).

[33] Robert Brum, *Jewish academy alleges discrimination by Clarkstown in Grace Baptist application*, ROCKLAND/WESTCHESTER JOURNAL NEWS (June 7, 2019), https://www.lohud.com/story/news/local/rockland/nanuet/2019/06/07/jewish-school-alleges-discrimination-vs-clarkstown-grace-baptist-application/1370413001).

104.    On June 24, 2019, counsel for ABY submitted another letter to the ZBA addressing the ZBA's continuing efforts to inordinately delay ABY's appeal, and presciently noting that such tactics would serve to allow a government entity to purchase the Property at a discount. Ex. DD. ABY's letter reminded the ZBA that undue delay, *in and of itself*, can evince invidious discrimination.[34] Counsel urged the ZBA to cease its delay, and review and respond to ABY's submission as expeditiously as possible.

## H.    ZBA REFUSES TO HEAR ABY'S APPEAL AND APPLICATION FOR AN AREA VARIANCE, AND THE TOWN BELATEDLY TRIES TO "FIX" THE GLARING DEFECTS IN ITS ZONING POSITION WITH INVIDIOUS INTENT

105.    On July 9, 2019, ABY received a letter from Wilson Elser Moskowitz Edelman & Decker LLP, the Town's outside counsel, indicating that the ZBA "will not entertain any appeal by [ABY] with respect to the [Property]," purportedly because "the contract for the sale of the property to [ABY] has been terminated and [ABY's] right to make any application to the Town concerning the property has been revoked." Ex. FF. Yet neither the Town nor its outside counsel is empowered to make zoning decisions. The ***ZBA*** is the duly constituted governmental entity in charge of deciding zoning appeals, but to this date, it has never held any hearing, any vote, or made any informal statement with respect to ABY's appeal. It has not even taken a vote to accept the errant advice of the Town's outside counsel and deny ABY's appeal on standing grounds. It has done nothing. The Town thus took the legally unsupportable position that ABY's appeal would ***not even be heard***, let alone voted upon by the ZBA.

106.    The Town's efforts to quash ABY's purchase of the Property continued. On July 25, 2019, the Town published legal notice of a proposed amendment to Section 290-20.I(7),

---

[34] *See, e.g.*, *Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 503 (S.D.N.Y. 2010), *aff'd*, 694 F.3d 208 (2d Cir. 2012); *Westchester Day Sch. v. Vill. of Mamaroneck*, 417 F. Supp. 2d 477, 549 (S.D.N.Y. 2006), *aff'd*, 504 F.3d 338 (2d Cir. 2007); *Israelite Church of God in Jesus Christ, Inc. v. City of Hackensack*, No. 1 l-CV-5960 SRC, 2012 WL 3284054, at *2 (D.N.J. Aug. 10, 2012).

among other provisions of the Town Code, which only confirmed that ABY's interpretation of the Town Code had been right all long. *See* Ex. GG. The proposed amendment was a transparent and discriminatory attempt by the Town to belatedly "fix" its zoning laws to address issues raised by ABY in its initial application, and further demonstrated the Town's intent on keeping ABY and other religious institutions out of its community.

107.    Specifically, the proposed amendment would have, among other things, rendered each and every use in the affected residential districts, other than single-family homes, as prior non-conforming *uses* unless they were located on a "State or County major or secondary road." The amendment proposed to "fix" the limitation of the location regulation in the R-10 district by expanding it from two-family homes to all uses other than single-family homes. And, any attempt to enlarge or expand these uses, including existing religious and educational uses – like the Property – would require a *use* variance, not a *bulk* variance.[35] A copy of the proposed amendment is attached hereto as Exhibit GG.

108.    The effects of the proposed amendment would be financially devastating to existing affected institutions, as, with the exception of relatively small buildings, it is financially impossible to convert a house of worship or school to a single family home.[36] These impacts are also not limited to one or two sites. Attached as Exhibit E is a map and chart of existing affected schools. There are 22 schools on ineligible roads within the Town. While most of these schools are public schools, and therefore allegedly exempt from the Town Code, they become non-conforming if they are closed and sold to a private institution. Attached as Exhibit JJ is a map

---

[35] The proposed amendment would also amend the Bulk Table so that Section 290-20.I(7) and Note 48, discussed above, would now specifically apply to Use Group O and potentially restrict ABY's proposed use of the Property. Notably, this is precisely the issue in the Town Code that ABY pointed out in its appeal to the ZBA. *See supra* Section D.

[36] See Exhibits HH and II for copies of two letters submitted to the Town Board on August 6, 2019 challenging the proposed amendment.

and chart of existing affected houses of worship. There are at least 14 houses of worship that would be affected by the proposed amendment.

109.     The adoption of the proposed amendment would also place a substantial burden on each of these 22 schools and 14 houses of worship, in violation of both federal and state law.

110.     It is also virtually impossible for any affected institution, whether new or existing, to meet the requirements for a use variance.

111.     Town Code § 267-b.2 provides the criteria for obtaining a use variance. Each of the four criteria must be met:

> (b) No such use variance shall be granted by a board of appeals without a showing by the applicant that applicable zoning regulations and restrictions have caused unnecessary hardship. In order to prove such unnecessary hardship the applicant shall demonstrate to the board of appeals that for each and every permitted use under the zoning regulations for the particular district where the property is located, (1) the applicant cannot realize a reasonable return, provided that lack of return is substantial as demonstrated by competent financial evidence; (2) that the alleged hardship relating to the property in question is unique, and does not apply to a substantial portion of the district or neighborhood; (3) that the requested use variance, if granted, will not alter the essential character of the neighborhood; and (4) that the alleged hardship has not been self-created.

112.     It is settled law that a person or entity seeking to use a property for a use otherwise prohibited by the Town Code has created his/her/its own hardship and is therefore not eligible for a use variance.[37]

113.     The proposed amendment would thus make it exceedingly difficult, if not impossible, to locate a school or house of worship on the Property and would have severely restricted GBC's ability to sell.

114.     Public hearing on the proposed amendment was scheduled for August 6, 2019, but was adjourned to September 10, 2019 due to the Town's receipt of two letters challenging the

---

[37] *See Expressview Dev., Inc. v. Town of Gates Zoning Bd. of Appeals*, 147 A.D.3d 1427, 46 N.Y.S.3d 725 (4th Dep't 2017); 2 Salkin, NEW YORK ZONING LAW AND PRACTICE (4th ed.) § 29:10.

proposed amendment which, upon information and belief, caused considerable concern. *See* Exs. HH & II. Notably, no further action has been taken on the proposed amendment. While this attempt to paper over its mistakes proved unnecessary to block ABY's timely purchase of the Property, it is yet further evidence of the Town's discriminatory intent.

## I.     THE TOWN OBSTRUCTS ABY'S FOIL DEMAND FOR DOCUMENTS

115.    On June 6, 2019, ABY filed a Freedom of Information Law ("FOIL") demand, requesting the following documents:

> Any and all records, written, electronic or otherwise, of the Town of Clarkstown relating to
>
> (A) the purchase and sale of all or a portion of that certain parcel of land currently owned by Grace Baptist Church of Nanuet located at 22 Demarest Ave, 24 Demarest Ave and 9 Highview Ave, Nanuet, NY, including but not limited to:
>
>> (1) records of communications between the Town of Clarkstown or any of its representatives or agents and any other party, including Grace Baptist Church of Nanuet and its officers and directors, including Pastor William French, Patrick Loftus, Esq., Rand Realty, or Paul Adler, Esq.;
>>
>> (2) records relating to the statement of Clarkstown Supervisor George Hoehmann as quoted in lohud.com, May 16, 2019, regarding the Town's interest in the property and evaluating its options with respect thereto,
>>
>> (3) copies of minutes and tape recordings of all meetings of the Town Board or other committee or subcommittee at which the sale of the property, or the Town's interest in the same, was discussed and
>>
>> (4) copies of any offers, term sheets, letters of intent or agreements, whether formal or informal, binding or nonbinding, submitted or received by the Town regarding the purchase of such property, in each case including but not limited to the time period between October 17th, 2018 through May 16, 2019,
>
> (B) a list of applications by any school or religious institution to the Clarkstown Building Department for permits, use variances or area variances within the last 5 years together with the decisions

issued by the Town with respect thereto (including a list of applications that were not ultimately heard at a meeting of the Zoning Board of Appeals due to incomplete submissions or applications otherwise terminated) and

(C) requirements of the Clarkstown Zoning Board of Appeal for applicants to submit a survey (or other supporting documentation not required by the Zoning Code) together with applications.

Ex. BB.

116.    On July 5, 2019, the Town responded to requests (A)(1), (A)(2), and (A)(4), stating that "[n]o records exist." Ex. KK. As shown below, this was a lie. *See infra* ¶¶ 121–127.

117.    On July 22, 2019, ABY submitted an appeal to Supervisor Hoehmann, stating that it found the Town's denial of responsive records "difficult to believe" based on published news articles discussing the Town's interest in purchasing the Property. Ex. LL; *see supra* ¶¶ 93, 95; *infra* ¶ 126. Supervisor Hoehmann failed to timely rule on the appeal.

118.    After the Town continued stonewalling, ABY submitted another FOIL demand on October 13, 2019, this time requesting the purchase and sale agreement between GBC and the Town and related documents. Ex. MM.

119.    On November 13, 2019, the Town provided ABY with a mere 12 pages of documents related to the sale, including the purchase offer for the Property signed by Supervisor Hoehmann on September 25, 2019. Ex. NN.

120.    On December 4, 2019, ***nearly six months*** after ABY's initial FOIL demand seeking documents related to the Town's interest in purchasing the Property, and five months since it claimed that "no records exist," the Town finally provided ABY with some additional documents. Ex. OO. The response included three emails concerning the Property sent by Paul Adler, GBC's real estate broker, on June 5, 2019 and June 6, 2019 to various Town representatives. These emails demonstrate that the Town indeed had multiple records related to

its interest in purchasing the Property, which were directly responsive to ABY's June 6, 2019 FOIL demand. They demonstrate, among other things, that the Town was actually engaged in active conversations with GBC about the Property during and around the time of the June 6, 2019 FOIL demand, and yet unlawfully withheld those records from ABY for *six months*. Troublingly, had ABY not submitted an additional FOIL demand and filed for Article 78 relief (discussed in Section L below), the Town would have likely continued to withhold these documents.

121.    The first document is a June 5, 2019 email from Paul Adler to Supervisor Hoehmann, Paul Schofield (Deputy Town Attorney), and Susan Resnick (Town employee), attaching, among other things, the cancelled contract between ABY and GBC. Mr. Adler states that "these documents will be helpful to your appraiser in determining the market value," and references (i) ABY's proposed purchase price, (ii) the amount that would be increased if the parsonage adjacent to the Property would have been included in the sale, and (iii) the resulting "firm sales price of $4.9m." Ex. PP.

122.    The second email, also from June 5, 2019, is another email from Mr. Adler to Mr. Schofield and Supervisor Hoehmann, among other recipients, attaching a "Title Report" for the Property intended for Schofield's "review and use." Ex. QQ.

123.    The third email, from June 6, 2019, is from Mr. Adler to Supervisor Hoehmann, Mr. Schofield, and Ms. Resnick, and discusses "an effort to assist the Town of Clarkstown & Nanuet School District in their due diligence deliberations," and attaches "an inspection report for the Grace Baptist Church . . . which might be helpful and instructive." Ex. RR.

124.    Each of these emails falls squarely under requests (A)(1) and (A)(2) of ABY's June 6, 2019 FOIL demand, as they are records of communications between Town

representatives and Mr. Adler, who is *explicitly* referenced in the FOIL demand, and relates to the sale and purchase of the Property, including the Town's interest in and efforts towards purchasing the Property for itself. *See* Ex. BB.[38]

125.    Nor can these records possibly constitute the entirety of responsive documents. On their face, these emails reference and were a part of larger conversations and exchanges between representatives of the Town and GBC regarding the Town's proposed purchase of the Property that, to date, ***still have not been provided to ABY***. For example, when Mr. Adler discusses the "market price for the assemblage" as compared to the value of ABY's contract with GBC, he is clearly justifying an increase in the purchase price from the ABY contract that the Town must have previously questioned or attempted to negotiate down. Ex. PP. And, when Mr. Adler references assisting the Town in its "due diligence deliberations," the only reasonable inference is that such deliberations, or communications related to those deliberations, already occurred. Ex. RR.

126.    Finally, the minutes of the November 27, 2018 Town Board meeting explicitly state that, as far back as November 26, 2018, the Town had already expressed interest in the Property. Ex. G. On that day, Supervisor Hoehmann met with GBC and the Nanuet School

---

[38] Furthermore, the Town should have documents that respond to section (B) of ABY's June 6, 2019 demand despite the Town's disingenuous response that "[t]he Town of Clarkstown does not maintain records in the manner and categories as contemplated by [y]our request." Ex. KK. In May 2017, St. Peter's Syro-Malankara Catholic Church of Rockland submitted a proposal to construct a two-story building in the Town. *See supra* ¶¶ 42–43; D'Onofrio, *supra* note 11. Additionally, in February 2018, Ramah Day Camp in Nyack submitted an application seeking permission to use its summer staff house year-round. *See Jewish Theological Ctr. & Ramah Day Camp in Nyack v. Town of Clarkstown*, No. 032265/2019, slip op. (N.Y. Sup. Ct., Rockland Cty. Jan. 7, 2020). All documents pertaining to these submissions fall under section (B) of ABY's FOIL demand and also should have been produced.  Notably, these examples are only the ones ABY has been able to find from the outside, and from what ABY understands, these applications were both rejected by the Town. There also appeared to be potential buyers from the Chung Tai Chan Monastery and Concilio Iglesia Dios Pentecostal, *see* Exs. QQ & RR (title report and inspection report prepared for each entity), but no records related to either were produced. Notably, the Town appears to have scared off at least two earlier potential buyers with its incorrect assertions regarding what the property can be used for. *See* Ex. G (referring to two prior buyers who "backed out" after meeting with the Town "to learn about potential usage of the property").

District about a potential sale of the Property. As those minutes attest, "[t]he Town was interested in the land and solicited a qualified appraiser of the property." *Id*. The appraisal in 2018, and any other documents related to the Town's interest at that time – which surely exist – are also responsive to ABY's June 6, 2019 FOIL demand and must be provided by the Town.

127.    At bottom, these emails and minutes provide "incontrovertible documentary evidence" that the Town unlawfully withheld documents responsive to ABY's June 6, 2019 FOIL demand. They also directly refute the Town's cavalier insistence that "[n]o records exist." Ex. KK. If there really are no other documents responsive to ABY's FOIL demand (beyond the documents that the Town belatedly produced), then there is a serious and substantial question as to whether the Town destroyed documents despite a duty to preserve them in light of ABY's pending appeal to the ZBA during that time. Even though by this time ABY's contract had been cancelled, its remedies in state court were very much alive and were being hindered by the Town and its discriminatory conduct.

## J.    ABY FILES AN ARTICLE 78 PETITION AND DECLARATORY JUDGMENT COMPLAINT

128.    On August 8, 2019, ABY filed a Verified Article 78 Petition and Declaratory Judgment Complaint against the Town, the ZBA, and the Building Department in the Supreme Court of New York, County of Rockland (the "Article 78 Proceeding"). Ex. SS. In the Article 78 Proceeding, ABY asked the state court for an order (1) compelling the ZBA to hear ABY's appeal of the Building Department's erroneous decision denying ABY's request for a building permit and, in the alternative, its application for an area variance; (2) directing the ZBA, upon that hearing, to find that a variance from Town Code § 290-20.I(7) is not required for use of a "school of general instruction" or, in the alternative, directing the ZBA to grant ABY's application for an area variance; (3) alternatively, annulling and setting aside the Building

Department's determination as contrary to law, arbitrary and capricious, invalid as applied to ABY, and in violation of ABY's constitutional right to the free exercise of their religion; and (4) compelling the Town to produce all discloseable records responsive to ABY's FOIL requests concerning the Town's interest in the Property.[39]

129.    On September 6, 2019, the Town moved to dismiss ABY's petition.[40]

## K.    THE TOWN SEEKS TO PURCHASE THE PROPERTY FOR ITSELF

130.    On October 3, 2019, the Town and CUPON culminated their campaign to prevent ABY from purchasing and operating an Orthodox-Jewish school on the Property. Supervisor Hoehmann stood in front of GBC and announced that the Town was purchasing the Property for *itself*, notably, and cynically, for the very same "commercial" purpose the Town and its constituents claimed they did not want ABY to purchase the Property.[41] In doing so, Supervisor Hoehmann laid bare the Town's disingenuous intentions all along. He highlighted GBC's proximity to the Town's newly approved Transit Oriented Development Downtown Zoning District ("TOD"), which is about 400 feet away. Yet in multiple court filings, the Town has contended that LL5's "legislative purpose" was to "preserve the residential character" of the zoning district by "restricting non-residential uses…" The Town has further touted the "steps" it "has taken . . . to fight against urban sprawl, to preserve open spaces, and to keep its residential neighborhoods free from the intrusion of activities that would entail increased vehicular activity and traffic." Ex. TT, ¶¶ 43–44.

---

[39] This federal suit, on the other hand, asks for monetary damages and injunctive relief under applicable federal and state laws for the Town's invidious motives and religious discrimination. In this suit, ABY seeks redress for the millions of dollars of injuries the Town inflicted upon ABY by unjustifiably and inordinately delaying its purchase of the Property and ultimately purchasing the Property for itself, all of which imposed numerous costs fully detailed in Section N below. And, now that the Town has closed on the Property itself, ABY also seeks to be awarded the Property and the permits necessary to be able to use it.

[40] Affirmation in Support of Motion to Dismiss, No. 034514/2019 (N.Y. Sup. Ct., Rockland Cty. Sept. 6, 2019) (ECF No. 29).

[41] Brum, *supra* note 7.

131.    Supervisor Hoehmann's announced ideas for the Property directly contradict these purported policy objectives. To wit, Supervisor Hoehmann highlighted the need to "meet[] parking needs for the expected growth to improve access to the downtown TOD area," noted "a critical need for parking [] which will only grow as properties are redeveloped and repurposed in the TOD zoning," and **even pointed to the parking needs of a nearby school**—Highview Elementary, located two blocks south.[42]

132.    The published agenda for the November 7, 2019 Town Board meeting, attached hereto as Exhibit UU, included a resolution authorizing the Town to purchase the Property for $4,550,000 million; a resolution authorizing the Town to finance the cost of acquisition through the issuance of bonds in the amount of $4,600,000 million; and a resolution adopting a determination of significance under the State Environmental Quality Review Act ("SEQRA") for the acquisition of the Property.

133.    The Short Environmental Assessment Form ("EAF"), which was filed in connection with the Town's SEQRA application, noted that the Property would be used for "general municipal purposes," and in particular, as "a community center, meeting facility, parking and similar uses."[43] In the original Short Environmental Assessment Form, the Town conceded that this is a "commercial" use, yet also claimed it is a "permitted use under the zoning regulations" and is "consistent with the predominant character of the existing built or natural landscape." Ex. UU at 5–6.

---

[42] Brum, *supra* note 7 (video embedded in online version at 1:26).

[43] Ex. UU at 5; *see id.* at 8 (resolution acknowledging the Town was purchasing the Property for "general municipal purposes").

134.    In other words, the Town sought to hold itself to a different standard, whereby a commercial community center and meeting facility with a large parking lot is a "permitted use" that is "consistent with" the residential nature of the neighborhood, but a religious school is not.

135.    On November 5, 2019, ABY alerted the Court in the Article 78 Proceeding to the blatant inconsistencies between the Town's planned purchase of the Property and its litigation position. *See* Ex. VV. The Town's stated goal in opposing ABY's Building Permit Application was "to keep its residential neighborhoods free from the intrusion of activities that would entail increased vehicular activity and traffic," Ex. TT, ¶ 44, yet the Town's current ideas for the use of the Property do just that. By the Town's own admission, it might use GBC for parking for (i) the TOD zones, (ii) the expected local redevelopment, and/or (iii) a nearby school. The Town also said it might convert the Property into a community center for people to drive, park, and attend events. In short, every use for the Property the Town has come up with is sure to increase traffic in the neighborhood.

136.    On November 6, 2019, in advance of the Town Board meeting scheduled for November 7, 2019 to approve the purchase of the Property, counsel for ABY sent the Town's outside counsel a letter putting the Town on notice that ABY was prepared to take all appropriate measures to vindicate its constitutional and federal rights should the Town vote to authorize the purchase of the Property. Ex. WW. To date, ABY has received no response to that letter.

137.    On November 7, 2019, the Town Board authorized the purchase of the Property. In doing so, however, the Town made a telling concession. In an amendment to its EAF, the Town no longer represented that the proposed use for the Property complies with the Town Code. Rather, the Town now contends that a municipality need not comply with its own zoning

rules, even if those same rules can obstruct and eventually scupper a private transaction for the same land. *See* Ex. XX, ¶ 15.

## L.   THE SUPREME COURT ISSUES ITS OPINION IN THE ARTICLE 78 PROCEEDING, AND ABY APPEALS

138.   On December 23, 2019, the Supreme Court issued its opinion in the Article 78 Proceeding. *See* Ex. YY. The court ordered the Town respond to ABY's FOIL cause of action, but dismissed ABY's other causes of action in the Article 78 Petition for lack of standing. *Id.* The court's standing analysis, however, was legally and factually erroneous on several grounds and, on January 7, 2020, ABY filed a timely notice of appeal from the Supreme Court's order. *See* Ex. ZZ.

139.   On January 21, 2020, the Town responded to ABY's FOIL cause of action, claiming its own denials of the existence of responsive documents constitute "incontrovertible documentary evidence" of its compliance with FOIL. Ex. AAA at 4. The Town further claimed that ABY's appeal "was never properly submitted," even though it had been submitted to and received by the official email of Supervisor Hoehmann in accordance with the Town's own FOIL request form. *Id.* at 5.

140.   On January 24, 2020, ABY replied to both of the Town's baseless arguments and mischaracterizations of its own procedures. Ex. BBB. Principally, ABY showed that by the Town's own meager production, the Town had proven the inadequacy of its production and the falsity of its claim that "no records exist." *See supra* Section I. As of the filing of this Complaint, the issue remains pending before the Supreme Court.

**M.     GBC PETITIONS THE SUPREME COURT FOR APPROVAL OF THE SALE OF THE PROPERTY TO THE TOWN**

141.    On January 10, 2020, GBC petitioned the Supreme Court for approval of the sale of the Property to the Town pursuant to Not-for-Profit Corporations Law §§ 510–511 and Religious Corporations Law § 12. Ex. CCC.

142.    On January 14, 2020, counsel for ABY again informed the Town of the legal consequences of purchasing the Property, noting that ABY intends to seek redress for the Town's and its officials' violations in federal court, including compensatory and punitive damages, and attorneys' fees. *See* Ex. DDD.

143.    On January 17, 2020, ABY moved to intervene and stay the Court's approval of the sale of the Property to the Town until the Appellate Division, Second Department has heard and determined ABY's appeal from the Supreme Court's Order in the Article 78 Proceeding. *See* Ex. EEE. ABY also submitted a sworn affidavit attesting that it is "ready, willing, and able" to reengage with GBC to purchase the Property (including the Parsonage) for its *appraised* value – which, notably, is higher than the Town's purchase price – if only the Town would stand down from its discriminatory conduct, and provide the appropriate permits, as it was legally required to do a year ago. *See* Ex. V, ¶ 16.

144.    On January 23, 2020, the Court denied ABY's motion to intervene and stay the sale, while acknowledging that ABY has a claim for tortious interference. *In the Matter of the Application of Grace Baptist Church of Nanuet for Approval to Sell Real Property Pursuant to Not-for-Profit Corporations Law §§510-511 and Religious Corporations Law §12*, No.

030222/2020, ECF No. 45. Hours later, GBC and Clarkstown closed on the Property, fulfilling the Town's long sought goal: ABY could no longer buy the Property.[44]

145.     Even though Supervisor Hoehmann and the Town had made previous inexplicable statements about possibly wanting the Property for parking, they did not actually know what they wanted the property for—except, that is, to keep ABY out. The EAF said the Property was to be used for "general municipal purposes." Ex. UU at 4. The resolution authorizing the Town to purchase the Property stated the same. *Id.* at 7. So too did the resolution authorizing the Town to issue $4,600,000 in bonds for the Property say it was "for general municipal purposes." *Id.* at 8. Confirming the Town's lack of a plan, the Town formed a "Vision Committee" within days of closing on the Property whose task is, reportedly, "to formulate ideas and seek public input."[45] While the Town does not even know what to do with the Property, ABY wanted to use it for the same educational purpose for which it was built: as a school. After all ABY had done and endured to try to find a home, the Town blocked ABY, bought it, and now does not even know what to do with it.

146.     Defendant CUPON congratulated its members for the realization of its foundational goal and urged them to continued vigilance:

> Thank you! **Due in large part to your strong support and commitment**, the Town of Clarkstown has finalized the purchase of Grace Baptist Church. **As you all know, CUPON of Greater Nanuet was formed to ensure that our community's values and needs are prioritized** . . . . There is power in numbers, as we've learned firsthand through our Grace Baptist Church experience and

---

[44] Robert Brum, *Nanuet: Clarkstown buys Grace Baptist Church*, ROCKLAND/WESTCHESTER JOURNAL NEWS (Jan. 24, 2020), https://www.lohud.com/story/news/local/rockland/nanuet/2020/01/24/nanuet-clarkstown-closes-grace-baptist-church-purchase/4568680002.

[45] Robert Brum, *Nanuet: What's next for Grace Baptist Church? 5 things to know*, ROCKLAND/WESTCHESTER JOURNAL NEWS (Jan. 30, 2020), https://www.lohud.com/story/news/local/rockland/nanuet/2020/01/30/nanuet-grace-baptist-church-sold-new-uses/4614001002.

by renewing your membership you are helping to use that power
for the good of Nanuet and Rockland County.

Ex. B (emphases added).

147.    People on the communities' Facebook pages similarly celebrated, "thank goodness dodged a BIG bullet," "This is Great news!", "Amen!!", and "Thank God!" Ex. FFF. To one person's sensible question, "For what purposes does the Clarkstown government need a church??", another refused to answer but alluded to the real reason: "If you live in Nanuet or C[l]arkstown you should know. If you don't you can read the paper or google it. If you don't live here **then do the research because it could happen to a neighbor[hood] near you.**" *Id.* (emphasis added).

## N.    ABY'S MONETARY DAMAGES

148.    If the Town had granted ABY's original Building Permit Application in January of 2019, ABY would have closed on GBC shortly thereafter. Because of the unjustified delay, ABY has had to incur numerous additional and otherwise unnecessary expenses, for which it seeks redress.

149.    Rather than being able to use the classrooms at GBC for the 2019-20 school year, ABY had to rent seven additional trailers to teach in, and for 2020-21, because of the Town's continued discrimination, ABY has had to secure another, different temporary location. Moreover, ABY has lost the opportunity to rent out the classrooms in the evenings.

150.    Similarly, ABY planned on using GBC's chapel immediately upon closing as an auditorium and performing arts center to host numerous all-school events. Instead, ABY has had to rent out outside facilities at great additional expense for an annual student production, graduation ceremonies, and all-school assemblies and dinners, not to mention the lost opportunities to rent out the chapel.

151.    Without the benefit of GBC's much greater square-footage, ABY has had to rent storage trailers.

152.    As a direct result of the Town preventing ABY from expanding into the GBC's large and permanent facilities, ABY lost students and the opportunity to enroll as many as 150 new students.

153.    ABY has also had to pay numerous extra fees, such as to the Village of New Hempstead.

154.    The Town even demanded an expensive survey of GBC, for which there was no legal requirement or necessity.

155.    ABY also had to incur professional fees for advice on its bonds, which were to come out of the proceeds of the bond sale, but which are now lost and had to come out of ABY's general fund.

156.    Rather than simply comply with its own laws, the Town forced ABY to hire attorneys to seek relief in court. ABY hired Ira Emanuel and Amy Mele and, after the Town continued its dilatory tactics, ABY retained Weil, Gotshal & Manges LLP ("Weil") for additional representation on a *pro bono* basis. ABY has incurred significant legal fees and costs associated with its ongoing litigations with the Town.

157.    In addition to all of these easily calculable and determinable damages, which, to date, total in excess of $10 million, ABY has suffered more than a year-long torrent of bad press, diminished fundraising and fundraising capacity, and other irreparable and incalculable damages arising out of Defendants' invidious discrimination.

## V.   CLAIMS AGAINST THE DEFENDANTS

### FIRST COUNT – RLUIPA

#### Against the Town

158.   ABY incorporates by reference the allegations set forth in ¶¶ 1–157 of this Complaint as if fully set forth herein.

159.   The Town's actions are in direct violation of RLUIPA. *See* 42 U.S.C. § 2000cc.

160.   The Town is the "government" for purposes of RLUIPA. *See* 42 U.S.C. § 2000cc(a)(1).

161.   The Town's actions in impeding ABY's purchase of the Property by, among other things, misapplying its Town Code and refusing to hear ABY's ZBA appeal, constitute the imposition or implementation of a land use regulation. *See* 42 U.S.C. § 2000cc(a)(1).

162.   ABY is a religious institution. *See* 42 U.S.C. § 2000cc(a)(1).

163.   The Town's imposition and implementation of land use regulations both on their face and as applied impose a substantial burden on ABY's religious exercise without using the least restrictive means of achieving a compelling governmental interest. *See* 42 U.S.C. § 2000cc(a)(1). This includes the Town's many discriminatory actions: passing LL5, denying ABY's Building Permit Application without basis in law or fact, imposing unnecessary requirements on ABY's ZBA appeal, refusing to schedule a hearing for the appeal, and never responding to or taking any vote on ABY's appeal, all in contravention of its affirmative duty under New York law to accommodate and assist ABY as a religious institution through the application and appeal process.

164.   The Town's denial of ABY's applications for a building permit and variance constitutes a substantial burden because, among other things, it foreclosed—by design—ABY's ability to obtain financing and to use the Property as a place of religious instruction even if it had

closed on it. ABY was and even now remains ready, willing, and able to satisfy all bona fide requirements necessary to purchase the Property. Financing for the Property is contingent only on the Town granting the building permit or variance, both of which they should have granted in the first place.

165.    The Town has no compelling governmental interest in misapplying their zoning laws, especially in contravention of New York State law, but even if it did, it has not used the least restrictive means of achieving whatever that compelling interest would be.

166.    This injury falls within the scope of RLUIPA because the substantial burden affects commerce among the several states. *See* 42 U.S.C. § 2000cc(a)(2)(B).

167.    This injury also falls within the scope of RLUIPA because the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which the Town makes, or has in place formal or informal procedures or practices that permit the Town to make, individualized assessments of the proposed uses for the property involved. *See* 42 U.S.C. § 2000cc(a)(2)(C).

168.    The Town violates the Equal Terms provision of RLUIPA. Among other facts alleged above, public schools need not meet the same zoning requirements religious schools must meet, and eighteen of twenty-one local public schools, in fact, fail the requirements used to deny ABY a variance. The Town has thus deprived and continues to deprive ABY of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that applies to religious land uses on terms that are less than equal to nonreligious assembly and institutional land uses. *See* 42 U.S.C. § 2000cc(b)(1).

169.    The Town also violates the Nondiscrimination provision of RLUIPA. A determination based on location (e.g., barring new religious facilities from locations not on eligible roads) discriminates in favor of established religious facilities and against new religious facilities in the same location or having the same location characteristics. The Town has thus deprived and continues to deprive ABY of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that discriminates against it on the basis of religion and religious denomination. *See* 42 U.S.C. § 2000cc(b)(2).

170.    The Town also violates the Exclusion and Limits provision of RLUIPA. The Town has deprived and continues to deprive ABY of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that unreasonably limits religious assemblies, institutions, or structures within the Town. *See* 42 U.S.C. § 2000cc(b)(3)(B).

## SECOND COUNT – SECTION 1983
### Against the Town and Defendant Hoehmann

171.    ABY incorporates by reference the allegations set forth in ¶¶ 1–170 of this Complaint as if fully set forth herein.

172.    ABY has a constitutional right under the First and Fourteenth Amendments to the United States Constitution to freely practice its religion.

173.    ABY has a constitutional right under the Fourteenth Amendment to the United States Constitution to equal protection of the laws.

174.    The Town and Defendant Hoehmann acted under color of State Law when they deprived ABY of its rights, privileges or immunities secured by the Constitution, and are therefore liable pursuant to 42 U.S.C. § 1983.

175.    The Town and Defendant Hoehmann have deprived and continue to deprive ABY of its right to freedom of religion and equal protection of the laws.

176.    The Town and Defendant Hoehmann intended to interfere with ABY's civil rights, and were at all times aware that they were acting in violation of federal laws.

177.    Defendant Hoehmann acted out of discriminatory motive and intent, or at least was recklessly and callously indifferent to ABY's federally protected rights.

## THIRD COUNT – SECTION 1985

### Against All Defendants

178.    ABY incorporates by reference the allegations set forth in ¶¶ 1–177 of this Complaint as if fully set forth herein.

179.    The Defendants have engaged in a conspiracy to deprive ABY of equal protection of laws or equal privileges and immunities, and acted in furtherance of the conspiracy out of invidious, discriminatory animus toward ABY based on its status as a Jewish institution in violation of 42 U.S.C. § 1985.

180.    As evidenced by CUPON's social media posts, and on further information and belief, Defendant Hoehmann continued to meet and coordinate with Defendant CUPON on multiple occasions throughout ABY's application process and subsequent appeal to concoct the "perfect storm" of administrative mayhem from the Town and purportedly independent outside pressure from CUPON to achieve the discriminatory goal of keeping Orthodox Jews – specifically ABY – from joining their community.

181.    Defendants' actions have injured ABY with respect to its free exercise of religion as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

## FOURTH COUNT – NEW YORK CONSTITUTION

### Against the Town and Defendant Hoehmann

182.   ABY incorporates by reference the allegations set forth in ¶¶ 1–181 of this Complaint as if fully set forth herein.

183.   The Town and Defendant Hoehmann, by their acts, have acted under color of law and have conspired and continue to conspire, in breach of ABY's rights to protect its interests under the law in violation of Article I, § 3 (freedom of worship; religious liberty), Article I, § 9 (right to assemble) and Article I, § 11 (equal protection of laws; discrimination in civil rights prohibited) of the New York State Constitution.

## FIFTH COUNT – TORTIOUS INTERFERENCE WITH CONTRACT

### Against All Defendants

184.   ABY incorporates by reference the allegations set forth in ¶¶ 1–183 of this Complaint as if fully set forth herein.

185.   ABY entered into a valid contract with GBC to purchase the Property.

186.   No Defendant was a party to that contract.

187.   Through oversight and participation in the administrative zoning process concerning ABY's permit application, the Town and Defendant Hoehmann had specific knowledge of ABY's contract to purchase the Property. Defendant CUPON was founded for the very purpose of opposing ABY's contract to purchase the Property, so it, too, had specific knowledge of the contract.

188.   Defendants intentionally, without justification or excuse, took actions to prevent ABY from executing its obligations under the contract to purchase the Property, including but not limited to organizing and conspiring to prevent the sale, denying ABY's permit application and its variance application, and refusing to consider ABY's appeal, thereby causing a breach.

189.   The purpose of this interference was twofold: (1) to prevent ABY from establishing a religious school at the site and (2) to eliminate all viable purchasers other than the Town, thus cornering the market for the Property.

190.   Defendants' actions have proximately caused damage to ABY, for which they are liable.

191.   By taking these and other actions, Defendants interfered with ABY's contract to, and ability to, purchase the Property.

192.   This interference was egregious and, with respect to the Town and Defendant Hoehmann, demonstrated a pattern of similar conduct against minority religious communities.

## VI.   RELIEF REQUESTED

WHEREFORE, ABY respectfully requests that this Court grant the following relief:

1.   An award of compensatory damages in favor of ABY for the injuries caused by Defendants' actions and land use decisions and the loss of ABY's rights as violations of RLUIPA, the United States Constitution as enforced by sections 1983 and 1985, the New York Constitution, and New York State common law against tortious interference;

2.   An award of punitive damages against Defendant Hoehmann for his evil intent or at least callous indifference to ABY's federally protected rights as available under section 1983, and against Defendant Hoehmann and the Town for their egregious interference with ABY's contract;

3.   If the Court does not award compensatory damages under RLUIPA, an award of nominal damages for the Town's violations of RLUIPA;

4.   An award of permanent injunctive relief compelling the Town to sell the Property to ABY on substantially the same terms the Town purchased the Property from GBC;

5.      An award of permanent injunctive relief compelling the Building Inspector to grant ABY's building permit or compelling the ZBA to hear ABY's appeal and grant it a variance;

6.      An award of permanent injunctive relief preventing the Town and Defendant Hoehmann from illegally and unconstitutionally applying the laws, practices and policies of the Town to ABY's proposed use of the Property, including but not limited to enjoining the Town and Defendant Hoehmann from applying the Town's laws, practices and policies in a manner that substantially burdens ABY's religious exercise, or from applying those laws, practices and policies in a discriminatory manner, and otherwise enjoining Defendant from preventing ABY's exercise of constitutional and statutory rights;

7.      An award of the full costs and attorneys' fees arising out of Defendants' actions and land use decisions alleged in connection with this action, as available under RLUIPA and sections 1983 and 1985, as permitted by 42 U.S.C. § 1988; and

8.      Such other and further relief as this Court may deem just and appropriate;

9.      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedures, ABY demands a trial jury in this action on all issues so triable.


Dated: February 18, 2020                    Respectfully submitted,

                                            /s/ Yehudah L. Buchweitz
                                            Yehudah L. Buchweitz
                                            Robert G. Sugarman
                                            David Yolkut
                                            Kevin M. Simmons (*pro hac vice pending*)
                                            WEIL, GOTSHAL & MANGES LLP
                                            767 Fifth Avenue
                                            New York, New York 10153
                                            (212) 310-8000

yehudah.buchweitz@weil.com
robert.sugarman@weil.com
david.yolkut@weil.com
kevin.simmons@weil.com

*Counsel for ABY*

IRA M. EMANUEL, P.C.
Ira M. Emanuel
Amy Mele
4 Laurel Road
New City, NY 10956
(845) 634-4141
ira@emanuellaw.com
amy@amymelelaw.com

*Of Counsel*

## APPENDIX A – EXHIBIT LIST

| Ex. | Description | Date |
|---|---|---|
| A | Original CUPON GoFundMe Page | Mar. 2, 2019[46] |
| B | CUPON of Greater Nanuet Congratulations on Town Purchasing GBC | Jan. 25. 2020 |
| C | French Affidavit | Nov. 28, 2018 |
| D | Local Law No. 5 | Mar. 22, 2016 |
| E | Map of Schools in Clarkstown | *None* |
| F | Technical Advisory Committee Meeting Minutes | Oct. 23, 2019 |
| G | Town Board Meeting Minutes | Nov. 27, 2018 |
| H | ABY's Contract with GBC | Oct. 17, 2018 |
| I | Investor Bank Term Sheet | Dec. 11, 2018 |
| J | ABY's Appeal | Mar. 8, 2019 |
| K | Clarkstown—Nanuet Transit Oriented Development Zoning, Vol. 1 Draft Report | Oct. 9, 2018 |
| L | CUPON GoFundMe | Feb. 12, 2020[46] |
| M | Petition Against GBC Becoming a School | Feb. 12, 2020[46] |
| N | Building Permit Application | Dec. 28, 2018 |
| O | Rockland County Political Party Facebook Post, and Comments | Jan. 11, 2019 |
| P | Building Inspector's Denial of ABY's Building Permit Application | Jan. 11, 2019 |
| Q | Social Media Posts | c. Mar. 13, 2019 |
| R | Email from Building Inspector to ABY | Mar. 19, 2019 |
| S | Letter from ABY to Building Inspector | Apr. 4, 2019 |
| T | Email Chain from ABY to Building Inspector | Apr. 10–15, 2019 |
| U | Letter from ABY to ZBA | May 7, 2019 |
| V | Affidavit of Rabbi Fink | Jan. 17, 2020 |
| W | Letter from GBC to ABY | Apr. 11, 2019 |
| X | Teiler Declaration | Jan. 16, 2020 |
| Y | Letter from GBC to ABY | May 16, 2019 |
| Z | Letter from GBC to the Town | May 16, 2019 |
| AA | CUPON of Greater Nanuet's Facebook Post | May 30, 2019 |
| BB | ABY FOIL Demand #1[47] | June 6, 2019 |
| CC | Letter from ABY to ZBA | June 6, 2019 |
| DD | Letter from ABY to ZBA | June 24, 2019 |
| EE | Social Media Post | c. June 6, 2019 |
| FF | Letter from Wilson Elser Moskowitz Edelman & Dicker LLP to ABY | July 9, 2019 |
| GG | Clarkstown Proposed Local Law | July 25, 2019 |
| HH | Letter from ABY to Town | Aug. 6, 2019 |

[46] Updated February 12, 2020. Started in late 2018.

[47] ABY made a prior FOIL Demand on February 2, 2019, to which the Town responded on March 7, 2019. Neither are included in the Complaint at this time.

| Ex. | Description | Date |
|---|---|---|
| II | Letter from Montalbano, Condon, & Frank, P.C. to Town | Aug. 6, 2019 |
| JJ | Map of Houses of Worship in Clarkstown | *None* |
| KK | Town FOIL Response #1 | July 5, 2019 |
| LL | ABY's Appeal of Town's FOIL Response | July 22, 2019 |
| MM | ABY FOIL Demand #2 | Oct. 13, 2019 |
| NN | Town FOIL Response #2 | Nov. 13, 2019 |
| OO | Town FOIL Response #3 | Dec. 4, 2019 |
| PP | Email from Adler to Hoehmann, Schofield, and Resnick | June 5, 2019 |
| QQ | Email from Adler to Hoehmann and Schofield | June 5, 2019 |
| RR | Email from Adler to Hoehmann | June 6, 2019 |
| SS | ABY's Art. 78 Proceeding | Aug. 8, 2019 |
| TT | Town's Affirmation in Opposition to ABY's Art. 78 Proceeding | Sept. 6, 2019 |
| UU | Town Board Meeting Minutes | Nov. 7, 2019 |
| VV | ABY's Notice of Supplemental Authority | Nov. 5, 2019 |
| WW | Letter from ABY to Town | Nov. 6, 2019 |
| XX | Town's Affirmation in Response to ABY's Notice of Supplemental Authority | Nov. 8, 2019 |
| YY | Supreme Court's Decision and Order in Art. 78 Proceeding | Dec. 24, 2019 |
| ZZ | ABY's Notice of Appeal | Jan. 7, 2020 |
| AAA | Town's Response to FOIL Cause of Action | Jan. 21, 2020 |
| BBB | ABY's Reply to FOIL Cause of Action | Jan. 24, 2020 |
| CCC | GBC's Petition for Sale | Jan. 10, 2020 |
| DDD | Letter from ABY to Town | Jan. 14, 2020 |
| EEE | ABY's Motion for Intervention and Stay | Jan. 17, 2020 |
| FFF | Town's Facebook Comments | Jan. 24, 2020 |

## APPENDIX B – ARTICLES LIST

| # | Citation |
|---|---|
| 1. | Michael D'Onofrio, *New Clarkstown law may sink Catholic church plan*, LOHUD (May 5, 2017), https://www.lohud.com/story/news/local/rockland/clarkstown/2017/05/05/clarkstown-catholic-church-overdevelopment/101194558. |
| 2. | Robert Brum, *Clarkstown buys land to stop proposed church*, LOHUD (Nov. 2, 2017), https://www.lohud.com/story/news/local/rockland/clarkstown/2017/11/02/clarkstown-proposed-church/825360001. |
| 3. | Lanning Taliaferro, *Clarkstown Buys Church Land On Mountainview Road*, Patch (Nov. 2, 2017), https://patch.com/new-york/newcity/clarkstown-buys-church-mountainview-road. |
| 4. | *SHOCKING FOOTAGE: Angry Residents Shout "We Don't Want You" at Rabbi Trying to Build Girls School in Nanuet – "That Was The Attitude in PITTSBURGH"*, Yeshiva World (Nov. 27, 2018), https://www.theyeshivaworld.com/news/general/1631889/shocking-footage-angry-residents-shout-we-dont-want-you-at-rabbi-trying-to-build-girls-school-in-nanuet-that-was-the-attitude-in-pittsburgh.html. |
| 5. | Robert Brum, *Nanuet Grace Baptist Church sale: Public hearing set on buyer's $5M financing plan*, Rockland/Westchester Journal News (Dec. 6, 2018), https://www.lohud.com/story/news/local/rockland/nanuet/2018/12/06/nanuet-church-sale-public-hearing/2200935002. |
| 6. | Robert Brum, *Nanuet church $5M sale: Hearing shelved amid lack of approvals*, Rockland/Westchester Journal News (Dec. 18, 2018), https://www.lohud.com/story/news/local/rockland/nanuet/2018/12/18/nanuetchurch-sale-hearing-shelved/2337405002. |
| 7. | Robert Brum, *Nanuet: Grace Baptist Church terminates sale to Ateres Bais Yaacov*, Rockland/Westchester Journal News (May 16, 2019), https://www.lohud.com/story/news/local/rockland/nanuet/2019/05/16/grace-baptist-church-terminates-sale-yeshiva-nanuet/3665127002. |
| 8. | Robert Brum, *Nanuet: Town, school district exploring Grace Baptist Church purchase*, Rockland/Westchester Journal News (June 4, 2019), https://www.lohud.com/story/news/local/rockland/nanuet/2019/06/04/nanuet-town-school-district-exploring-grace-baptist-church-purchase/1342961001. |
| 9. | Robert Brum, *Jewish academy alleges discrimination by Clarkstown in Grace Baptist application*, Rockland/Westchester Journal News (June 7, 2019), https://www.lohud.com/story/news/local/rockland/nanuet/2019/06/07/jewish-school-alleges-discrimination-vs-clarkstown-grace-baptist-application/1370413001. |
| 10. | Robert Brum, *Grace Baptist Church purchase part of Clarkstown's bid to revitalize Nanuet's center*, Rockland/Westchester Journal News (Oct. 3, 2019), https://www.lohud.com/story/news/local/rockland/nanuet/2019/10/03/grace-baptist-church-purchase-part-plan-revitalize-nanuets-center/3846664002. |
| 11. | *Blessing of St. Peter's Syro-Malankara Catholic Church Rockland*, St. Mary, Queen of Peace Syro-Malankara Catholic Eparchy in USA and Canada (Jan. 1, 2020), http://syromalankarausa.org/node/8921 (noting St. Peter's fulfilled its "long-cherished dream" of blessing its own church on November 23, 2019). |

| #   | Citation |
| --- | --- |
| 12. | Robert Brum, *Nanuet: Clarkstown buys Grace Baptist Church*, Rockland/Westchester Journal News (Jan. 24, 2020), https://www.lohud.com/story/news/local/rockland/nanuet/2020/01/24/nanuet-clarkstown-closes-grace-baptist-church-purchase/4568680002. |
| 13. | Robert Brum, *Nanuet: What's next for Grace Baptist Church? 5 things to know*, Rockland/Westchester Journal News (Jan. 30, 2020), https://www.lohud.com/story/news/local/rockland/nanuet/2020/01/30/nanuet-grace-baptist-church-sold-new-uses/4614001002. |