# EXHIBIT   J

LAW OFFICE

# Ira M. Emanuel, P.C.

Four Laurel Road, New City, NY 10956
Tel: 845.634.4141 Fax: 845.634.9312
E-mail: Info@EmanuelLaw.com
www.EmanuelLaw.com

Counsel to
Freeman & Loftus, RLLP

Amy Mele, Esq.
*Of counsel*

ZONING BOARD OF APPEALS
TOWN OF CLARKSTOWN

NARRATIVE SUMMARY

ATERES BAIS YAAKOV ACADEMY OF ROCKLAND
20 Demarest Avenue, Nanuet, New York
Tax Lots 64.09-1-47, 48, 50 and 51

Ateres Bais Yaakov Academy of Rockland ("ABY" or the "Applicant") is a New York State chartered education corporation providing both secular and Jewish religious instruction to girls in grades pre-K through 12. It has recently entered into a contract to purchase the campus of Grace Baptist Church at 20 Demarest Avenue, Nanuet (and other adjacent parcels identified in the application form) (the "Property" or the "GBC Campus"). Grace Baptist Church ("GBC") has occupied the location since 1860. During the ensuing 159 years, GBC built two sanctuaries, offices, and a large school building containing nine large classrooms with 40 smaller classrooms, along with attendant offices, storage, and bathrooms. GBC and its tenants have continuously and regularly conducted worship services of various Christian faiths and have provided religious education consistent with their faiths. Both religious and educational uses continue to this day. *See* Affidavit of William French, Pastor of GBC (the "French Affidavit").[1]

We provide the following narrative summary in appealing from the Town of Clarkstown Building Inspector's arbitrary and erroneous decision that "[a] variance from the Clarkstown Zoning Board of Appeals ("ZBA") would be required for use of the school of general instruction." See Building Inspector Denial Letter (Jan. 11, 2019), attached hereto as Exhibit 2 (the "Denial Letter"). The Building Inspector failed to take into account several governing principles of law, including that religious use is an inherently beneficial use and that every effort should be made to accommodate a religious use.

Further, by relying upon Zoning Code § 290-29.C, the Building Inspector erroneously applied the wrong criteria in evaluating how the Zoning Code applied to

---

[1] The French Affidavit was originally included in the underlying building permit application for this project, the denial of which gives jurisdiction to this Board. See Exhibit 1 for a complete copy of ABY's building permit application, filed on or about January 4, 2019 (the "Building Permit Application").

ABY's Building Permit Application. ABY appeals from this determination, and seeks an interpretation of the relevant section(s) of the Zoning Code.

Alternatively, and as set forth more fully below, ABY is entitled to and seeks an area variance from the requirements of Zoning Code § 290-20.I(7), allowing the use of the GBC campus as a school and house of worship without having frontage on, and access to, a "state or county major or secondary road."

## I.   Factual Background

The Property is located in an R-10 residential zoning district and within the Nanuet Hamlet Overlay District.[2]

According to Table 1 of the Zoning Code, "Schools of general instruction" are permitted uses, as of right, in the R-10 district.

A "school of general instruction" is defined as:

Any public or private nursery, elementary, junior high, high school or college offering courses in general instruction and accredited by the New York State Education Department, offering courses at least five days per week and seven months per year.[3]

"School" is further defined as:

Any public school under the jurisdiction of the Commissioner of Education of the State of New York; any parochial school operated and maintained by any religious corporation authorized to perform its corporate functions in the State of New York; or any school chartered by the Board of Regents of the University of the State of New York.[4]

ABY is a "school" in that it is a "school chartered by the Board of Regents of the University of the State of New York."[5]

ABY is a "school of general instruction" in that it meets the definition thereof through its course offerings.[6]

---

[2] As of this writing, there are no specific regulations governing schools in the Nanuet Hamlet Overlay District.
[3] Clarkstown Zoning Code (hereafter "ZC") § 290-3, as amended by LL 5-2016.
[4] ZC § 290-3.
[5] See Exhibit A to the Counsel's Opinion Letter included in the Building Permit Application (Exhibit 1 hereto) for a copy of ABY's provisional and permanent charter certificates.
[6] *See* ABY's Narrative Summary included in the Building Permit Application (Exhibit 1 hereto).

The only "schools" defined in Article I of the Zoning Code (which contains the "Definitions" provisions of the Code) are "schools", "schools of general instruction", and "nursery schools". All three definitions apply to ABY.

The Property is generally bounded by Demarest Avenue, Orchard Street, Highview Avenue, and Church Street. All are local Town roads.

As set forth in greater detail in the French Affidavit, GBC has been occupying the Property since 1860. The original building contained a sanctuary, church offices, and ancillary facilities.

In or about 1955, GBC built an educational wing that is has used continuously ever since. It was built specifically for school use. The building contains nine large classrooms and 40 smaller classrooms within the large ones. The building and the Property have continued to be used for educational and religious purposes by both GBC and other resident religious institutions through this year.[7]

In 2016, the Town of Clarkstown adopted Local Law No. 5 of 2016 (LL5). LL5 covered a number of matters relating to the Zoning Code of the Town. The Town maintains that a provision of LL5 now renders GBC's century and a half of continued use at its present location illegal.

LL5 added section 290-20.I(7) to the Zoning Code, which provides that in residential districts, "[a]ll uses other than single-family residences shall have minimum frontage of 100 feet and access to either a state or county major or secondary road as classified on the Town Official Map." Notably, § 290-20.I(7) falls under the heading, "Additional <u>Bulk</u> Regulations" (emphasis added).

The Town's Residential Zoning Districts Land Use Table lists places of worship and "schools of general instruction" as "Permitted as of Right." However, GBC is not located on a "state or county major or secondary road." As such, although the use is permitted in the zoning district, it no longer meets the bulk requirements imposed by LL5. The Building Inspector's determination, however, implies that the *use* is no longer allowed in the district, which is wrong. As set forth more fully below, and contrary to the Building Inspector's erroneous determination, the issue is one of non-complying *bulk*, not prior non-conforming *use*.

The Building Inspector determined that GBC would be allowed to continue its use in its present location as a prior non-conforming use under section 290-29 of the Zoning Code, but only if it does not cease such use for a continuous period of one year. (ABY disputes this, as the use is permitted in the district as of right, and

---

[7] *See* French Affidavit.

because LL5 only added a *bulk* requirement; it did not change the *use* requirements.)

The enactment of LL5 came at a particularly inopportune time for GBC. Its membership was declining and it was having difficulty generating sufficient revenue to maintain its campus. Therefore, GBC decided to sell.

LL5's provisions, as erroneously interpreted by the Building Inspector, combined with the fact that the building is specifically designed as a place of worship with an educational annex, severely restricted GBC's market. GBC attempted to sell to the Town of Clarkstown and the Nanuet Union Free School District ("Nanuet UFSD"), both of which are exempt from the restrictions of LL5. Neither attempt was successful.

ABY does not know why the Nanuet UFSD was interested in the site, but it does know the Town's intent. According to information received from GBC's real estate broker, Paul Adler, the Town intended to use the GBC Campus as a senior citizen center. It also sought to share the Property, and possibly the cost of purchase, with the Rockland County Sewer District No. 1 (the "Sewer District").[8] The Sewer District planned to use the GBC Campus for offices and as an education/training center – in other words, a school.

GBC then went to the open real estate market. It was able to attract only two serious prospects. The first was a Buddhist religious group, which intended to use the GBC Campus for Buddhist religious worship services and education. That group decided not to go forward.

The second was ABY.

ABY is a Jewish religious all-girls school, first established in 2002. Its primary purpose is to provide secular and religious education to girls in grades pre-K to 12. As part of its religious mission, it also holds religious worship services. The GBC Campus, with its two sanctuaries, offices, and school building is a perfect fit.

### *ABY Faces Firestorm of Local Opposition and Discriminatory Backlash*

Unfortunately, vocal members of the Nanuet community, Clarkstown residents in general, as well as influential political figures in the area, have opposed the potential sale. At rallies and on social media, ABY has been told to "go back where you came from." In a post on the official Facebook page of the Rockland

---

[8] It should be noted that the Supervisor of the Town of Clarkstown is also the Chairman of the Sewer District's Board of Commissioners.

Ateres Bais Yaakov Academy of Rockland

Page 5

County Republican Committee, the Chairman of that Committee called ABY's move to Nanuet a "hostile invasion."[9]

GBC's Pastor, William French, has also been publicly criticized for daring to sell the Property to an Orthodox Jewish school.

Representatives from ABY and GBC voluntarily appeared at a Town Board meeting on November 26, 2018, to try to assuage some of the community's concerns. ABY explained its curriculum, which is virtually identical to the curricula of other local religious schools such as Albertus Magnus and St. Anthony's. Three of ABY's accomplished graduates were introduced: the owner of a small business in the fashion industry, a pre-med student, and an MBA candidate. While some residents were careful to couch their objections in terms of increased traffic (a total of eight buses, twice per day, plus some staff), others could barely contain their hostility towards an orthodox Jewish school having the temerity to invade "their town."

The local opposition formed a new citizens' group called "Citizens United to Protect Our Neighborhood" or "CUPON" of Greater Nanuet for the express purpose of preventing ABY from operating its school. CUPON has established a Facebook page, held meetings at schools operated by the Nanuet UFSD, and hired counsel. At a CUPON meeting, counsel felt it necessary to tell CUPON members that they had "adversaries," not "enemies," and that they should not operate on the basis of "hate." But, he told the crowd, "If you can't get that hate out of your heart, then please keep your mouth shut."[10]

CUPON has also started a "GoFundMe" campaign.[11] Its purpose is clearly stated on its fundraising page: "Nanuet has become united in its efforts to ensure that the sale of the Grace Baptist Church is one that makes sense for the town, its residents, and their children's future."

CUPON has also created a petition on Change.org entitled, "Petition against Grace Baptist Church becoming a school."[12] As of noon, March 7, 2019, the petition had been signed by 4,781 people. Notably, the online petition does not provide any information as to the potential impacts (or non-impacts) of ABY's application, nor does it specifically identify ABY. But Nanuet is a small community, and ABY's proposed purchase is well known.

---

[9] *See* Exhibit 3.
[10] A video of Stephen Mogel, Esq's presentation was posted to CUPON of Greater Nanuet's Facebook page at https://www.facebook.com/CTWTDWYTK/videos/2222326208086174/, at 3:10.
[11] *See* Exhibit 4.
[12] *See* Exhibit 5.

### *ABY Submits a Permit Application, Which the Building Inspector Denied*

Despite this hostile climate, ABY persisted. Knowing the history of the Property, ABY applied to the Clarkstown Building Department for a permit to make some needed improvements to the buildings.

The Building Permit Application was accompanied by a description of ABY's proposed use of the Property, the sworn French Affidavit describing the history of the Property, and an opinion letter from the undersigned regarding the applicable law. A copy of the Building Permit Application and accompanying materials is attached hereto as Exhibit 1.

These accompanying materials were not considered. The Building Inspector did not dispute any of the facts set forth in the Building Permit Application or accompanying affidavit. Rather, he summarily concluded that, because the Building Department had no records of a New York State Fire Inspection on the Property since 1990, GBC's school use at the Property had ceased. And, because the Building Inspector interpreted LL5 to create new *use* requirements – a determination that is wholly erroneous – he denied the building permit. A copy of the Denial Letter is attached hereto as Exhibit 2.

This appeal follows.

## II.    SEQRA and GML Status

This application constitutes a Type II action under one or more of the following sections of the Commissioner's Regulations (all references are to 6 N.Y.C.R.R. § 617.5(c)):

> (1) maintenance or repair involving no substantial changes in an existing structure or facility;
> (9) construction or expansion of a primary or accessory/appurtenant, nonresidential structure or facility involving less than 4,000 square feet of gross floor area and not involving a change in zoning or a use variance and consistent with local land use controls, but not radio communication or microwave transmission facilities;
> (10) routine activities of educational institutions, including expansion of existing facilities by less than 10,000 square feet of gross floor area and school closings, but not changes in use related to such closings.

As set forth above, ABY does not intend to expand any portion of any building or structure on the Property, and this application does not seek any such expansion.

If an action is a Type II action, then no environmental review is required.[13] Further, Environmental Assessment Forms ("EAFs") are not needed for Type II actions.[14]

The Property is located within 500 feet of a County road, Main Street (a/k/a South Middletown Road a/k/a Rockland County Route 33). As such, the alternative application for an area variance is subject to referral to the Rockland County Planning Department for review of "pertinent inter-community and county-wide considerations".[15]

The portion of this application seeking an appeal of the Building Inspector's erroneous determination and an interpretation of the Zoning Code, however, is *not* within the County Planning Department's jurisdiction.[16]

## III.   Appeal and Interpretation: The Building Inspector Incorrectly Determined That LL5 Created a Prior Non-conforming Use

As set forth above, the Building Inspector denied ABY's Building Permit Application under the provisions of Zoning Code § 290-29.C. In his Denial Letter, the Building Inspector stated:

> 1. A variance from the Clarkstown Zoning Board of Appeals would be required for the use of the school of general instruction. Our records show the last required NY State Fire Safety inspection for a school of general instruction on this property was conducted on December 11, 1990. Clarkstown Town Code section 290-29C (non-conforming use) "Discontinuance of use. If active and continuous operations are not carried on with respect to a nonconforming use during a continuous period of one year, the building or land where such nonconforming use previously existed shall thereafter be occupied and used only for a conforming use." Clarkstown Town Code section 290-20I(7) additional regulations, All uses other than single family residences shall have minimum frontage of 100 feet and access to either a state or county major or secondary road as classified on the Town Official Map.[17]

ABY contends that the Building Inspector is wrong for at least two reasons:

First, because § 290-20.I(7) is a *bulk* requirement rather than a *use* requirement, the cessation of use provision of § 290-29.C does not apply.

---

[13] 6 N.Y.C.R.R. § 617.6(a)(1)(i).
[14] SEQR Handbook, (Draft 4th Ed., 2019), Ch. 2, Part B, § 5.
[15] Gen. Mun. L. § 239-l.2.
[16] Gen. Mun. L. § 239-m.3; Gen. Mun. L. § 239-n.
[17] Exhibit 2.

Ateres Bais Yaakov Academy of Rockland                                    Page 8

Second, § 290-20.I(7) does not apply to schools in the R-10 Zoning District because the only Use Group to which this requirement applies consists solely of two-family homes.

### § 290-20.I(7) is a Bulk Requirement, Not a Use Requirement

Section 290-20.I(7), was added by LL5. It is part of Article V ("Bulk Regulation") and contained in a larger section entitled, "Additional Bulk Regulations." Among the other bulk regulations included in § 290-20 are: "Additional required yard regulations," bulk requirements for "Lots divided by district boundary" and "Lots within 25 feet of the boundary for a more restrictive district," "Courts," "Spacing of buildings," bulk requirements for multi-family residences ("MF") and active adult residential districts ("AAR"); bulk requirements for regional shopping districts ("RS"); and bulk requirements for home occupations, "keeping domestic animals" and "[r]etail/commercial agriculture allowable operations" in residential districts.

LL5 also added Note 48 to the *Bulk* Table, which provides: "These uses shall have minimum frontage of 100 feet and access to either a state or county major or secondary road as classified on the Town Official Map." Notably, the *Use* Tables, which were also amended by LL5, do not contain this provision.

In addition, by inserting a special provision applying Note 48 to one specific type of use – loading docks for dormitories[18] – the drafters further evidenced their intent to make § 290-20.I(7) a *bulk* requirement rather than a *use* requirement. For these specific loading docks, "Ingress and egress roads shall be from a county major or secondary road. A variance from this provision shall be deemed a *use* variance." (emphasis added).

Because § 290-20.I(7) is a *bulk* requirement, not a *use* requirement, the Building Inspector's reliance on § 290-29.C is incorrect, improper and should be overturned.

§ 290-29.C reads:

Discontinuance of *use*. If active and continuous operations are not carried on with respect to a nonconforming use during a continuous period of one year, the building or land where such nonconforming use previously existed shall thereafter be occupied and used only for a conforming use. Intent to resume active operations shall not affect the foregoing. [Emphasis added.]

---

[18] § 290-17.BB(8)(b)[1], enacted in LL5 of 2016, § 13.

This section stands in stark contrast to § 290-28:

Buildings with nonconforming *bulk*. Buildings with nonconforming bulk may receive routine maintenance or repairs and interior structural alteration. Relocation or enlargement is permitted, provided that no new nonconforming bulk is added to such building. "Nonconforming bulk" shall mean any portion of the building which is located within a required front, rear or side yard. Additional nonconforming bulk shall be deemed to occur if any additional floor area or projection into a required front, rear or side yard is proposed. In the event that a building with prior nonconforming bulk is damaged by casualty or voluntarily demolished, any new or replacement construction shall be required to conform to the then existing general bulk regulations unless excepted by the provisions of § 290-29E. In all cases involving reconstruction, alteration or enlargement, site plan approval, if required by § 290-31C, shall be obtained prior to the issuance of a building permit. [Emphasis added.]

ABY applied for a building permit to perform "routine maintenance or repairs and interior structural alteration." It is not seeking to demolish, replace, or enlarge any of the buildings on the GBC Campus. The buildings are to remain exactly as they have been for the past sixty years.

New York courts have applied the distinction between use and bulk regulations to locational requirements. For example, in *Real Holding Corporation v. Lehigh*,[19] the Court of Appeals held that relief from the Town Code provisions which mandated 1,000 feet between a gasoline filling station and the boundary line of certain residentially zoned lands and 2,500 feet between gasoline filling stations constituted an area variance, and was not a use variance.

The courts have also distinguished between non-conforming uses and non-complying bulks. In *Amzalak v. Inc. Village of Valley Stream*, for example, the Village sought the demolition of a non-complying building that had been vacant for some time. The court held that nothing in the Zoning Code required:

the demolition [upon] cessation of use of a non-conforming building for its non-use for any period. It is limited solely to the termination of the right to use a building in a particular manner. This ordinance must be strictly construed. * * *

Since it is the building and not the use thereof which does not conform to the ordinance, summary judgment is granted to the

---

[19] 2 N.Y.3d 297, 299 (2004).

[property owner, and the building was permitted to remain despite its non-complying bulk].[20]

In *Dawson v. Zoning Board of Appeals of Southold*,[21] the Second Department relied on the *Amzalak* decision above. Ms. Dawson owned property on which was located a primary residence and a cottage used as a secondary residence. The Village required her to obtain area variances, which the ZBA conditionally granted. Citing *Amzalak*, the Appellate Division held that the cottage "constituted a nonconforming building rather than a nonconforming use." Since the ZBA "unreasonably and erroneously determined that the cottage fell into the latter category," it incorrectly focused on the cessation of use. The Appellate Division therefore held that Ms. Dawson was entitled to a certificate of occupancy and annulled the ZBA's determination.

This line of New York case law illustrates the clear difference between a non-conforming *use* and a non-complying *bulk*. While non-conforming uses may be lost as a result of cessation of use, such cessation has no impact on the *bulk* or dimensional requirements.

### § 290-20.I(7) Does Not Apply to Schools in the R-10 District

The location requirement of § 290-20.I(7) is embodied in Note 48 to the Bulk Table. The Use Groups to which Note 48 refers are, generally, all uses other than single-family dwellings in residential districts. However, in the relevant R-10 district, Note 48 applies *only* to two-family dwellings (Use Group N), but not to any other allowed uses (*i.e.*, Use Groups M [single-family residences] and O [all other uses]). Below is an excerpted copy of the Bulk Table. Each of the Use Groups to which Note 48 applies is circled:

---

[20] *220 N.Y.S.2d 113, 114 (Sup. Ct., Nassau Co. 1961)*.
[21] 12 A.D.3d 444, 785 N.Y.S.2d 84 (2d Dept. 2004).

| 1 | 2 | 3 |
|---|---|---|
| **District** | **Group** | **For Uses Listed Below**<br>**(Uses herein refer in abbreviated form**<br>**to the uses listed in detail in**<br>**Use Table Cols. 2 and 3)** |
| R-160 | A | Single-family residences |
|  | Ⓒ | All other uses for which standards are not otherwise specified<br>(See Note No. 48) |
| R-80 | A | Single-family residences |
|  | Ⓒ | All other uses for which standards are not otherwise specified<br>(See Note No. 48) |
| R-40 | D | Single-family residences |
|  | Ⓕ | Same as Group C<br>(See Note No. 48) |
| R-22 | G | Single-family residences |
|  | Ⓘ | Same as Group C<br>(See Note No. 48) |
| R-15 | J | Single-family residences |
|  | Ⓛ | Same as Group C<br>(See Note No. 48) |
| R-10 | M | Single-family residences |
|  | Ⓝ | Two-family residence<br>(See Note No. 48) |
|  | O | All other uses for which standards are not otherwise specified |

This is not a simple printing error. The text of LL5 expressly applies Note 48 *only* to Use Group N in the R-10 district:

Add Note 48, which shall read:

These uses shall have minimum frontage of 100' and access to either a State or County major or secondary road as classified on the Town Official Map.

Add Note 48 reference to R-160, Group C, Column 3; R-80, Group C, Column 3; R-40 Group F, Column 3; R-22, Group I, Column 3; R-15, Group L, Column 3 and R-10, Group N, Column 3.[22]

The drafters of LL5 therefore made the conscious choice to apply Note 48 *only* to two-family dwellings in the R-10 district.

It is a well-established principle of law that, where there is an ambiguity in a Zoning Code, the ambiguity is to be resolved against the municipality and in favor of the property owner, as zoning codes are "in derogation of the common law property rights" of owners.[23] The Use Table and Section 290-20.I are in direct conflict with one another.

Case law is also clear that where there is an ambiguity in a Zoning Code, specific provisions control general provisions.[24] Section 6 of LL5 lists each of the Use Groups to which Note 48 apply. That list does not contain Use Group O, which applies to schools and houses of worship. This is in sharp contrast to the catch-all provision of Section 8, which added identical provisions to all the residential districts at one fell swoop.[25] The changes made to the Bulk Table in Section 6 are specific to the individual zoning districts and Use Groups, and therefore should take precedence over the conflicting general provision of Section 8.

The Building Inspector's application of Section 290-20.I(7) and Note 48 to ABY was, therefore, wholly improper and should be overturned.

## IV.   Alternatively, ABY is Entitled to an Area Variance

Should the ZBA agree with the Building Inspector's decision that § 290-20.I(7) applies, however, ABY seeks, in the alternative, an area variance from the requirements of that section, allowing the use of the GBC Campus as a school and house of worship without having frontage on, and access to, a "state or county major or secondary road." ABY is not proposing to add a single brick to the building, and has more than enough parking for its use.

The GBC Campus consists of the following tax lots: 64.09-1-47, 48, 50 and 51. It is located in an R-10 zoning district and bounded by the following roads:

---

[22] LL5 of 2016, Section 6. Section 6 also added Use Group N (two-family dwellings) to the R-10 row, a designation that did not previously exist. Use Group O, however, has been in existence since at least 2005.

[23] *See, e.g., C. DeMasco Scrap Iron & Metal Corp. v. Zirk,* 62 A.D.2d 92, 98, 405 N.Y.S.2d 260, 264 (2d Dept 1978) aff'd 46 N.Y.2d 864, 414 N.Y.S.2d 516 (1979).

[24] *See, e.g., Dutchess County Dept. of Social Services v. Day,* 96 N.Y.2d 149, 153, 726 N.Y.S.2d 54 (2001); *Erie County Water Authority v. Kramer,* 4 A.D.2d 545, 550 (4th Dept 1957), aff'd 5 N.Y.2d 954 (1959).

[25] These provisions became § 290-20.I.

Demarest Avenue, Orchard Street, Highview Road, and Church Street. None of these roads is a "state or county major or secondary road."

One block to the West of the GBC Campus is Main Street. Main Street is a county major road, as shown on the Official Map of Clarkstown. Thus, if the GBC Campus was located 200 feet to the West, it would comply with the Code requirements.[26]

According to available mapping,[27] there is little physical difference between the roads surrounding the GBC Campus and Main Street. All roads are paved, and all have rights of way of approximately 40 feet in width. If anything, Main Street is more congested, being fronted by commercial properties and on-street parking. It is difficult to understand why a school would be acceptable on Main Street, but not on Demarest Avenue.

As discussed above, the Town and Sewer District sought to purchase the GBC Campus for use as a senior citizen center and as an administrative office and training center. It is also difficult to understand why the Town felt that the Campus would be acceptable for its own use as a senior citizen center, but it is not acceptable for ABY's use by students in grades pre-K to 12. Both populations would arrive primarily by bus, both populations would be supervised by trained personnel, and both uses would be active throughout the day and most of the week. It also defies logic that it would be acceptable for the Town and/or Sewer District to use the GBC Campus for its own educational purposes, but not for ABY to do the same.

Immediately across Church Street from the GBC Campus is the Highview Elementary School, operated by the Nanuet UFSD. Further to the East along Church Street are two other schools operated by the Nanuet UFSD: A. MacArthur Barr Middle School and Nanuet High School. Because these schools are public schools, they are exempt from the restrictions of the Zoning Code. If any of them were to be sold to a private school, however, they would be automatically deemed unlawful and non-conforming.

### Criteria for Area Variance

One of the purposes of a ZBA, underlying its ability to grant variances, is to provide a "safety valve" where the strict application of a zoning code cannot allow an otherwise appropriate use of property because of the peculiar circumstances

---

[26] Although Main Street in this area is in a different zoning district, the Community Shopping ("CS") district, the use is still a permitted use. *See* Clarkstown Zoning Code, Use Table 6, Column 2, items 1 and 3.

[27] For a map of the immediate area, see the Rockland County Geographic Information Service map attached hereto as Exhibit 6.

applicable to that property. For this reason, any municipality that adopts a zoning code must also establish a board of appeals.[28]

In making a determination to grant an area variance, a ZBA "shall take into consideration the benefit to the applicant if the variance is granted, as weighed against the detriment to the health, safety and welfare of the neighborhood or community by such grant."[29] The ZBA must also consider five questions when engaging in this balancing test. These questions, and ABY's responses, are set forth below:

(1) "whether an undesirable change will be produced in the character of the neighborhood or a detriment to nearby properties will be created by the granting of the area variance":

New York courts have long held that schools and religious institutions are inherently beneficial to the public welfare; zoning laws are valid only if they are reasonably related to the public health, safety, morals or welfare.[30]

When dealing with zoning variances, the Court of Appeals has held:

The presumptive value of religious facilities must be balanced against any actual detriment to the public health, safety or welfare, bearing in mind that typical hazards of traffic congestion, noise, diminution in property values, and the like, are generally insufficient to outweigh the public benefit of religious institutions and the constitutional protection to which such organizations are entitled.[31]

Under New York law, both schools and, particularly, religious institutions receive favored zoning treatment. New York has long held that schools and religious institutions are "inherently beneficial" to the residential areas in which they are located.[32] Attempts to exclude these uses from residential areas violate the New York Constitution.[33]

---

[28] See 2 Salkin, *New York Zoning Law and Practice* (3d ed.), §§ 27:07 – 27:10; *McKinney's Town Law*, Practice Commentary to § 267-a; Town L. § 267.2; *McKinney's Village Law*, Practice Commentary to § 7-712-a; Village L. § 7-712(2).

[29] See Town L. § 267-b.3(b); Village L. § 7-712-b.3(b).

[30] 1 New York Zoning Law and Practice, § 11.08; *see also Concordia Collegiate Institute v. Miller*, 301 N.Y. 189 (1950); *New York Institute of Technology, Inc. v. Ruckgaber*, 65 Misc.2d 241, 317 N.Y.S.2d 89 (Sup. Ct. 1970).

[31] *Matter of Westchester Reform Temple v Brown*, 22 N.Y.2d 488, 496 (1968), also cited in *High Street United Methodist Church v. City of Binghamton*, 715 N.Y.S.2d 279, 283 (Sup. Ct., Broome County, 2000).

[32] *Cornell University v. Bagnardi*, 68 N.Y.2d 583, 510 N.Y.S.2d 861 (1986).

[33] *Albany Preparatory Charter School v. City of Albany*, 10 Misc.3d 870, 805 N.Y.S.2d 818 (Sup. Ct., Albany Co., 2005), aff'd as modified 818 N.Y.S.2d 651 (3d Dept 2006).

Indeed, both the Second Department and other New York state courts have repeatedly and consistently held that zoning boards must make "every effort" to accommodate a religious use.[34] For example, the Second Department has held that a ZBA's denial of church's application to waive certain off-street parking requirements was "arbitrary, capricious and an abuse of discretion and was properly annulled" because board was required to recommend other alternatives to "accommodate proposed religious use while mitigating adverse effects on surrounding community to the greatest extent possible".[35]

This principle is so important that, even where the denial of a variance was supportable under the general rules for granting a variance, those rules must give way where a religious institution is involved. In *Islamic Society of Westchester & Rockland, Inc. v Foley*,[36] the Second Department overturned a variance denial even after finding that "the board's determination to deny the application was supported by substantial evidence and was not arbitrary and capricious when measured against the general standard for granting area zoning variances."[37]

However, as the [lower] court correctly noted, the case law in this State has established that municipalities must apply the requirements of their zoning ordinances in a more flexible manner to religious institutions in view of the constitutionally protected status of the free exercise of religion. Although religious institutions, like petitioner, are not wholly exempt from the requirement of establishing practical difficulty, and other standards applicable to the granting of zoning variances, a municipality may not deny such a variance to a religious institution on the basis of factors which would justify the exclusion or

---

[34] *Rosenfeld v. ZBA of Town of Ramapo*, 6 A.D.3d 450, 774 N.Y.S.2d 359 (2d Dept 2004) quoting *Genesis Assembly of God v. Davies*, 208 A.D.2d 627, 617 N.Y.S.2d 202 (2d Dept 1994). *See, e.g., Smith v. Cmty, Bd. No. 14*, 128 Misc. 2d 944, 949 (Sup. Ct. Queens Cty. 1985), *aff'd*, 133 A.D.2d 79 (2d Dep't 1987) (concluding that "New York Courts have long recognized the principle of accommodation" and they "have repeatedly held that by their very nature religious institutions are beneficial to public welfare and consequently proposed religious uses should be accommodated"); *see also, e.g., Richmond v. City of New Rochelle Bd. of Appeals on Zoning*, 24 A.D.3d 782, 783 (2005) (affirming grant of area variance as rational and not arbitrary and capricious because "the Board did not improperly elevate the religious concerns of the applicant over the public health, safety and welfare of the community," and the board instead rightly made an effort to accommodate the religious use, as required by the law); *North Shore Hebrew Acad. v. Wegman*, 105 A.D.2d 702, 705 (2d Dep't 1984) (holding that board of trustees unconstitutionally applied zoning ordinance to prohibit religious institution from expanding its programs, and finding that "stricter scrutiny" applies to such zoning restrictions); *Matter of Westchester Reform Temple v. Brown*, 22 N.Y.2d 488, 494-97 (1968) (reversing Planning Commission's rejection of synagogue's expansion plan, concluding that "under the guise of reasonable regulation, [the Planning Commission] has unconstitutionally abridged religious freedom").

[35] *St. Thomas Malankara Orthodox Church, Inc., Long Island v. Bd. of Appeals, Town of Hempstead*, 23 A.D.3d 666, 666–67 (2d Dep't 2005).

[36] 96 AD2d 536, 464 NYS2d 844 (2d Dept 1983).

[37] *Id.* 96 A.D.2d at 537, 464 N.Y.S. 2d at 845.

restriction of commercial establishments, including traffic hazards and decreased enjoyment of neighboring properties [citations omitted]. There is an affirmative duty on the part of a local zoning board to suggest measures to accommodate the planned religious use, without causing the religious institution to incur excessive additional costs, while mitigating the detrimental effects on the health, safety and welfare of the surrounding community.[38]

As the Second Department has explained, because "a proposed religious use should be accommodated, even when it would be inconvenient for the community," a zoning board may not reject such an application based on factors such as traffic hazards (which are not implicated here in any event) that could potentially justify a restriction on a commercial-use: "Where an irreconcilable conflict exists between the right to erect a religious structure and the potential hazards of traffic or diminution in value, the latter must yield to the former."[39]  On the contrary, it is equally well-settled that a "municipality has an affirmative obligation to adopt less restrictive alternatives" in such circumstances.[40]

In sum, New York law requires that ZBAs and other land use boards exercise "'greater flexibility in evaluating an application for a religious use than an application for another use, and every effort to accommodate the religious use must be made'" (internal citations omitted).[41]

Moreover, as set forth above, GBC has been occupying the Property for over 150 years. Pastor French has confirmed that GBC, its predecessors, and tenants have been operating a school at the subject location for most of those 150 years, and in the current school building since the late 1950s. *See* French Affidavit.

The Applicant currently has no plans to erect new buildings, add on to the existing buildings, or demolish the existing buildings. The Applicant also currently has no plans to alter the existing parking area or street grid. In fact, other than a few cosmetic changes and the removal of non-Jewish religious symbols, the Applicant currently has no plans to modify the exterior at all. ABY wishes only to modify the interior to meet its educational needs.

The only change to the neighborhood will be the use of a school building and its accompanying sanctuaries by a Jewish entity, rather than a Christian one.

---

[38] *Id.*

[39] *Westchester Reform Temple*, 22 N.Y.2d at 497; *see also, e.g., Matter of Tabernacle of Victory Pentecostal Church v. Weiss*, 101 A.D.3d 738, 741 (2d Dep't 2012); *North Shore Hebrew Acad.*, 105 A.D.2d at 705; *Matter of Jewish Reconstructionist Synagogue of the North Shore*, 41 A.D.2d 537, 538 (2d Dep't 1973).

[40] *North Shore Hebrew Acad.*, 105 A.D.2d at 706.

[41] *St. Thomas Malankara Orthodox Church v. Board of Appeals , Town of Hempstead*, 23 A.D.3d 666, 804 N.Y.S.2d 801 (2005).

(2) *"whether the benefit sought by the applicant can be achieved by some method, feasible for the applicant to pursue, other than an area variance":*

The only way to comply with the Zoning Code is to convince the Rockland County Legislature to take ownership of one of the roads surrounding the GBC campus, and then to convince the Town of Clarkstown to designate that road as a "major or secondary road".

(3) *"whether the requested area variance is substantial":*

Whether a requested variance is "substantial" is more than simple arithmetic. It requires an understanding of the general area and of the existing conditions. *See,* 2 New York Zoning Law and Practice, § 29:15.

There will be no physical or usage changes of substance. The existing physical structure was built to accommodate far greater usage than is proposed by ABY.

ABY's student population will be transported on eight school buses. Students are not permitted to drive to school. There are approximately 75 faculty and staff members, about 35 of whom are on site at any one time. The existing parking area has over 100 parking spaces.[42]

Some people, including the Superintendent of the Nanuet UFSD, have expressed concern about ABY's impact on Church Street traffic. Aside from the fact that the amount of additional traffic is minimal, the physical layout of the Property and the locations of the homes of the student body means that buses transporting students will most likely not need to use Church Street. Arriving buses will generally travel South on Main Street, turn left onto Orchard Street, then right onto Highview Avenue and right onto Center Street, a private road that serves as a driveway for the campus. To exit the campus, buses will proceed from Center Street, turn right onto Demarest Avenue, left onto Orchard Street, and right onto Main Street. A map showing these routes is attached hereto as Exhibit 7.

The Town of Clarkstown recently conducted a traffic study of the area in connection with its proposed rezoning of the area as a Transit Oriented Development. It specifically examined existing and anticipated (post-rezoning) traffic conditions at the Orchard Street/Main Street intersection.

---

[42] *See,* ABY's Narrative Summary accompanying the Building Permit Application, attached hereto as Exhibit 1.

The Town's study determined that the intersection currently operated at Levels of Service A, B or C for all time periods studied.[43]

That same study examined the 2030 "Build" condition, which assumed the introduction of hundreds of units of housing and dozens of additional commercial units. It found that the Orchard Street/Main Street intersection "would operate under similar operating conditions as without the Proposed Action."[44] Therefore, according to the Town's *own* study, the introduction of eight school buses and approximately 35 cars for faculty and staff will not adversely impact the Orchard Street/Main Street intersection. Further, ABY has continually stated its readiness to coordinate its schedule with that of Nanuet UFSD to avoid potential conflicts.

*(4) "whether the proposed variance will have an adverse effect or impact on the physical or environmental conditions in the neighborhood or district":*

As discussed above, the existing physical structure was built to accommodate the proposed use.

*(5) "whether the alleged difficulty was self-created":*

The difficulty results *solely* from the imposition of the restrictions enacted by Local Law No. 5 of 2016. In fact, the adoption of LL5 adversely impacts at least seven existing private schools in Clarkstown. It impairs their ability to expand and to sell their property.

Attached as Exhibit 8 is a map showing the locations of identifiable private and public schools in Clarkstown, and whether they are on a State or county major or secondary road.[45]

Of eleven identified private schools, seven are not located on eligible roads:

- Benim Scholastic Academy
- Reuben Gittleman Hebrew Day School
- Rockland Christian School
- St. Anthony School
- Blue Rock School
- New Square Girls' School.

---

[43] Draft Generic Environmental Impact Statement prepared for Town of Clarkstown Nanuet Transit Oriented Development Zoning, accepted by the Lead Agency October 9, 2018 (TOD DGEIS), p. 46, Table 24.

[44] TOD GEIS, p. 62.

[45] Schools were identified and located by this office using publicly available information, including web searches and the Clarkstown Official Map.

If LL5's restrictions were to be applied to public schools, then seventeen of the twenty identified public schools in Clarkstown would be on ineligible roads. While this may not have an immediate impact on the public schools, it would adversely affect them if any of these schools need to close as a result of continuing declining enrollments. These ineligible schools, if closed for more than one year, could not then be sold for school use. The future financial burden on the taxpayers could be extreme.

On balance, therefore, the requested variances are beneficial to both the applicant and the community. Moreover, denying the requested variance in a fashion that does not treat ABY on equal terms with all other applicants, and/or that substantially burdens ABY's religious exercise, would subject the Town to potential violations of RLUIPA for failing to comply with well-established federal law. *See, e.g., Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 138 F.Supp.3d 352 (S.D.N.Y. 2015);

## V.   <u>Relief Requested</u>

Accordingly, ABY seeks:

1. A determination by the ZBA that the Building Inspector erred in refusing to grant a building permit for the reasons stated above, and directing him to grant a building permit upon compliance with the requirements of the New York State Uniform Fire Safety and Building Code; or

2. In the alternative, an area variance from the requirements of Zoning Code § 290-20.I(7), allowing the use of the GBC Campus as a school and house of worship without having frontage on, and access to, a "state or county major or secondary road."

In pursuing this relief, ABY waives none of its legal positions and rights, including the right to seek redress under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc.

Dated: March 8, 2019
   New City, New York

_____
Ira M. Emanuel, P.C.
Attorney for Applicant

Cc: Yehduah L. Buchweitz, Weil Gotshal & Manges LLP (co-counsel to Applicant)
   David Yolkut, Weil Gotshal & Manges LLP (co-counsel to Applicant)
   Kaela Dahan, Weil, Gotshal & Manges LLP (co-counsel to Applicant)

[Building Permit Application

Found at Exhibit N]

[Building Inspector's Denial of ABY's Building Permit Application

Found at Exhibit P]

[Rockland County Political Party Facebook Post

Found at Exhibit O]

[Original CUPON GoFundMe Page

Found at Exhibit A]



# Petition against Grace Baptist Church becoming a school.



EXHIBIT 5

**4,774 have signed.** Let's get to 5,000!



**G A** started this petition to **Legislators of Nanuet** and 3 others

The potential sale of the Grace Baptist Church is raising great concern to Nanuet residents. The potential buyer plans on using the facilities to house over 300 students. With this sale brings increasing concerns regarding traffic on roads surrounding Highview Avenue and Church Street.  Adding an additional school will have a negative impact on the town and the Nanuet school district campus.  Leglislator's and town officials should consider rezoning the property to better serve the community.

**Start a petition of your own**
This petition starter stood up and took action. Will you do the same?
Start a petition

Start a petition of your own

This petition starter stood up and took action. Will you do the same?

## Updates

1. 3 months ago
   4,000 supporters

2. It's time to let the Attorney General know the facts!

   The Attorney General must approve the sale of the Grace Baptist Church In order for the sale to be final.  It is not too late!  Please send the Attorney General a brief description of your concerns regarding the discrepancy be...

   It's time to let the Attorney General know the facts!

   The Attorney General must approve the sale of the Grace Baptist Church In order for the sale to be final.  It is not too late!  Please send the Attorney General a brief description of your concerns regarding the discrepancy between the two appraisals of GBC, the financial history of the potential buyer and the safety concerns you have for our children in the 3 other schools that already exist on this street.

   Please click on the website below and complete the simple form provided.  Remember to include a brief description of your concerns in the comment section.  It will only take a few minutes to share your concerns.  Together we can share our concerns so that another school doesn't open in Nanuet.

https://ag.n̶v̶...̶s̶-comments-to-attorney-general



**G A**
3 months ago
3. 3 months ago
3,000 supporters

4. What's next to prevent the sale? Let's start a CUPON

Nanuet has become united in its efforts to ensure that the sale of the Grace Baptist Church is one that makes sense for the town, its residents, and their children's future....

What's next to prevent the sale? Let's start a CUPON

Nanuet has become united in its efforts to ensure that the sale of the Grace Baptist Church is one that makes sense for the town, its residents, and their children's future.

The establishment of the Greater Nanuet CUPON will spearhead any legal action needed to guarantee that goal, and also to respond to any future land-use and/or zoning concerns that may occur within our community.

Learn m̶... unite, create a CUPON and raise money to support the cause. Please click on the l̶i̶...̶ ̶a̶nd share it with others.

C̶... ̶uary. Stayed tuned for details.

...̶ ̶=̶greater-nanuet

**G A**
3 months ago
5. 3 months ago
1,000 supporters
6. 3 months ago
G A started this petition

## Reasons for signing

Privacy · Terms



**Lynn Meehan** · 3 months ago

The small hamlet of Nanuet cannot support the traffic of an additional school within 100 yards of an operational elementary school. The congestion on surrounding roads is already in need of remedy. While the GBC is grandfathered in to this zoning., a new property owner should not be grandfathered and the property should revert to residential zoning.

- 
- 19

.

Share

.

Tweet

.

Report

---



**Dawn Becker-Gallagher** · 3 months ago

I do not want this in my neighborhood. The traffic, the congestion....this will destroy Nanuet.

- 
- 12

.

Share

.

Tweet

.

Report

**View all reasons for signing**

Report a policy violation

## Complete your signature

Privacy · Terms

**4,771 have signed.** Let's get to 5,000!



**Carmel Reilly** signed this petition



**Liam Tracey** signed this petition



**Michael Clifford** signed this petition

| First name |
| Last name |
| Email |

Elizabeth, 07201
United States

| United States                    ▼ |

Elizabeth

| NJ    ▼ |

| 07201 |

☑ Display my name and comment on this petition

| Sign this petition |

By signing, you accept Change.org's <u>Terms of Service</u> and <u>Privacy Policy,</u> and agree to receive occasional emails about campaigns on Change.org. You can unsubscribe at any time.

| Sign this petition |

Privacy · Terms



Ateres Bais Yaakov Academy of Rockland - Vicinity Map

EXHIBIT 6



Ateres Bais Yaakov Academy of Rockland - Bus Route - AM

EXHIBIT 7



Ateres Bais Yaakov Academy of Rockland - Bus Route - PM

[Map of Schools in Clarkstown

Found at Exhibit E]