# EXHIBIT   EEE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
-----------------------------------------------------------x

In the Matter of the Application of
Grace Baptist Church of Nanuet
For Approval to Sell Real Property
Pursuant to Not-for-Profit Corporations Law
§§510-511 and Religious Corporations Law §12

-----------------------------------------------------------x

ORAL ARGUMENT REQUESTED

Index No. 030222/2020

**MEMORANDUM IN SUPPORT
OF ABY'S APPLICATION
FOR INTERVENTION AND A
STAY OF PROCEEDINGS**

Ateres Bais Yaakov Academy of Rockland ("ABY"), by and through its undersigned

counsel, respectfully moves to intervene pursuant to CPLR 1012 and 1013, as well as for an

order under CPLR 2201 to stay proceedings in the above-captioned matter concerning the Grace

Baptist Church of Nanuet's ("GBC") verified petition for approval of the sale of real property

located at 20 Demarest Avenue, 22 Demarest Avenue, 24 Demarest Avenue, 26 Demarest

Avenue, and 9 Highview Avenue, Nanuet, New York (the "Property") to the Town of

Clarkstown (the "Town").

## INTRODUCTION AND FACTUAL BACKGROUND

1.      ABY seeks a limited stay of these proceedings pending appeal of its Article 78

Petition, which alleges that the Town's discriminatory and unlawful conduct eviscerated ABY's

valid agreement to purchase the Property at issue.  As ABY sought to vindicate its rights through

the proper legal processes, the Town swooped in to purchase the Property and eliminate any chance

at due process to have ABY's case heard and seek appropriate relief.  While ABY is reluctant to

intervene in this matter in deference to GBC, it cannot look the other way given the Town's

manifestly unjust actions. Indeed, a stay ultimately will inure to the benefit of GBC because, as we explain below, ABY is prepared to pay more than the Town if only ABY can finally obtain the permits it lawfully applied for in the first place. In that event, moreover, GBC will have a new market of buyers instead of a cornered market that the Town created through its misuse of its zoning powers. At bottom, ABY merely asks this Court to delay the sale of the Property until its appeal is heard and decided by the Second Department.

2. ABY is a New York State chartered education corporation providing both secular and Orthodox Jewish religious instruction to girls in grades pre-K through 12 since 2000. *See* Aff. of Rabbi Aaron Fink, ¶ 3. Previously, ABY was located at 236 Cherry Lane in the Village of Airmont. ABY currently occupies temporary quarters in the Village of New Hempstead (the "New Hempstead Property"). *Id.* Those quarters are made up of two modular buildings. *Id.* ABY's permit to remain on the New Hempstead Property, having already been extended, expires at the conclusion of the 2019-20 school year, at which time the modular buildings must be removed. *Id.* The permits cannot be renewed, and ABY has put the New Hempstead Property up for sale.

3. On October 17, 2018, ABY entered into a contract with GBC to purchase the Property (except for the parsonage located at 20 Demarest Avenue). *Id.* ¶ 4. Upon entering into the contract with GBC, ABY applied to the Rockland Economic Assistance Corporation ("REAC")—which is administered by the Rockland County Industrial Development Agency ("IDA")—for permission to receive tax-exempt bonds. *Id.* ¶ 5. ABY had successfully navigated the IDA process in 2016, when it obtained $8 million in tax-exempt bonds to fund the construction of a school building on the New Hempstead Property, though ABY ultimately did not go through with the construction. *Id.* The REAC scheduled a public hearing for January 15, 2019, and, pending that hearing, voted to transfer that earlier approval to ABY's purchase of the Property. *Id.*

¶¶ 6, 8. ABY also secured a Letter of Intent from Investors Bank expressing the bank's interest in providing ABY financing of up to $5 million for the purchase of the Property. *Id.* ¶ 7.

4.      News of ABY's interest in the Property did not sit well with various vocal members of the Nanuet community, certain Clarkstown residents, and local political figures, who called ABY's move to Nanuet a "***hostile invasion***." *See* Aff. of Yehudah L. Buchweitz, ¶¶ 2-3 (Exs. 1-2).[1] While some residents carefully couched their objections in terms of "increased traffic" (an unsupported concern given ABY's size and its offer to work with the Town to alter its school hours), others barely contained their hostility, shouting at raucous public meetings "***go away, we don't want you, go back to Ramapo***."[2] GBC's pastor, Rev. William French, was also publicly criticized for agreeing to sell the Property to an Orthodox Jewish institution.

5.      As detailed below, ABY endured a firestorm of local opposition and discrimination from the moment news of its proposed purchase of the Property surfaced. For example, at a November 27, 2018 Town Board Meeting, Supervisor George Hoehmann stated that while "[t]he Town cannot interfere with a private property matter between two parties," the "Town will strongly enforce our zoning laws and our building code within the entire Town of Clarkstown." Ex. 3. Supervisor Hoehmann added that ABY's purchase would "NOT occur in the Town of Clarkstown without ALL approvals," and that in enforcing its zoning code, the Town would "**issue search warrants if necessary**" (emphasis added). *Id.* Public comments of Town residents at this same meeting included inappropriate questions about how ABY's dean, Rabbi Aaron Fink, was getting the money for the Property and rhetorical questions about what happens "[i]f this God-awful deal does go through." *Id.* There were also *ad hominem* statements about not wanting "Nanuet to turn

---

[1] All exhibit references herein are to the Buchweitz Affirmation.

[2] YWN (Yeshiva World News), *Clarkstown Residents Attack Rabbi Over School Project* (Nov. 29, 2018), https://www.youtube.com/watch?v=ZB6Qg9FGHO8, at 2:34.

into Ramapo," calls for the Town to "have worked harder" to purchase the Property.  *Id.*

6.      The local opposition also formed a citizens' group called "Citizens United to Protect Our Neighborhood," or "CUPON of Greater Nanuet" ("CUPON"), for the express purpose of preventing ABY from operating an Orthodox Jewish school in the Town.  CUPON is a local chapter of CUPON of Rockland, an organization notorious for its anti-Semitic agenda to prevent Orthodox Jews from moving into communities throughout Rockland County under the façade of "overdevelopment" and preserving the "character" of the community.

7.      On December 12, 2018, CUPON also started a "GoFundMe" campaign.  It has raised a total of $13,340 as of January 17, 2020.  Ex. 4.  CUPON's very purpose, as per its fundraising page, which it has since updated in an apparent attempt to whitewash its underlying mission, was and is to prevent ABY's purchase of the Property: "Nanuet has become united in its efforts to ensure that the sale of the Grace Baptist Church is one that makes sense for the town, its residents, and their children's future."  Ex. 4 to Ex. 7.  Indeed, upon its establishment, CUPON created a petition on Change.org entitled, "Petition against Grace Baptist Church becoming a school."  As of December 24, 2019, the petition has been signed by 4,823 people.  Ex. 5.

8.      On or about December 18, 2018 – amid this heated public opposition to the sale of the Property to ABY – the REAC canceled the public hearing.  IDA's executive director explained that holding a hearing before ABY had received preliminary permits or approvals from the Town would be "putting the cart before the horse."[3]  While such meetings are typically sparsely attended, the REAC knew that ABY's hearing was likely to attract hundreds.  *Id.*

9.      Despite the hostile climate, ABY persisted.   On December 26, 2018, in

---

[3] Robert Brum, *Nanuet church $5M sale: Hearing shelved amid lack of approvals*, ROCKLAND/WESTCHESTER JOURNAL NEWS (Dec. 18, 2018), https://www.lohud.com/story/news/local/rockland/nanuet/2018/12/18/nanuet-church-sale-hearing-shelved/2337405002.

conformance with the procedures of the Town's Building Department, ABY submitted an application to the Building Department for a permit to make some needed improvements to the buildings (the "Building Permit Application").

10.     On January 10, 2019, CUPON held a meeting at a school operated by the Nanuet Union Free School District, at which Supervisor Hoehmann both attended and offered closing remarks.  At this meeting, CUPON's counsel engaged in an in-depth training session advising CUPON members and Town representatives – including Supervisor Hoehmann – on how to appear "facially neutral"—in other words, how to mask the organization's underlying discriminatory motives.  Counsel for CUPON exhorted its members, for example, that they had "adversaries," not "enemies," and that they should not operate on the basis of "hate."  But, he told the crowd, "of you can't get that hate out of your heart, then please keep your mouth shut."[4]  On information and belief, counsel advised the attendees to focus their complaints on innocuous topics like traffic and avoid overt complaints that it was Orthodox Jews that wanted to purchase and operate the Property.

11.     The next day, in a post on its official Facebook page, the Rockland County committee of a major political party summarized the CUPON meeting as a "respectful and professional 2 hour presentation that focused on how the community can protect themselves from a ***hostile invasion***."  *See* Ex. 1 (emphasis added).  As if that xenophobic smear needed elaboration, a commenter doubled down on the hatred:

> Let's all be honest and verbal about the term **"hostile invasion."** (Which is **maybe a bit harsh, but not by alot**.) Can we all say this out loud together? The residents of Nanuet and Orangetown do not want to see our towns, ones we pay high taxes to live in for wonderful schools, parks, libraries, etc, ones that we have all paid for homes in one of the costliest places in the nation, **over come with Yeshivas**, and the private homes that are not taxed because they are all yeshivas, not responsible for taxes, but we pay for their bussing

---

[4] Clarkstown – What They Don't Want You to Know, *CUPON's Attorney Steven Mogel Discusses Possible Litigation*, FACEBOOK (Jan. 10, 2019), https://www.facebook.com/CTWTDWYTK/videos/2222326208086174, at 3:10.

and more, **for Hasidics to infiltrate our local governments** at the town, county levels, as well as becoming involved with our local public school districts, and seeing what we have all worked so hard for, continue to do so, **go down the drain to the tune of the raping of our school budgets** and the large decrease in property values, as we have all seen happen in Ramapo. The people that **suffer when the hasidics come into our community** are students and all of their extra curricular programs, not to mention the fact that the teachers salaries go down considerably, so we wont get the best anymore, but also the folks that look forward to retiring here with equity in their homes, as opposed to owing money at retirement time due to a drastic decrease in property values. So there you go. . . . **Nanuet and Orangetown residents do not want Hasidic communities here.** I'm clearly not speaking for all, but I am sure a large majority.

Ex. 2 (emphasis added). The post and response remain on the Facebook page.

12.    That very same day, the Town's Building Inspector denied ABY's Building Permit Application (the "Denial Letter"). *See* Ex. 6. He summarily concluded that because the Building Department had no records of a New York State Fire Inspection on the Property since 1990, GBC's school use at the Property had ceased under Clarkstown Town Code section 290-29(C). *Id.* And, because the Building Inspector interpreted Clarkstown Town Code section 290-20.I(7) to create new use requirements – a determination that is wholly erroneous and contrary to applicable law – he concluded that "[a] variance from the [ZBA] would be required for the use of the school of general instruction." *Id.* However, the record was clear that GBC had operated a school on the Property continuously since 1990. *See* Ex. 1 to Ex. 7. Notably, the Town has effectively conceded its unlawful misapplication of the law, evidenced by its subsequent attempt (and failure) to amend its zoning code to align with its desired misapplication.

13.    Specifically, in his Denial Letter, the Building Inspector stated:

A variance from the Clarkstown Zoning Board of Appeals would be required for the use of the school of general instruction. Our records show the last required NY State Fire Safety inspection for a school of general instruction on this property was conducted on December 11, 1990. Clarkstown Town Code section 290-29C (non-conforming use) "Discontinuance of use. If active and continuous operations are not carried

on with respect to a nonconforming use during a continuous period of one year, the building or land where such nonconforming use previously existed shall thereafter be occupied and used only for a conforming use." Clarkstown Town Code section 290-20I(7) additional regulations, All uses other than single family residences shall have minimum frontage of 100 feet and access to either a state or county major or secondary road as classified on the Town Official Map.

Ex. 6.

14.     Following the denial of its Building Permit Application, ABY submitted a timely appeal to the Clarkstown Zoning Board of Appeals (the "ZBA") on March 8, 2019.  *See* Ex. 7. ABY's appeal contended that the Building Inspector's application of its zoning code to ABY was wholly improper and contrary to applicable law.  *Id.*  ABY alternatively sought an area variance from the requirements of Section 290-20I(7), allowing the use of the Property as a school and house of worship without having frontage on, and access to, a "a state or county major or secondary road."  *Id.*  ABY made clear that it had no plans to erect new buildings, add on to the existing buildings, or demolish the existing buildings.  *Id.*  It also had no plans to alter the existing parking area or street grid. ABY explained that other than a few cosmetic changes and the removal of non-Jewish religious symbols, it wished only to modify the interior to meet its educational needs.  *Id.* The **only** change to the neighborhood would be the use of a school building and its accompanying sanctuaries by a Jewish entity, rather than a Christian one.  *Id.*

15.     Mere days after ABY's appeal, it faced additional discriminatory backlash.  Certain residents – who, upon information and belief, were CUPON members – took to social media to voice their hatred:

- "***They are nothing but parasites!*** They don't want to follow the rules, ***they are disgusting!*** Unfortunately what [] said was pretty close to what will happen! They will hire lawyers for the ***cult*** and tirelessly drag it through the courts until they get the desired results! #monseycowboys #parasites #hopetheyallgetmeasles." (emphasis added)

- "You better before the[y] ***infest*** Pearl River! Good luck!" (emphasis added)

- "I was waiting for this. What Rockland County needs is an awesome lawyer to argue before the Supreme Court that RLUIPA is unconstitutional. And we need that lawyer now."

- "Of course they are appealing. Of course they blame the Nanuet community. Of course they hired RLUIPA lawyers. Nanuet welcome to the game, you will be labeled anti-Semitic. You will all be harassed and intimidated on social media, at your work place, and at public forums . . . ."

Ex. 8 (emphasis added).

16.     On March 19, 2019, even though ABY's appeal included all elements and documents required by the Town Code and the ZBA's own published rules, the ZBA inexplicably declined to *even schedule a hearing*. Instead, it placed on ABY the additional burden of submitting a survey of the Property (a requirement that was unnecessary, but with which ABY complied at great expense). *See* Exs. 9-10.

17.     As a direct result of the Building Inspector's denial of ABY's Building Permit Application and the ZBA's undue delay in scheduling a hearing, Investors Bank revoked its Letter of Intent to provide ABY with financing to purchase the Property. *See* Fink Aff. ¶ 12. ABY was unable to obtain alternative means of financing the acquisition of the Property because lenders feared that ABY would not be able to overcome the Town's manifest hostility and clear interest in preventing an Orthodox-Jewish school from "invading" their Town. As a result, ABY was unable to close by the time of the essence date set by GBC and the contract was terminated.[5]

18.     On May 16, 2019, GBC filed a letter with the ZBA "revok[ing] any consent to land use applications" relating to the Property. *See* Ex. 12. That same day, Supervisor Hoehmann

---

[5] On May 16, 2019, ABY received a letter from GBC terminating the contract. *See* Fink Aff. ¶ 13; *see also* Ex. 11. Contrary to the Petition, at no point did ABY seek to terminate or cancel the contract with GBC, neither on its own accord or through its counsel. *See* Fink Aff. ¶ 13 ("At no point did I cancel the contract, or direct or authorize any agent of mine or ABY's to cancel the contract").

publicly stated that "the [T]own has interest in the property and will evaluate its options in the coming weeks."[6]

19.     On June 4, 2019, Supervisor Hoehmann left no doubt about the Town's intentions: "I am excited about the prospects for the acquisition of Grace Baptist Church. . . . All options are on the table and I look forward to the involvement of the school district and potentially the private sector to create something unique for the benefit of all residents."[7]

20.     Also on June 6, 2019, ABY filed a letter with the ZBA objecting to GBC's withdrawal of consent and urging the ZBA to schedule a hearing. Ex. 13. ABY articulated in its letter that the Town's interference was the direct cause of ABY losing its financing resources. *Id.* ABY attached a special memorandum of law concerning religious discrimination from its *pro bono* attorneys, which focused upon how the Building Inspector's denial of a building permit infringed upon ABY's religious liberties, was rife with invidious discrimination, and ran contrary to Second Department law requiring municipalities and zoning authorities to reasonably accommodate the free exercise of religion, which is inherently beneficial.[8]

---

[6] Robert Brum, *Nanuet: Grace Baptist Church terminates sale to Ateres Bais Yaacov*, ROCKLAND/WESTCHESTER JOURNAL NEWS (May 16, 2019), https://www.lohud.com/story/news/local/rockland/nanuet/2019/05/16/grace-baptist-church-terminates-sale-yeshiva-nanuet/3665127002.

[7] Robert Brum, *Nanuet: Town, school district exploring Grace Baptist Church purchase*, ROCKLAND/WESTCHESTER JOURNAL NEWS (June 4, 2019), https://www.lohud.com/story/news/local/rockland/nanuet/2019/06/04/nanuet-town-school-district-exploring-grace-baptist-church-purchase/1342961001.

[8] *Id.*; *see, e.g.*, *East End Eruv Ass'n, Inc. v. Town of Southampton*, No. 14-21124, 2015 WL 4160461, at *6 (N.Y. Sup. Ct., Suffolk Cty. June 30, 2015) (concluding that "greater flexibility is required in evaluating an application for a religious use" and that zoning boards have "an affirmative duty . . . to suggest measures to accommodate the planned religious use (citation omitted)); *Smith v. Cmty. Bd. No. 14*, 128 Misc. 2d 944, 949 (N.Y. Sup. Ct., Queens Cty. 1985), *aff'd*, 133 A.D.2d 79 (2d Dep't 1987) (concluding that "New York courts have long recognized the principle of accommodation" and "have repeatedly held that by their very nature religious institutions are beneficial to the public welfare and consequently proposed religious uses should be accommodated"); *see also Westchester Reform Temple v. Brown*, 22 N.Y.2d 488, 492-97 (1968) (reversing Planning Commission's rejection of synagogue's expansion plan, concluding that "under the guise of reasonable regulation, [the Planning Commission], has unconstitutionally abridged religious freedom"); *St. Thomas Malankara Orthodox Church, Inc., Long Island v. Bd. of Appeals, Town of Hempstead*, 23 A.D.3d 666, 666–67 (2d Dep't 2005) (zoning board's denial of church's application to waive certain off-street parking requirements was "arbitrary, capricious and an abuse of discretion and was properly annulled" because board was required to recommend other alternatives to "accommodate proposed

FILED: ROCKLAND COUNTY CLERK 01/17/2020 03:33 PM
NYSCEF DOC. NO. ...

INDEX NO. 030222/2020

RECEIVED NYSCEF: 01/17/2020

Case 7:20-cv-01399-NSR   Document 1-58   Filed 02/18/20   Page 11 of 21

21.     ABY emphasized that the ZBA was still lawfully obligated to continue to hear ABY's appeal because declaratory relief on the misapplication of Town Code sections 290-29(C) and 290-20.I(7) and/or a grant of an area variance would necessarily bind those interested in purchasing the Property in the future (whether that be ABY or otherwise) and would also affect other properties to which these sections of the Town Code have been or will be similarly misapplied.  Ex. 13.  ABY noted that this was especially true because the Town's own actions conveniently left *itself* as one of the few, if not the only, viable purchasers of the Property.  *Id.*

22.     ABY further contended that its appeal and application for an area variance was not moot because the nature of the action is capable of repetition yet evading review.  *Id.*  ABY argued that public policy should not incentivize towns to engage in delay and xenophobic tactics.  *Id.*  Were it otherwise, towns and their zoning officials could do exactly what Clarkstown has done here: delay proceedings, misapply their zoning ordinances, create uncertainty in the marketplace, and cause interested parties to lose their prospective or current property interests *before* exhausting their respective zoning appeals.  *Id.*

23.     ABY also emphasized that – as guaranteed by the First Amendment of the U.S. Constitution and Article I, Section 3 of the New York State Constitution – the ZBA was affirmatively required to reasonably accommodate ABY's free exercise rights through its intended

---

religious use while mitigating adverse effects on surrounding community to the greatest extent possible"); *Richmond v. City of New Rochelle Bd. of Appeals on Zoning*, 24 A.D.3d 782, 782–83 (2d Dep't 2005) (affirming grant of area variance, and holding that zoning board must make "every effort to accommodate [a] religious use" ); *Harrison Orthodox Minyan, Inc. v. Town Bd. of Harrison*, 159 A.D.2d 572, 572–73 (2d Dep't 1990) (a town board's unqualified denial of a special exception use permit was "arbitrary, capricious, and an abuse of discretion" where it did not make any attempts to accommodate religious use); *Jewish Reconstructionist Synagogue of the N. Shore, Inc. v. Levitan*, 41 A.D.2d 537, 538 (2d Dep't 1973), *aff'd*, 34 N.Y.2d 827 (1974) ("facilities for religious or educational uses are, by their very nature, clearly in furtherance of the public morals and general welfare; that different considerations apply to them; and that considerations which might properly control commercial structures may not control or even apply to religious structures" (citations and internal quotations omitted)).

operation of a Jewish school on the Property. *Id.* ABY also reminded the ZBA that if it places

ABY on unequal terms with other applicants and/or substantially burdens ABY's religious

exercise, it would subject the Town to potential violations of both the First Amendment and the

Religious Land Use and Institutionalized Persons Act ("RLUIPA"). *Id.*

24.     All the while, the anti-Semitic rants from local residents and CUPON members

continued unabated. For example, one resident posted on Facebook:

> "We have laws and those laws protect the people from the ridiculous
> situation they have created!!!! Take a ride or research how many times these
> so called religious have been caught doing crimes or violating laws!!!!
> About time this happened and the law abiding citizens will not stand for any
> false lawsuit or pressure to have a ***religious phony school!!! Go back to
> Europe or whatever country your from!!!*** This is Native American land
> and the disrespect you see these stereotypes not just Hasidic but others
> coming here to take advantage its ridiculous and unacceptable!!!!"

Ex. 22 (emphasis added).

25.     On June 7, 2019, notwithstanding the Town's affirmative duty to reasonably

accommodate religious land use, Supervisor Hoehmann told the local press that "[w]e will

continue to vigorously enforce our building and zoning codes irrespective of the background of

the owner," and that ABY "was treated just like any other applicant."[9]

26.     On June 24, 2019, counsel for ABY submitted another letter to the ZBA addressing

the ZBA's continuing efforts to inordinately delay ABY's appeal, and presciently noting that such

tactics would serve to allow a government entity to purchase the Property at a discount. Ex. 14.

ABY's letter reminded the ZBA that undue delay, *in and of itself*, can evince invidious

---

[9] Robert Brum, *Jewish academy alleges discrimination by Clarkstown in Grace Baptist application*, ROCKLAND/WESTCHESTER JOURNAL NEWS (June 7, 2019), https://www.lohud.com/story/news/local/rockland/nanuet/2019/06/07/jewish-school-alleges-discrimination-vs-clarkstown-grace-baptist-application/1370413001)

discrimination.[10]  Counsel urged the ZBA to cease its delay, and review and respond to ABY's submission as expeditiously as possible.

27.     On July 9, 2019, ABY received a letter from Wilson Elser Moskowitz Edelman & Decker LLP, the Town's outside counsel, indicating that the ZBA "will not entertain any appeal by [ABY] with respect to the [Property]," purportedly because "the contract for the sale of the property to [ABY] has been terminated and [ABY's] right to make any application to the Town concerning the property has been revoked."  Ex. 15.  The Town took the legally unsupportable position that ABY's appeal would *not even be heard*, let alone voted upon by the ZBA.

28.     On August 8, 2019, ABY filed a Verified Article 78 Petition and Declaratory Judgment Complaint against the Town, the Building Department, and the ZBA in the Supreme Court of New York, County of Rockland (the "Article 78 Proceeding").  Ex. 16.  In the Article 78 Proceeding, ABY asked the court for an order (1) compelling the ZBA to hear ABY's appeal of the Building Department's erroneous decision denying ABY's request for a building permit and, in the alternative, its application for an area variance; (2) directing the ZBA, upon that hearing, to find that a variance from Town Code § 290-20.I(7) is not required for use of a "school of general instruction" or, in the alternative, directing the ZBA to grant ABY's application for an area variance; (3) alternatively, annulling and setting aside the Building Department's determination as contrary to law, arbitrary and capricious, invalid as applied to ABY, and in violation of ABY's constitutional right to the free exercise of their religion; and (4) compelling the Town to produce all discloseable records responsive to ABY's Freedom of Information Law ("FOIL") requests concerning the Town's interest in the Property.  *Id.*

---

[10] *Id.*; *see also, e.g.*, *Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 503 (S.D.N.Y. 2010), *aff'd*, 694 F.3d 208 (2d Cir. 2012); *Westchester Day Sch. v. Vill. of Mamaroneck*, 417 F. Supp. 2d 477, 549 (S.D.N.Y. 2006), *aff'd*, 504 F.3d 338 (2d Cir. 2007); *Israelite Church of God in Jesus Christ, Inc. v. City of Hackensack*, No. 11-CV-5960 SRC, 2012 WL 3284054, at *2 (D.N.J. Aug. 10, 2012).

29.     On September 6, 2019, the Town moved to dismiss ABY's Article 78 Proceeding.[11]

30.     On October 3, 2019, the Town, culminated its campaign to prevent ABY from purchasing and operating an Orthodox-Jewish school on the Property.  Supervisor Hoehmann stood in front of GBC and announced that the Town was purchasing the Property for itself – notably, and cynically, for the very same "commercial" purpose the Town and its constituents claimed they did not want ABY to purchase the Property.[12]  The Town apparently seeks to hold itself to a different standard, whereby a commercial community center and meeting facility with a large parking lot is a "permitted use" that is "consistent with" the residential nature of the neighborhood, but a religious school is not.

31.     On November 5, 2019, ABY alerted the Court to the blatant inconsistencies between the Town's planned purchase of the Property, and its litigation position.  Ex. 17.

32.     On November 6, 2019, in advance of the Town Board meeting scheduled for November 7, 2019 to approve the purchase of the Property, counsel for ABY sent the Town's outside counsel a letter putting the Town on notice that ABY was prepared to take all appropriate measures to vindicate its constitutional and federal rights should the Town vote to authorize the purchase of the Property.  Ex. 18.  To date, ABY has received no response to that letter.

33.     On November 7, 2019, the Town Board authorized the purchase of the Property. In doing so, however, the Town made a telling concession.[13]  In an amendment to its SEQRA

---

[11] Affirmation in Support of Motion to Dismiss, No. 034514/2019 (N.Y. Sup. Ct., Rockland Cty., Sep. 6, 2019) (ECF No. 29).

[12] Robert Brum, *Grace Baptist Church purchase part of Clarkstown's bid to revitalize Nanuet's center*, ROCKLAND/WESTCHESTER          JOURNAL          NEWS          (Oct.          3,          2019), https://www.lohud.com/story/news/local/rockland/nanuet/2019/10/03/grace-baptist-church-purchase-part-plan-revitalize-nanuets-center/3846664002/.

[13] Affirmation in Response to Petitioner's Notice of Supplemental Authority, No. 034514/2019 (N.Y. Sup. Ct., Rockland Cty. Nov. 8, 2019) (ECF No. 44).

application, the Town no longer represente44.d that the proposed use for the Property complies with the Town Code.  Rather, that the Town now contends that a municipality need not comply with its own zoning rules, even if those same rules can obstruct and eventually scupper a private transaction for the same land.

34.     On December 23, 2019, the Supreme Court issued its opinion in the Article 78 Proceeding.  Ex. 19.  The court ordered the Town to comply with ABY's FOIL request, but dismissed ABY's other causes of action in the Article 78 Petition for lack of standing.  *Id.*  ABY has timely filed notice of its appeal from the adverse aspects of the Court's order.  Ex. 20.  ABY is also prepared to expedite perfecting its appeal rather than wait the entire six-month permitted period in order to minimize any prejudice to GBC.

35.     On January 14, 2019, counsel for ABY again informed the Town of the legal consequences of purchasing the Property, noting that ABY intends to seek redress for the Town's and its officials' violations in federal court, including compensatory and, punitive damages and attorneys' fees.  Ex. 21.

## ARGUMENT

### A.  This Court Should Grant Intervention As of Right.

36.     Under CPLR 1012(a)(3), a party "shall be permitted to intervene . . . when the action involves the disposition or distribution of, or the title or a claim for damages for injury to, property and the [party] may be affected adversely by the judgment."

37.     This Court currently has before it GBC's application for approval for the sale of the Property to the Town.  This is, of course, the very same Property at the heart of ABY's pending litigation against the Town for its discriminatory conduct that led to the loss of ABY's contract for the Property.  Given ABY's pending litigation against the Town, as well as the likely irreversible

destruction of ABY's continuing interest in the Property should this Court approve the sale, ABY is statutorily entitled to intervene as of right.

38.     ABY's requested intervention is timely.  As the Second Department has held, "intervention may occur at any time, provided that it does not unduly delay the action or prejudice existing parties." *Halstead v. Dolphy*, 70 A.D.3d 639, 640 (2d Dep't 2010).  Here, GBC filed its Petition on January 10, 2020, but as of January 14, 2020, working copies of the Petition had not been delivered to this Court.  ABY has moved expeditiously, and seeks expedited treatment of its intervention request by order to show cause.  Under these unique circumstances, ABY's intervention will not unduly delay this proceeding.  *See, e.g.*, *id.* (reversing trial court's denial of motion to intervene, holding that intervention was timely even though sought more than four years after commencement of the action); *Jeffer v. Jeffer*, No. 17649/04, 2010 WL 3652981, at *3 (Sup. Ct., Kings Cty., Sept. 21, 2010) (motion to intervene made ten months after Amended Complaint filed considered "timely," even though intervenors had been aware of action for at least 5 years).

39.     Accordingly, ABY should be permitted to intervene in this action as of right, pursuant to CPLR 1012, to seek to prevent the Town from capitalizing on its discriminatory and unlawful methods at ABY's expense.

**B. The Court Should Also Grant Permissive Intervention.**

40.     Alternatively, this Court should grant permissive intervention to ABY under  CPLR 1013, which provides that "[u]pon timely motion, any person may be permitted to intervene in any action when a statute of the state confers a right to intervene in the discretion of the court, or when the person's claim or defense and the main action have a common question of law or fact.  In exercising its discretion the court shall consider whether the intervention will unduly delay the determination of the action or prejudice the substantial rights of any party."

41.     GBC's Petition and the New York Attorney General's Affirmation both reference ABY and necessarily recognize it as an interested party to the sale at issue.  *See* Petition ¶ 23, ECF No. 1 ("There was a previous application to the Attorney General and the Court for approval to sell 22-26 Demarest Ave. and 9 Highview Ave. to Ateres Bais Yaakov, an Educated Corporation. . . ."); Affirmation of Gary Brown ¶¶ 5-14, ECF No. 17 (bringing to this Court's attention ABY's ongoing legal dispute with the Town concerning the Property).

42.     As set forth in detail above, ABY has consistently shown its continued interest in the Property.  Even following the Town's unlawful actions, ABY continues to have a very real and substantial interest in whether this Court approves this sale to the Town.  *See, e.g.*, *Matter of Cavages, Inc. v. Ketter*, 56 A.D.2d 730, 731 (4th Dep't 1977) ("A third party will generally be permitted to intervene where he has an actual and ultimate interest in the result of the litigation.").

43.     While ABY vigorously disputes the Supreme Court's threshold determination that ABY lacks standing, which will be the subject of ABY's forthcoming appeal to the Second Department, intervention in this matter is *not* contingent on its standing to proceed with its Article 78 Proceeding.  Indeed, "[t]he bases for permissive intervention are broader than they are for standing to originate the proceeding." *Ball v. Town of Ballston*, 173 A.D.3d 1304, 1306 (3d Dep't 2019) (finding that even though developers had no standing to bring an action against the town, their property interests would have been impacted had the petitioner succeeded, and were therefore an "interested person" for purposes of intervening).  Here, for all of the reasons set forth *supra*, ABY is an "interested person" with a keen and continuing interest in the Property.

44.     Moreover, ABY's intervention will not unduly delay this action or prejudice any party's rights given that the underlying question in ABY's pending appeal goes to the heart of this Court's review: whether the Town is in a position to enter into this transaction at all.

45.     For the foregoing reasons, ABY should be permitted to intervene in this matter as a discretionary matter under CPLR § 1013.

### C. This Court Should Grant a Stay of Proceedings Pending ABY's Appeal of Counts One – Three of Its Article 78 Proceeding.

46.     Pursuant to CPLR § 2201, "[e]xcept where otherwise prescribed by law, the court in which an action is pending may grant a stay of proceedings in a proper case, upon such terms as may be just." Indeed, "a court has broad discretion to grant a stay in order to avoid the risk of inconsistent adjudications, application of proof and potential waste of judicial resources." *In re Tenenbaum*, 81 A.D.3d 738, 739 (2d Dep't 2011) (quoting *Zonghetti v. Jeromack*, 150 A.D.2d 561, 563 (2d Dep't 1989). Grounds for ordering a stay include "further[ing] the interest of justice by preventing inequitable results and promot[ing] orderly procedure by furthering the goals of comity and uniformity." *Concord Assoc., L.P. v. EPT Concord, LLC*, 101 A.D.3d 1574, 1575 (3d Dep't 2012) (citing *Nat'l Mgt. Corp. v. Adolfi*, 277 A.D.2d 553, 555 (2d Dep't 2000)).

47.     Moreover, "[w]here determination of a related, pending proceeding may dispose of or limit issues involved in a pending action, a stay is proper." *McCarthy v. Kerrigan*, 59 Misc.3d 872, 885 (Sup. Ct., Lawrence County 2018) (quoting *SSA Holdings, LLC v. Kaplan*, 120 A.D.3d 1111, 1111 (1st Dep't 2014), *aff'd as modified*, 178 A.D.3d 1342 (3d Dep't 2019). In the property context, a stay is warranted where a pending, simultaneous action would necessarily affect rights associated with the property at issue. *See, e.g.*, *Swartz v. Swartz*, 145 A.D.3d 818, 830 (2d Dep't 2016) (upholding Supreme Court's stay of an accounting malpractice action where a determination in a separately pending matrimonial action would affect plaintiff's rights in the assets at issue).

48.     Here, the Second Department's determination of ABY's appeal may significantly alter the analysis of whether the Town's contract to purchase the Property is "fair and reasonable" pursuant to N.Y. NPCL § 511(d). In evaluating a transaction under N.Y. NPCL § 511, numerous

New York courts have determined the fairness and reasonability of a purchase price based on how it compares to other offers. *See, e.g.*, *In re HHH Choices Health Plan, LLC*, 554 B.R. 697, 703 (Bankr. S.D.N.Y. 2016) ("[T]he ordinary determination of what is fair and equitable under the state court decisions is fair market value and *best price*. Whether a deal is fair and equitable to a corporation has to include consideration of *how it compares to other offers*[.]") (emphasis added); *In re Sculpture Ctr., Inc.*, No. 113773/01, 2001 WL 1568739, at *2 (Sup. Ct., N.Y. Cty. 2001) ("A building's fair market value, for NPCL §511 purposes, is calculated at the time of sale and *fundamentally is predicated on what a willing buyer is prepared to pay to a willing seller who is not under a compulsion to sell*") (emphasis added).

49.     Here, ABY has submitted sworn affidavits attesting that it is ready, willing, and able to reengage with GBC to purchase the Property (including the parsonage located at 20 Demarest Avenue) for its appraised value – which, notably, is higher than the Town's current offer price – if only the Town would stand down from its discriminatory conduct, and provide the appropriate permits, as it was legally required to do a year ago. *See* Fink Aff. ¶ 16 ("ABY is ready, willing, and able to purchase the entire property at its appraised value of $4.65 million).

50.     ABY has been working closely with David Teiler, a senior underwriter at Alliance Private Capital, a commercial real estate mortgage brokerage firm based in Brooklyn, NY, that provides brokerage services to the real estate industry, including not-for-profits. *See* Aff. of David Teiler ¶ 1. Mr. Teiler has confirmed that "[i]n order that ABY be able to [purchase the property], and subject to ABY obtaining the necessary building permits from the Town, Alliance Private Capital is ready, willing, and able to arrange bank financing to ABY to fund the acquisition of the Property." *Id.* ¶ 5. Mr. Teiler is "aware of sufficient financing sources that would permit ABY to purchase the Property at the appraisal value." *Id.*

51.     This Court is charged with determining, for purposes of NPCL §511, whether the Town's planned purchase of the Property is fair and reasonable. Critical to this inquiry is the availability to GBC of a higher offer, as well as the Town's unlawful conduct in the lead-up to this transaction. ABY should be permitted to intervene for the purpose of bringing both of these points to the Court's attention.

52.     But even more critically, a limited stay of these proceedings pending the outcome of ABY's appeal to the Second Department is appropriate. Should the Second Department reverse Supreme Court's erroneous decision as to ABY's standing to pursue three counts of its Article 78 Proceeding, the Town will be foreclosed from its current efforts to usurp the Property. In these unique circumstances – where the Town has misused its local laws and sought to insulate itself from any legal challenge thereto – a stay is warranted to allow ABY to vindicate its original interest in the Property.

53.     Finally, a limited stay of these proceedings would also help protect GBC's interest. NPCL §510 "is designed to protect the members of a not-for-profit corporation from unwise bargains and the wrongful use of the corporation's property, and to assure both the public's interest in the proper distribution of the corporation's assets and the satisfaction of the officers' and directors' fiduciary obligation." McKinney's NY-NPCL § 510. By granting this stay, the Court will authorize the appropriate time needed to, through determination of ABY's Article 78 Petition, ensure that the Property has been properly sold, at an appropriate price, and to a buyer that has not engaged in unlawful means to position itself for such purchase. Indeed, without the improper obstacles put in place by the Town, there could be a far larger pool of buyers for this property, which will only inure to the benefit of GBC. Thus, a limited stay would fulfill the underlying intent behind NPCL §510, and protect GBC from a sale process that is contrary to its best interests.

## **CONCLUSION**

54.     Based on the facts as stated above, ABY respectfully requests that the Court stay this proceeding until the Second Department has heard and determined ABY's appeal from Supreme Court's Order of December 24, 2019.


Dated: January 17, 2020

Respectfully submitted,

/s/ *Yehudah L. Buchweitz*
Yehudah L. Buchweitz
Robert G. Sugarman
David Yolkut
Kaela Dahan
Michael E. Nagelberg
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
yehudah.buchweitz@weil.com
robert.sugarman@weil.com
david.yolkut@weil.com
kaela.dahan@weil.com
michael.nagelberg@weil.com

*Counsel for ABY*

IRA M. EMANUEL, P.C.
Ira M. Emanuel
Amy Mele
4 Laurel Road
New City, NY 10956
(845) 634-4141
ira@emanuellaw.com
amy@amymelelaw.com

*Of Counsel*