UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ATERES BAIS YAAKOV ACADEMY OF
ROCKLAND,

                                        Plaintiff,

        -against-

TOWN OF CLARKSTOWN, GEORGE
HOEHMANN, CUPON INC., and CITIZENS
UNITED TO PROTECT OUR NEIGHBORHOODS
OF GREATER NANUET, INC.,

                                        Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 07/12/2022

No. 20 Civ. 1399 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiff Ateres Bais Yaakov Academy of Rockland ("ABY"), a New York State chartered education corporation for both secular and Orthodox Jewish girls in grades pre-K through 12, brings this action under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000c, *et seq.*, 42 U.S.C. §§ 1983 and 1985, and the New York State Constitution and common law, against Defendants Town of Clarkstown (the "Town"); George Hoehmann, the Town's Supervisor (collectively, the "Town Defendants"); a citizens' group called "Citizens United to Protect Our Neighborhoods, Inc.," and one of its chapters called "Citizens United to Protect Our Neighborhoods, of Greater Nanuet, Inc." [hereinafter collectively, "CUPON"] (all collectively, "Defendants"). (Am. Compl. ¶ 2, ECF No. 30.)

ABY alleges that Defendants—motivated by religious discrimination against Orthodox Jews—prevented it from closing the purchase of a building (the "Property") owned by Grace Baptist Church ("GBC"), ultimately interfering with and depriving ABY of its right to freely exercise religion. (*Id.* ¶¶ 1–3.) Specifically, ABY alleges that Defendants conspired to prevent ABY from executing its obligations under the contract with GBC by (i) misapplying local zoning

law to obstruct ABY's attempt to secure financing for its purchase of the Property, and (ii) refusing to hear ABY's appeal of such misapplication. (*Id.*)

Presently pending before the Court are Defendants' motions to dismiss ABY's Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and (6). (ECF Nos. 42 and 45.) For the following reasons, the Court GRANTS Defendants' motions to dismiss.

## BACKGROUND

### I.   Factual Background

The following facts are derived from the Amended Complaint and the documents referenced therein and are taken as true and constructed in the light most favorable to ABY for the purposes of this motion.[1]

#### A.      ABY Enters into a Contract to Purchase the Property from GBC

ABY is a New York State chartered education corporation providing both secular and Orthodox Jewish religious instruction to girls in grades pre-K through 12 since 2000. (Am. Compl. ¶ 12.)  Rabbi Aaron Fink is the founder and dean of ABY. (*Id.* ¶ 13.)

On October 17, 2018, ABY entered into a purchase and sale contract with GBC to purchase the Property. (*Id.* ¶ 51.) The Property is a located at 22, 24, and 26 Demarest Avenue, and 9 Highview Avenue in Nanuet, New York. (*Id.* ¶ 23.) In relevant part, the contract provides that the Property's purchase price was "FOUR MILLION THREE HUNDRED [sic] THOUSAND AND

---

[1] "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)). Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint "relies heavily upon its terms and effect," which renders the document "integral" to the complaint. *Int'l Audiotext*, 62 F.3d at 72. Additionally, a district court "may take judicial notice of the records of state administrative procedures, as these are public records, without converting a motion to dismiss to one for summary judgment." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002) (citations omitted).

NO/DOLLARS ($4,300,000.00)," which ABY agreed to pay "at the Closing [(December 31, 2018)] by certified or bank check payable as [GBC] may direct, or by wire transfer of immediately available funds to a bank account designated by [GBC]." (*Id.*, Ex. H at 2–3, 10, ECF No. 30-8.) In the contract, ABY represented and warranted to GBC that

> [it] ha[d] the capacity and authority to execute th[e] Agreement and perform [its] obligations . . . under th[e] Agreement. All action necessary to authorize the execution, delivery and performance of th[e] Agreement by [ABY] ha[d] been taken and such action ha[d] not been rescinded or modified. Upon the execution and delivery of th[e] Agreement, th[e] Agreement [would] be legally binding upon [ABY] and enforceable against [ABY] in accordance with all of its provisions. . . .

(*Id.*, Ex. H at 8.) The contract also provides that "if [ABY] fail[ed] to timely close th[e] transaction on the Closing Date for reasons other than [GBC's] default or the failure of any of the express conditions to ABY's performance, then th[e] Agreement [would] terminate . . . ." (*Id.*, Ex. H at 13.) Finally, the contract provides that it constitutes "the entire agreement" between ABY and GBC and that it could not "be changed, modified, waived or terminated orally but only by an agreement in writing signed by" ABY and GBC. (*Id.*, Ex. H at 14.)

B.   *ABY Applies to the REAC for Permission to Receive Tax-Exempt Bonds*

Upon entering into the contract, ABY applied to the Rockland Economic Assistance Corporation ("REAC"), which is administered by the Rockland County Industrial Development Agency ("IDA"), for permission to receive tax-exempt bonds. (*Id.* ¶ 52.) ABY had successfully navigated the IDA process in 2016, when it obtained $8 million in tax-exempt bonds to fund the construction of a school building on the New Hempstead Property, though ABY ultimately did not go through with that construction. (*Id.*) On November 15, 2018, the REAC informally voted to transfer that earlier approval to ABY's purchase of the Property pending a public hearing. (*Id.* ¶ 53.) This meeting was supposed to take place sometime during the month of December that year. (*Id.*, Ex. G at 18, ECF No. 30-7.)

C.      *The November 27, 2018 Town Board Meeting*

On November 27, 2018, the Town Board held a public meeting to which Rabbi Fink attended. (*Id.*, Ex. G.) At the meeting, Supervisor Hoehmann presented a timeline about the sale of the Property, beginning with how the Town was initially interested in the Property and solicited an appraisal. (*Id.*, Ex. G at 8.) Although the Town made a verbal offer to purchase the Property, GBC declined the Town's offer because GBC's appraisal was ten percent higher the Town's appraisal. (*Id.*) Afterwards, ABY became interested in purchasing the Property and entered into a contract with GBC to do so. (*Id.*)

Hoehmann indicated that while "there is definitely an interest in th[e] [P]roperty for Town usage and the school district is interested in parking located there," "the sale [was] a private sale, with a contract between two private parties," for which it would be "illegal and inappropriate" for the Town to "interfere." (*Id.*)

Hoehmann noted that ABY intended to use the Property as a school, reason for which, just as any other school "certified by the New York Education Department," it was "required to be inspected annually by a certified inspector," such as the Town's Building Inspector or Fire Inspector. (*Id.*)  Hoehmann also noted that the "last recorded inspection that [was] on file in the Town for the [Property] was in 1991," which was the "last time the [Property] was used for general instruction[.]" (*Id.*) Hoehmann stated that the Town's Building Department would review ABY's application and determine whether the proposed use was an allowable use. (*Id.*, Ex. G at 9.)

Hoehmann also noted that, at the time, ABY had neither met with the Building Inspector to solicit input, nor applied to the Building Department regarding its proposed use of the Property. (*Id.*) Hoehmann stated that while the "Town cannot interfere with a private property matter between two parties, . . . the Town [would] strongly enforce [its] zoning laws and building code within the entire Town[.]" (*Id.*)

Later at the meeting, Hoehmann asked the Building Inspector, Erik Asheim, to address the matter. (*Id.*, Ex. G at 10.) Asheim stated that he had met with Rabbi Fink the day before (November 26, 2018) and introduced himself. (*Id.*) Asheim stated that the Property is in a residential R10 zoning district and that while GBC had been using it for religious studies, there was no school. (*Id.*) Asheim also stated that the last time Fire Inspectors were at the Property and filed a report for the school that operated there was back in the 1990s. (*Id.*) He stated that although there was a preschool in 2001 for approximately one year, the school had not been in use for a number of years. (*Id.*)

Asheim also said that the Property had been as a nonconforming use because while "[a] church is a permitted usage in [that] district[,] . . . it needs to have access to a state or a county road." (*Id.*) He told all of this to Rabbi Fink and explained to him that his option was to ask for a variance from the Zoning Board of Appeals ("ZBA") because the use had not been current for more than a year. (*Id.*) Hoehmann agreed with Asheim. (*Id.*)

Hoehmann then asked Rabbi Fink to address some details about ABY's intended purchase of the Property, including the planned financing and the application to the IDA. (*Id.*, Ex. G at 18.) Rabbi Fink answered that ABY "[was] not waiting for financing" because ABY would "be getting funding without financing." (*Id.*) Rabbi Fink averred that ABY had applied to the IDA for bonding to "help fund this deal" and that ABY would pay "whatever interest is incurred." (*Id.*) Rabbi Fink also stated that ABY was "also exploring the conventional mortgage market." (*Id.*)

Hoehmann then told Rabbi Fink that the IDA will need to hold some type of public hearing on the matter because "[t]his [was] an expenditure and approval that involves [p]ublic [f]unds." (*Id.*) Hoemann also told Rabbi Funk that he had yet to submit a written narrative about his intentions with the Property because there had been no traffic study and the Building Inspector

was unaware of his intentions. (*Id.*) Hoehmann told Rabbi Fink that there was a process to follow, and that "[a]ny other applicant would be required to do the exact same thing. [He had] attested that [he] plan[s] to buy, close, move in and operate. This [would] NOT occur in the Town . . . without ALL approvals." (*Id.*)

Hoehmann then asked Rabbi Fink to address some concerns a Rockland County legislator had raised about certain alleged violations ABY committed in its property in the Village of Airmont. (*Id.*) Rabbi Fink first explained that there were no violations at the Airmont property at the time and that he had never had a problem with fire compliance in the Village of Airmont. (*Id.*) Rabbi Fink then averred that the Airmont property had been hooked up to a private home's well because he thought it was permissible under Rockland County Health Laws. (*Id.*) He claimed that, at the time, he did not know that there was a difference between a well used for a private home and one used for a school. (*Id.*) He stated that ABY brought in a water truck and fed the school building with the line from the truck, but that after the pipes froze, ABY closed for the day. (*Id.*)[2]

---

[2] Two of the news articles that ABY incorporates by reference in its Amended Complaint provide additional context:

> [ABY's] past problems
>
> In October 2017, students were uprooted from 17 trailer classrooms on the New Hempstead campus after [ABY] ran into trouble for lacking proper electricity or running water. The school paid Ramapo $5,000 for holding classes at the town's baseball stadium for 16 days. [ABY] reopened in November, but was closed again for a week in early January after water from a storage tanker that was being used for drinking, sinks and toilets froze.

(*See* Am. Compl. ¶ 52 n.22 (citing Robert Brum, *Nanuet Grace Baptist Church sale: Public hearing set on buyer's $5M financing plan*, Rockland/Westchester Journal News (Dec. 6, 2018), https://www.lohud.com/story/news/local/rockland/nanuet/2018/12/06/nanuet-church-sale-public-hearing/2200935002); *id.* ¶ 64 n.25 (citing Robert Brum, *Nanuet church $5M sale: Hearing shelved amid lack of approvals,* Rockland/Westchester Journal News (Dec. 18, 2018), https://www.lohud.com/story/news/local/rockland/Nanuet/2018/12/18/nanuetchurch-sale-hearing-shelved/2337405002).)

Rabbi Fink also talked about ABY's property in the Village of New Hempstead, saying that the State monitor and the Town of Ramapo's Building Department approved ABY's use of a temporary fire hydrant while waiting for the installation of a permanent one. (*Id.*) Rabbi Fink said that it took over nine months to install the permanent hydrant, and although the Fire Department was not happy, he continued to use the permits that "the Village of New Hempstead (Town of Ramapo)" had issued him. (*Id.*) Rabbi Fink said that while he also waited for Orange and Rockland Counties to install power lines in such property, he did not wait for completion and opened ABY's doors because he already a temporary certificate of occupancy. (*Id.*)

Near the end of the public meeting, Hoehmann assured the people attending that the Town would be enforcing its code strictly and would "issue search warrants if necessary," making sure that "all laws, codes, variances and enforcements are followed" and that "[a]ll applicants will be treated equally." (*Id.*, Ex. G at 21.)

D.      *REAC Schedules the IDA Public Hearing for January 15, 2018*

On December 6, 2018, the REAC scheduled the IDA public hearing on ABY's application for permission to receive $5 million in tax-exempt bonds to help finance its purchase of the Property for January 15, 2018. (*See id.* ¶ 52 n.22 (citing Robert Brum, *Nanuet Grace Baptist Church sale: Public hearing set on buyer's $5M financing plan*, Rockland/Westchester Journal News (Dec. 6, 2018), https://www.lohud.com/story/news/local/rockland/nanuet/2018/12/06/nanuet-church-sale-public-hearing/2200935002).)

E.      *ABY Secures a Letter of Intent from Investors Bank for Financing*

On December 11, 2018, ABY secured a Letter of Intent from Investors Bank expressing the bank's interest in providing ABY financing up to $5 million for the purchase of the Property in the form of a "tax-exempt mortgage." (*Id.* ¶ 54; *id.*, Ex. I at 2, ECF No. 30-9.) The Letter of

Intent provides that the purpose of the $5 million financing was to "[p]urchase real properties known as 22, 24, 26 Demarest, Ave., and 9 Highview Ave., in Nanuet, NY" and that "[t]he proceeds [would] also be used to partially finance renovation to the aforementioned properties." (*Id.*, Ex. I at 2.) The Letter of Intent only lists three conditions precedent for the loan: "1. Satisfactory RE appraisal and Environmental Report[;] 2. Engineering report (facilities inspection[; and] 3. Receipt and satisfactory review of accountant prepared review level FY 2018 financial statements[.]" (*Id.*, Ex. I at 3.)

     *F.    CUPON and its GoFundMe Campaign*

CUPON is a citizens' group averring that its purpose is to "orchestrate awareness of changes that adversely affect the character of our diverse [Rockland] Community." (*Id.* ¶ 18 (citing *About Us*, CUPON Inc., https://www.cuponrockland.org/about).) ABY alleges that CUPON has chapters across cities and towns in New York and New Jersey that either have or are adjacent to growing or large Orthodox Jewish populations. (*Id.*) ABY further alleges that CUPON and its chapters espouse anti-Semitic views, and that its Nanuet chapter in particular directly opposed ABY's contract to purchase and convert the Property into an Orthodox Jewish all-girls school. (*Id.* ¶¶ 19, 62.)

On December 12, 2018, CUPON started a "GoFundMe" campaign with the stated purpose of preventing ABY's purchase of the Property: "Nanuet has become united in its efforts to ensure that the sale of [GBC's Property] is one that makes sense for the town, its residents, and their children's future." (*Id.* ¶ 63; Ex. A, ECF No. 30-1.) CUPON also created a petition on Change.org entitled: "Petition against Grace Baptist Church becoming a school," which by February 12, 2020, had been signed by 4,823 people. (*Id.* ¶ 63; Ex. M, ECF No. 30-14.)

G.      *REAC Cancels the January 15, 2018 IDA Public Hearing*

Six days later, on December 18, 2018, the REAC cancelled the public hearing on ABY's

application scheduled for January 15, 2018. (*Id.* ¶ 64.) The REAC executive director stated that

REAC would schedule the public hearing again once ABY received all preliminary permits and

approvals from the Town to operate the Property; otherwise, he stated it would be "a little bit like

putting the cart before the horse." (*Id.* ¶ 64 n.25 (citing Robert Brum, *Nanuet church $5M sale:*

*Hearing shelved amid lack of approvals,* Rockland/Westchester Journal News (Dec. 18, 2018),

https://www.lohud.com/story/news/local/rockland/Nanuet/2018/12/18/nanuetchurch-sale-

hearing-shelved/2337405002).)

H.      *ABY Submits a Building Permit Application to the Town's Building Department*

On December 26, 2018, as a contract vendee,[3] ABY submitted a building permit

application to the Town's Building Department so that it could make some needed improvements

to the Property. (*Id.* ¶ 65.) ABY's building permit application included a description of its proposed

use of the Property, the sworn affidavit of William French (GBC's pastor) describing the history

of the Property, and an opinion letter from ABY's land use counsel regarding the applicable law.

(*See id.*, Ex. N, ECF No. 30-15.)

I.      *CUPON's January 10, 2019 Meeting*

On January 10, 2019, CUPON held an inaugural meeting for its chapter in Nanuet at a

public school operated by the Nanuet UFSD, to which several elected officials attended, including

Supervisor Hoehmann, who attended the meeting in its entirety and offered closing remarks. (*Id.*

¶¶ 66, 69.) During the meeting, speakers highlighted CUPON's successful efforts to obstruct the

---

[3] "A contract vendee, being the equitable owner of the property, is a party aggrieved and, as such, is entitled to make an application for a variance." *Mandalay Const., Inc. v. Zimmer*, 194 N.Y.S.2d 404, 406 (Sup. Ct. 1959) (citing *Matter of Hickox v. Griffin*, 79 N.Y.S.2d 193, 195 (2d Dep't 1948), *rev'd. on other grounds*, 298 N.Y. 365 (1949)).

IDA's approval of ABY's application to receive tax-exempt bonds, which resulted in the postponement of the hearing. (*Id.* ¶ 66.) Speakers at the meeting also underscored the ongoing relationship between the Town and CUPON leaders, including Hoehmann, who was described as being "an enormous support" to CUPON. (*Id.* ¶ 67.) In his closing remarks, Hoehmann began by stating that he "can't say enough good things about CUPON," and he also discussed how ABY needed a variance from the Town before being able to operate its school on the Property. (*Id.* ¶ 69.)

> J.  *The Town's Building Inspector Denies ABY's Building Permit Application*

The next day, on January 11, 2019, the Town's Building Inspector denied ABY's building permit application. (*Id.* ¶ 71, Ex. P, ECF No. 30-17.) Specifically, the Building Inspector concluded that:

> A variance from the Clarkstown Zoning Board of Appeals would be required for the use of the school of general instruction. Our records show the last required NY State Fire Safety inspection for a school of general instruction on this property was conducted on December 11, 1990. Clarkstown Town Code section 290-29C (non-conforming use) "Discontinuance of use. If active and continuous operations are not carried on with respect to a nonconforming use during a continuous period of one year, the building or land where such nonconforming use previously existed shall thereafter be occupied and used only for a conforming use." Clarkstown Town Code section 290-20I(7) additional regulations, All uses other than single family residences shall have minimum frontage of 100 feet and access to either a state or county major or secondary road as classified on the Town Official Map.

(*Id.*)

> K.  *ABY Appeals the Building Inspector's Denial of its Building Permit Application*

Nearly two months later, on March 8, 2019, ABY submitted an appeal of the Building Inspector's denial of its building permit application to the ZBA. (*Id.* ¶ 100, Ex. J, ECF No. 30-10.) ABY's appeal argued that the Building Inspector's application of Section 290-20.I(7) and Note 48 to ABY was wholly improper and contrary to applicable law. (*Id.*) ABY also sought, in the alternative, an area variance from the requirements of Section 290-20.I(7), allowing the use of the

Property as a school and house of worship without having frontage on, and access to, a "state or county major or secondary road." (*Id.*)

In its appeal, ABY stated that it had neither plans to erect new buildings, add on to the existing buildings, or demolish the existing buildings, nor plans to alter the existing parking area or street grid. (*Id.*) ABY further explained that other than a few cosmetic changes and the removal of non-Jewish religious symbols, it wished only to modify the interior to meet its educational needs. (*Id.*)  It averred that the only change to the neighborhood would be the use of a school building and its accompanying sanctuaries by a Jewish entity, rather than a Christian one. (*Id.*) ABY also included a cover letter contending that it need not submit the survey required by the ZBA's printed application form because

> [t]he relief requested bears no relationship to the location of features or structures within the site; rather, it relates to the location of the site relative to the Official Map of the Town of Clarkstown. Appropriate mapping is included with the Narrative Summary. Further, to the applicant's knowledge, no current survey is available.

(*Id.* ¶ 101, Ex. T, ECF No. 30-22.)

L.      *ABY Requests GBC to Adjourn the Closing Date*

Sometime before March 18, 2019,[4] ABY received a letter from GBC informing it that GBC had received court approval for the sale of the Property such that the transaction was ready to close. (*Id.* ¶ 109, Ex. AA, ECF No. 30-29.) By its letter, GBC also reminded ABY that (i) the closing date would now be at 10:00 a.m. on April 15, 2019[5]; (ii) time was of the essence with respect to that date; and (iii) ABY's failure to appear and close at that date and time would constitute a default

---

[4] The exhibit ABY attached to its Amended Complaint is a letter from GBC that is undated.

[5] As the closing date in the October 17, 2018 contract was December 31, 2018, it can be reasonably inferred that ABY and GBC agreed to adjourn the closing date in writing at least once, if not multiple times, by the time of the letter. (*See* Am. Compl., Ex. H. at 14 (providing that GBC and ABY could change or modify the contract "only by an agreement in writing signed by" them).)

under the October 17, 2018 contract, after which GBC would pursue its remedies available under the contract, including its termination and retention of the deposit. (*Id.*)

On March 18, 2019, ABY sent a letter to GBC requesting to adjourn the closing date once again because the April 15, 2019 date "failed to give [ABY] adequate time" to fulfill its contractual duties. (*Id.*, Ex. BB, ECF No. 30-30.)

M.     *The Building Inspector Asks ABY to Submit a Survey for its Application for Appeal before the ZBA is Deemed Complete*

The next day, on March 19, 2019, the Building Inspector emailed ABY's counsel advising that the ZBA "requires a survey of the property to be submitted as part of the application before it can be processed." (*Id.* ¶ 103, Ex. V, ECF No. 30-24.) On April 4, 2019, despite not considering the survey to be required by or probative to its application to the ZBA, ABY agreed to commission a survey and informed the Building Inspector of the same. (*Id.* ¶ 104, Ex. T.)

N.     *GBC Agrees to Adjourn the Closing Date to May 16, 2019*

On April 11, 2019, in response to ABY's request, GBC agreed to adjourn the April 15, 2019 closing date to May 16, 2019, at 10:00 a.m. (*Id.* ¶ 109, Ex. BB.) GBC again reminded ABY that time was of the essence with respect to such closing date, and that if the closing did not occur at that time, the contract would "terminate automatically." (*Id.*)

O.     *Investors Bank revokes its Letter of Intent to Provide ABY with Financing*

Sometime before May 16, 2019,[6] Investors Bank informed ABY that it was revoking its Letter of Intent to provide ABY with financing to purchase the Property. (*Id.* ¶ 108, Ex. Y, ECF No. 30-27.)

---

[6] ABY does not allege a specific date on which this event occurred.

P.     *GBC Terminates the October 17, 2018 Contract after ABY Fails to Close the Purchase of the Property*

On May 16, 2019, after ABY failed to appear and close the purchase of the Property, GBC informed ABY that it was terminating the October 17, 2018 contract. (*Id.* ¶ 111, Ex. CCC, ECF No. 30-31.) GBC also returned ABY its $107,500.00 contract deposit[7] and informed it that GBC was "revoking any consent to land use applications relating to the [P]roperty . . . ." (*Id.*, Ex. CCC.) Simultaneously, GBC filed a letter with the ZBA "revok[ing] any consent to land use applications" relating to the Property after ABY's contract vendee status ceased upon termination of the contract. (*Id.* ¶ 111, Ex. DDD, ECF No. 30-32.)

Q.     *The Town Expresses Interest in Purchasing the Property Again*

On June 4, 2019, Hoehmann expressed in an interview that he was "excited about the prospects for the acquisition of [the Property]," that "[a]ll options are on the table," and that he was looking forward to "the involvement of the school district and potentially the private sector to create something unique for the benefit of all residents." (*Id.* ¶ 114.)

R.     *ABY Files FOIL Request and Objects to GBC's Withdrawal of Consent*

On June 6, 2019, ABY filed a FOIL demand, requesting documents the Town had in its possession pertaining to the Property and the Town's interest in purchasing the same. (*Id.* ¶ 115, Ex. GG, ECF No. 30-35.) That same day, ABY filed a letter with the ZBA objecting to GBC's withdrawal of consent and urging the ZBA to schedule a hearing in the coming weeks. (*Id.* ¶ 116,

---

[7] Notably, the contract provides that in the event that ABY failed to timely close the transaction on the closing date such that the contract was terminated, then the $107,500.00 contract deposit would be delivered to GBC "as agreed upon liquidated damages." (*Id.*, Ex. H at 12). Hence, it can be reasonably inferred that, because GBC returned ABY its contract deposit after ABY failed to close the transaction, ABY and GBC agreed in writing to change or modify the October 17, 2018 contract at least once, if not multiple times. (*See id.*, Ex. H. at 14 (providing that GBC and ABY could change or modify the contract "*only* by an agreement in writing signed by" them).)

Ex. HH, ECF No. 30-36.) In this letter, ABY contended that the Town's interference was the direct cause of ABY losing its financing resources. (*Id.*)

On June 24, 2019, counsel for ABY submitted another letter to the ZBA contending that the ZBA's continuing efforts to inordinately delay ABY's appeal, and averring that such tactics would serve to allow the Town to purchase the Property at a discount. (*Id.* ¶ 123, Ex. JJ, ECF No. 30-38.)

S.      *ZBA Refuses to Entertain ABY's Appeal*

On July 9, 2019, ABY received a letter from the Town's counsel indicating that the ZBA "[would] not entertain any appeal by [ABY] with respect to the [Property]" because "the contract for the sale of the property to [ABY] has been terminated and [ABY's] right to make any application to the Town concerning the [P]roperty has been revoked." (*Id.* ¶ 124, Ex. KK, ECF No. 30-39.)

T.      *ABY Files an Article 78 Petition and Declaratory Judgment Complaint*

On August 8, 2019, ABY filed a Verified Article 78 Petition and Declaratory Judgment Complaint against the Town, the ZBA, and the Building Department in the Supreme Court of New York, County of Rockland (the "Article 78 Proceeding"). (*Id.* ¶ 148, Ex. XX, ECF No. 30-52.) In the Article 78 Proceeding, ABY asked the state court for an order (1) compelling the ZBA to hear ABY's appeal of the Building Department's erroneous decision denying ABY's request for a building permit and, in the alternative, its application for an area variance; (2) directing the ZBA, upon that hearing, to find that a variance from Town Code § 290-20.I(7) is not required for use of a "school of general instruction" or, in the alternative, directing the ZBA to grant ABY's application for an area variance; (3) alternatively, annulling and setting aside the Building Department's determination as contrary to law, arbitrary and capricious, invalid as applied to ABY, and in violation of ABY's constitutional right to the free exercise of their religion; and (4)

compelling the Town to produce all discloseable records responsive to ABY's FOIL requests concerning the Town's interest in the Property. (*Id.*) On September 6, 2019, the Town moved to dismiss the Article 78 Proceeding. (*Id.* ¶ 149.)

> U.  *The Town Seeks to Purchase the Property*

On October 3, 2019, the Town announced that it was purchasing the Property for $4.55 million with a closing date in January 2020, which would be financed by short-term borrowing that would later be converted into longer term serial bonds. (*Id.* ¶ 150 (citing Robert Brum, *Grace Baptist Church purchase part of Clarkstown's bid to revitalize Nanuet's center*, Rockland/Westchester Journal News (Oct. 3, 2019), https://www.lohud.com/story/news/local/rockland/nanuet/2019/10/03/grace-baptist-church-purchase-part-planrevitalize-nanuets-center/3846664002.) In a press conference, Hoehmann said that "final plans for the property would be formulated with input from the community, [but that] the need for senior housing and parking top the list." (*Id.*)

On November 5, 2019, ABY alerted the Rockland County Supreme Court in the Article 78 Proceeding of the alleged "blatant inconsistencies" between the Town's planned purchase of the Property and its litigation position. (*Id.* ¶ 155, Ex. AAA, ECF No. 30-55.) ABY averred that the Town's "stated goal in opposing ABY's [b]uilding [p]ermit [a]pplication was to 'keep its residential neighborhoods free from the intrusion of activities that would entail increased vehicular activity and traffic,' [(*id.*, Ex. YY, ECF No. 30-54),]. . . yet the Town's current ideas for the use of the Property just do that." (*Id.* ¶ 155.)

Two days later, the Town Board held a meeting in which it issued several resolutions doing the following: (1) authorizing the Town to purchase the Property for $4.55 million; (2) authorizing the Town to finance the cost of the acquisition through the issuance of bonds in the amount of $4.6 million; and (3) adopting a determination of significance under the State Environmental Quality

Review Act ("SEQRA") for the acquisition of the Property. (*Id.* ¶ 152, Ex. ZZ, ECF No. 30-54.) In the Short Environmental Assessment Form ("EAF") it filed in connection with the SEQRA application, the Town noted that the Property would be used for "general municipal purposes," and in particular as "a community center, meeting facility, parking and similar uses." (*Id.*, Ex. ZZ at 5, 8.) The Town also noted that such use was a "commercial" use and that it was a "permitted use under the zoning regulations" and "consistent with the predominant character of the existing built or natural landscape." (*Id.*, Ex. ZZ at 5–6.)

In an amended EAF, the Town later changed its answer as to whether using the Property as a community center was a "permitted use under the zoning regulations" from "yes" to "N/A." (*Id.*, Ex. CCC at 9, ECF No. 30-57.) In support of this amendment, in an affirmation responding to a notice of supplemental authority that ABY filed in the Article 78 Petition, the Town's counsel contended that "[i]t is a fundamental principal of zoning law that a municipality is exempt from its own zoning regulations when carrying out a governmental function." ((*Id.*, Ex. CCC at 5 ¶ 15 (citing *Little Joseph Realty, Inc. v. Town of Babylon*, 41 N.Y.2d 738, 742 (1977)).)

V.    *The Rockland County Supreme Court Dismisses ABY's Article 78 Petition*

On December 23, 2019, the Rockland County Supreme Court issued a decision and order in the Article 78 Proceeding. (*Id.* ¶ 158, Ex. DDD, ECF No. 30-58.) By its decision and order, the court dismissed ABY's causes of action in the Article 78 Petition for lack of standing. Specifically, the court noted the following:

> ABY applied for the building permit as a contract-vendee with GBC's, the owner of the Property, consent. While ABY's appeal was pending before the ZBA, GBC notified the Town that it terminated the Agreement and revoked its consent previously given to ABY. Consequently, although ABY was initially an "immediate party" to the administrative proceedings, GBC's revocation of its consent terminated ABY's interest in the Property. Therefore, the ZBA's subsequent actions did not cause ABY to lose its access to financing the acquisition of the Property. As a result, ABY is not an aggrieved party to have standing to

challenge the ZBA's decisions to not hold a hearing, overturn the Building Department's decision, or grant a variance.

(*Id.*, Ex. DDD at 4.) On January 7, 2020, ABY filed a timely notice of appeal from the Rockland County Supreme Court's order. (*Id.* ¶ 158, Ex. EEE, ECF No. 30-59.)

> W.  *GBC Petitions the Rockland County Supreme Court for Approval of the Sale of the Property to the Town*

Three days later, GBC petitioned the Rockland County Supreme Court for approval of the sale of the Property to the Town under the Not-for-Profit Corporations Law §§ 510–11 and Religious Corporations Law § 12. (*Id.* ¶ 162, Ex. III, ECF No. 30-63.) A week after, on January 17, 2020, ABY moved to intervene and stay the court's approval of the sale of the Property to the Town until the Appellate Division, Second Department had heard and determined ABY's appeal of the Article 78 Proceeding. (*Id.* ¶ 164, Ex. KKK, ECF No. 30-65.)

On January 24, 2020, the Rockland County Supreme Court denied ABY's motion to intervene and stay the sale, and authorized GBC to sell the Property to the Town. (*Id.* ¶ 165 (citing *In the Matter of the Application of Grace Baptist Church of Nanuet for Approval to Sell Real Property Pursuant to Not-for-Profit Corporations Law §§510-511 and Religious Corporations Law §12*, No. 030222/2020, Entry No. 45).)[8]

> X.  *The Rockland County Supreme Court Rules that the Town Improperly Denied ABY Access to Records and Remands ABY's FOIL Appeal to the Town*

On May 13, 2020,[9] the Rockland County Supreme Court issued a Decision, Order, and Judgment finding that the Town had "denied ABY access to the requested records by failing to respond within ten business days pursuant to FOIL" and "failed to provide all the records requested

---

[8] ABY also alleges that in its order, the court acknowledged that ABY "ha[d] a claim for tortious interference." (*Id.* ¶ 165.) However, nothing in that order supports that allegation.

[9] This event occurred after ABY had commenced the instant action against Defendants. As it will be discussed *infra*, ABY amended its complaint after receiving these documents.

by ABY," and remanding the appeal to the Town to respond. (*Id.* ¶ 169, Ex. HHH, ECF No. 30-64.) Specifically, the court indicated that there emails discussing the Town's potential purchase of the Property that were in the Town's possession on or before ABY's June 6, 2019 FOIL request and well before ABY's July 22, 2019 FOIL appeal. (*Id.* ¶ 169, Ex. HHH at 4.)

A month later, the Town responded to ABY's FOIL request in accordance with the court's ruling and included the following documents: (i) the Town's 2017 appraisal of the Property (*id.*, Ex. R, ECF Nos. 30-19 &-20); (ii) various emails between the Town and the company that conducted the 2017 appraisal (*id.*, Ex. Q, ECF No. 30-18); (iii) various emails between the Town and GBC's real estate broker, from June 2017, February 2018, and June 2019, discussing the Town's interest in purchasing the Property[10] (*id.*, Exs. NNN, OOO, PPP, & QQQ, ECF Nos. 30-68, 30-69, 30-70, & 30-71); (iv) an April 13, 2018 email from GBC's real estate broker to Hoehmann attaching GBC's 2018 appraisal of the Property (*id.*, Ex. S, ECF No. 30-21); and (v) two May 2019 email chains between GBC's real estate broker and Hoehmann with an inspection report and marketing materials (*id.*, Exs. RRR & SSS, ECF Nos. 30-72 & 30-73).

## II.  Procedural Background

On February 18, 2020, ABY filed the instant lawsuit against Defendants. (Compl., ECF No. 1.) In March 2020, Defendants first sought leave to file a motion to dismiss. (ECF Nos. 19 & 24.) On April 28, 2020, the Court granted Defendants leave to file their motions to dismiss and issued a briefing schedule under which Defendants would serve their moving papers to ABY on June 29, 2020, ABY would serve Defendants its opposition papers on July 29, 2020, and Defendants would serve ABY their replies on August 13, 2020. (ECF No. 29.)

---

[10] These discussions took place before ABY entered into a contract with GBC in October 2018, and after GBC terminated that contract in May 2019.

However, on July 20, 2020—after Defendants had already served their moving papers—ABY filed its Amended Complaint with new allegations. (Am. Compl., ECF No. 30.) On August 3, 2020, Defendants once again sought leave to file new motions to dismiss ABY's Amended Complaint, which the Court subsequently granted on August 21, 2020. (ECF Nos. 31, 32, & 35.)

On December 11, 2020, the parties filed their respective briefing on the instant motions in: the Town and Hoehmann their notice of motion (ECF No. 42), memorandum in support ("Town Defendants' Motion," ECF No. 44), declaration with accompanying exhibits (Loomba Decl., ECF No. 43), and reply ("Town Defendants' Reply" ECF No. 50); CUPON its notice of motion (ECF No. 45), memorandum in support ("CUPON Motion," ECF No. 48), declarations with accompanying exhibits (Mogel Decl., ECF No. 46; Shapiro Decl., ECF No. 47), and reply ("CUPON Reply," ECF No. 51); and ABY its response in opposition ("Response in Opposition," ECF No. 49). The parties also filed letters with supplemental authority. (ECF Nos. 52 & 53.).

While the instant motions remained pending, on October 27, 2021, because it moved its school to New Hempstead and the Property was no longer of use to it, ABY filed a premotion conference seeking leave to file a supplemental pleading under Federal Rule of Civil Procedure 15(d). (ECF No. 54.) By its motion, ABY seeks to (i) withdraw its requests for injunctive relief and (ii) to assert claims for additional compensatory damages and/or recovery costs to cover the difference between the costs associated with its New Hempstead property and the costs it would have incurred had it purchased the Property. (*Id.*) On November 3, 2021, Defendants filed their oppositions to ABY's request. (ECF Nos. 56 & 57.)

**LEGAL STANDARD**

### I.  Federal Rule of Civil Procedure 12(b)(1)

"[F]ederal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Durant, Nichols, Houston,*

*Hodgson, & Cortese-Costa, P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) (internal quotation omitted). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Nike, Inc. v. Already*, LLC, 663 F.3d 89, 94 (2d Cir. 2011) (internal quotation omitted). The party invoking the Court's jurisdiction bears the burden of establishing that jurisdiction exists. *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009).

When, as here, the case is at the pleading stage, in deciding a motion to dismiss under Rule 12(b)(1), the Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Id.* at 143. But "argumentative inferences favorable to the party asserting jurisdiction should not be drawn." *Buday v. N.Y. Yankees P'ship*, 486 F. App'x 894, 895 (2d Cir. 2012) (summary order) (quoting *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992)).

## II. Federal Rule of Civil Procedure 12(b)(6)

In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Freidus v. Barclays Bank PLC,* 734 F.3d 132, 137 (2d Cir. 2013). To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action will not do"; rather, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. In applying these principles, the Court may consider facts alleged in the complaint and documents attached to it or incorporated by reference. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir. 2002) (internal quotation marks and citation omitted).

20

**DISCUSSION**

In its Amended Complaint, ABY asserts a total of five claims: (1) a RLUIPA claim against the Town; (2) a 42 U.S.C. § 1983 claim against the Town Defendants for alleged violations of ABY's rights under the First and Fourteenth Amendments; (3) a 42 U.S.C. § 1985 conspiracy claim against all Defendants under the First and Fourteenth Amendments; (4) a claim under the New York Constitution against the Town Defendants for alleged violations of freedom of worship, religious liberty, right to assemble, equal protection of laws, and discrimination; and (5) a common law tortious interference with a contract against all Defendants. (Am. Compl. at 64–71.)

The Town Defendants seek to dismiss ABY's claims for lack of subject matter jurisdiction based on standing and ripeness, as well as for failure to state a claim. (Town Defs.' Mot. at 16–36.) CUPON only seeks to dismiss the claims against it for failure to state a claim. (CUPON Mot. at 13–24.) Accordingly, the Court must first address the Town Defendants' challenge to subject matter jurisdiction and will analyze whether ABY fails to state a claim against all Defendants only if the Court has subject matter jurisdiction over this case. *See Brokamp v. James*, --- F. Supp. 3d ---, No. 21-CV-389, 2021 WL 5444277, at *2 (N.D.N.Y. Nov. 22, 2021) ("Subject matter jurisdiction is a threshold issue and, thus, when a party moves to dismiss under both Rules 12(b)(1) and 12(b)(6), the motion court must address the 12(b)(1) motion first." (citations omitted)).

## I. Standing & Ripeness

The Town Defendants first argue that ABY lacks standing to bring its claims for three reasons. First, the Town Defendants argue that ABY cannot establish that it suffered and injury in fact because it never owned the Property, and whatever property interest it had based on its contract with GBC, such interest was foreclosed and then GBC independently terminated the contract. (Town Defs.' Mot. at 17–18.) Second, the Town Defendants argue that ABY cannot establish causation/traceability to their conduct because GBC independently decided to terminate the

21

purchase and sale agreement when ABY failed to appear. (*Id.* at 18–19.) And third, the Town Defendants argue that ABY cannot meet the redressability requirement because, as its claimed injury is its inability to open a private school in the Town, ABY has failed to allege that the Property is the only property within the Town that is suitable for that purpose. (*Id.* at 19–20.)

Additionally, the Town Defendants argue that ABY's claims are unripe for judicial review because ABY never obtained a final definitive position on its building permit application. (*Id.* at 20–22.) Specifically, the Town Defendants argue that while ABY's appeal and variance application was pending before the ZBA, GBC terminated the contract and revoked ABY's authority to pursue the appeal and variance application. (*Id.*) Thus, "because ABY never received a final determination on its land use application, its claims are not ripe for judicial review." (*Id.* at 22.)

In response, ABY contends that it has sufficiently alleged not one, but *two* injuries in fact. The first injury in fact relates to the Town Defendants' infringement of First Amendment rights when it denied ABY's building permit application by misapplying the zoning code, conspiring with CUPON, unlawfully delaying and then ceasing the zoning appeals process, and then buying the Property for itself—all with an underlying discriminatory intent against Orthodox Jews. (Resp. in Opp'n at 23.) And the second injury relates to Defendants causing both ABY to breach the contract to purchase the Property and GBC to terminate the same. (*Id.* at 24.) ABY further contends that both of these injuries in fact are directly traced to the Defendants' conduct and are redressable by the instant litigation. (*Id.* at 26–30.)

Moreover, ABY contends that its claims are ripe for judicial review because after the ZBA lost jurisdiction to entertain ABY's appeal, it issued a denial based on jurisdictional grounds that constitutes a final determination on its building permit application. (*Id.* 30–31.) Alternatively,

ABY contends that the futility exception applies because through its denial based on jurisdictional grounds, the ZBA "has dug in its heels and made clear that all such applications will be denied." (*Id.* at 31.)

But after thoroughly reviewing the Amended Complaint and all documents referenced therein, and even when construing them in ABY's favor, the Court concludes that ABY fails to sufficiently establish standing for either of its two alleged injuries in fact with respect to the Town Defendants.

    *A.*    *Standing Legal Standard*

"Standing is a federal jurisdictional question 'determining the power of the court to entertain the suit.'" *Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir. 2010) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "'[A] plaintiff must demonstrate standing for each claim and form of relief sought.'" *Id.* (quoting *Baur v. Veneman*, 352 F.3d 625, 642 n. 15 (2d Cir. 2003)). There are three Article III standing requirements: (1) the plaintiff must have "suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *John v. Whole Foods Market Group, Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

As to the first element, an injury in fact "'consists of an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.'" *John*, 858 F.3d at 736 (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016)). "Each element of standing 'must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation,' and at the pleading stage, 'general factual allegation of injury resulting from the defendant's conduct may suffice.'" *John*, 858 F.3d at 736 (quoting *Lujan*, 504 U.S. at 561).

B.      *Ripeness Legal Standard*

The doctrine of ripeness is closely related to the doctrine of standing. "The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). The Second Circuit has explained that "the best way to think of constitutional ripeness is as a specific application of the actual injury aspect of Article III standing. . . . Constitutional ripeness, in other words, is really just about the first *Lujan* factor[,]" whether a plaintiff's injury is concrete, particularized, and actual or imminent. *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013). "The ripeness requirement prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002).

C.      *Standing in the Land-Use Context*

To establish that a claim is ripe in the land-use context, and especially where there is a challenge to a local zoning determination, "the Court must apply the first prong of the analysis the Supreme Court articulated *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172  (1985)." *Islamic Cmty. Ctr. for Mid Westchester v. City of Yonkers Landmark Pres. Bd.*, 258 F. Supp. 3d 405, 416 (S.D.N.Y. 2017), *aff'd*, 742 F. App'x 521 (2d Cir. 2018); *see also Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 247 (2d Cir. 2005) (explaining that the "'prong-two ripeness' test" only applies to takings challenges); *see also Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2167 (2019) (doing away with the second prong in *Williamson* and holding that a property owner who has "suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation . . . may bring his claim in federal court under § 1983 at that time").

The first prong of the *Williamson County* test requires that a plaintiff plead facts showing that "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty.*, 473 U.S. at 186. This "final-decision requirement helps distinguish between those cases in which a plaintiff has suffered a 'concrete and particularized,' 'actual or imminent' injury, and those in which the injury is 'merely speculative and may never occur, depending on the final administrative resolution.'" *Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 122 (2d Cir. 2014) (quoting *Dougherty*, 282 F.3d at 90). "In other words, a non-final decision on how a parcel of land may be used does not ordinarily give rise to an injury that is sufficiently concrete and particularized to satisfy Article III." *Id.*

To meet the final-decision requirement, the plaintiff must "obtain a final, definitive position as to the application of the relevant zoning law to the property from the municipal entity responsible for those laws." *Islamic Cmty.*, 258 F. Supp. 3d at 416 (quoting *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 915 F. Supp. 2d 574, 597 (S.D.N.Y. 2013)) (internal quotation marks omitted). As such, "'plaintiff cannot seek federal court review of a zoning ordinance or provision until it has submitted at least one meaningful application for a variance' from the restrictions of the land-use laws." *Id.*

However, whether an action is final is "conceptually distinct" from whether administrative remedies have been exhausted. *See Williamson*, 473 U.S. at 193. "While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by

which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate." *Id.*

Finally, "[a]lthough the ripeness test in *Williamson* involved only a takings claim, the ripeness requirement of *Williamson* has also been extended to equal protection and due process claims asserted in the context of various land use challenges." *Homefront Org., Inc. v. Motz*, 570 F. Supp. 2d 398, 405 (E.D.N.Y. 2008) (citing *Dougherty*, 282 F.3d at 88–89 (applying ripeness test to equal protection and due process claims); *Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 96–97 (2d Cir. 1992) (applying ripeness test to substantive due process claims)).

Courts recognize one exception permitting federal court review of a non-final decision— "if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile." *Murphy*, 402 F.3d at 349. This occurs when "a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied." *Id.* Courts have interpreted this futility exception narrowly. *Missere v. Gross*, 826 F. Supp. 2d 542, 555 (S.D.N.Y. 2011). "Although the precise contours of the futility exception are not well-defined, courts in the Second Circuit have recognized that mere allegations of open hostility are not sufficient to invoke the futility exception." *Norwood v. Salvatore*, No. 12-cv-1025, 2015 WL 631960, at *5 (N.D.N.Y. Feb. 13, 2015) (internal citations and quotations omitted); *Osborne v. Fernandez*, No. 06-cv-4127, 2009 WL 884697, at *6 (S.D.N.Y. Mar. 31, 2009), *aff'd*, 414 F. App'x 350 (2d Cir. 2011) (rejecting futility argument based on allegations that "defendant decisionmakers were hostile to plaintiffs' proposed development or act[ed] in bad faith"). It is a "high standard" met only "when the government's actions are so unreasonable, duplicative, or unjust as to make the conduct farcical." *Sherman v. Town of Chester*, 752 F.3d 554, 563 (2d Cir. 2014).

D.      *ABY Fails to Sufficiently Establish its First Alleged Injury In Fact Based on Ripeness*

Regarding the first alleged injury in fact, even when construing the Amended Complaint in its favor, ABY fails to sufficiently establish that its claims based on the denial of the building permit application are ripe such that it suffered an "actual, concrete injury" because the ZBA never issued a final decision on ABY's appeal and variance application. In other words, the ZBA's non-final decision here does not "give rise to an injury that is sufficiently concrete and particularized to satisfy Article III." *Sunrise Detox V, LLC*, 769 F.2d at 122.

"A final decision exists when a development plan has been submitted, considered and rejected by the governmental entity with the power to implement zoning regulations." *S & R Dev. Estates, LLC v. Bass*, 588 F. Supp. 2d 452, 461 (S.D.N.Y. 2008). Even if a plan has been submitted and rejected, a claim is not ripe until the "property owner submit[s] at least one meaningful application for a variance." *Murphy*, 402 F.3d at 348. Four considerations undergird the requirement that plaintiffs seek a variance before requesting relief from a federal court: (1) the need to develop a full record; (2) "only if a property owner has exhausted the variance process will a court know precisely how a regulation will be applied to a particular parcel;" (3) "a variance might provide the relief the property owner seeks without requiring judicial entanglement in constitutional disputes," thereby enforcing "the longstanding principle that disputes should be decided on non-constitutional grounds wherever possible;" and (4) "[r]equiring a property owner to obtain a final, definitive position from zoning authorities evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution." *Id.* (citations omitted).

Here, the Amended Complaint and the documents referenced therein indicate that while ABY's appeal and zoning application was pending, GBC terminated the contract on May 16, 2019.

27

(Am. Compl. ¶ 111, Ex. CCC.) This termination in turn ceased ABY's contract vendee status, through which ABY was entitled to submit applications for building permits and variances. *See Mandalay*, 194 N.Y.S.2d at 406 ("A contract vendee, being the equitable owner of the property, is a party aggrieved and, as such, is entitled to make an application for a variance." (citing *Matter of Hickox*, 79 N.Y.S.2d at 195)). Additionally, after terminating the contract on May 16, 2019, GBC also informed the ZBA that it was "revok[ing] any consent to land use applications" relating to the Property. (Am. Compl. ¶ 111, Ex. DDD.) After such developments, on July 9, 2019, ABY received a letter from the Town's counsel indicating that the ZBA "[would] not entertain any appeal by [ABY] with respect to the [Property]" because "the contract for the sale of the property to [ABY] has been terminated and [ABY's] right to make any application to the Town concerning the [P]roperty has been revoked." (*Id.* ¶ 124, Ex. KK.)

In its opposition papers, ABY contends that the ZBA's refusal to entertain ABY's appeal and variance application constitutes a "denial of ABY's appeal on jurisdictional grounds" that constitutes "a final, determinative position by the Town . . . ." (Resp. in Opp'n at 30.) On that same basis, ABY contends in the alternative that the futility exception applies because the ZBA "has dug in its heels and made clear that all such applications will be denied." (*Id.* at 31.) But the Court disagrees with both of ABY's arguments because the ZBA's refusal to entertain ABY's appeal and variance application is more properly characterized as a "voluntary dismissal" by GBC, instead of a denial on jurisdictional grounds by the ZBA.

"A land contract is not a conveyance of real property but only an agreement to convey real property in the future if certain conditions are fulfilled." *Upham v. Lowry*, 485 N.Y.S.2d 680, 684 (Sup. Ct. 1985). "[T]he execution of a contract for the purchase of real estate and the making of a part payment gives a contract vendee equitable title to the property and an equitable lien in the

amount of the payment." *Heritage Art Galleries v. Raia*, 570 N.Y.S.2d 67, 68 (2d Dep't 1991). The contract vendor, in turn, "holds the legal title in trust for the vendee, subject to the vendor's equitable lien for the payment of the purchase price in accordance with the terms of the contract." *Bean v. Walker*, 464 N.Y.S.2d 895, 896 (4th Dep't 1983). In short, "the owner of the real estate from the time of the execution of a valid contract for its sale is to be treated as the owner of the purchase money[,] and the purchaser of the land is to be treated as the equitable owner thereof." *Id.*; *but see Crossland Sav., FSB v. Foxwood & S. Co.*, 609 N.Y.S.2d 282, 283 (2d Dep't 1994) (noting that "[w]hen a purchaser makes a down payment on a contract to sell real property, the purchaser acquires an equitable lien on the property," but not when the purchaser only makes a deposit to be held in escrow).

Once equitable title to the property vests in the vendee, the vendee "cannot be divested of that title except by foreclosure proceedings." *Madero v. Henness*, 607 N.Y.S.2d 153, 154 (3d Dep't 1994). However, when the contract vendee "has failed to honor the contract" by failing to make payment and "paid neither taxes nor insurance premiums," then the contract vendee does not "become an equitable owner of the property." *Hadlick v. DiGiantommaso*, 545 N.Y.S.2d 816, 818 (2d Dep't 1989).

"A contract vendee, being the equitable owner of the property, is a party aggrieved and, as such, is entitled to make an application for a variance." *Mandalay*, 194 N.Y.S.2d at 406 (citing *Matter of Hickox*, 79 N.Y.S.2d at 195). However, one who has no legally cognizable interest in the property to be affected by a zoning variance may not apply for such variance or appeal from its denial. *See Underhill v. Bd. of Appeals of Town of Oyster Bay*, 72 N.Y.S.2d 588, 595 (Sup. Ct.), *aff'd*, 75 N.Y.S.2d 327 (2d Dep't 1947), *aff'd*, 297 N.Y. 937 (1948); *Kenny Dev. Corp. v. Kramer*, 123, 202 N.Y.S.2d 421, 422 (Sup. Ct. 1960).

Here, upon signing the contract to purchase the Property from GBC on October 17, 2018, ABY became a contract vendee and presumably the equitable owner of the Property—which entitled it to apply for a building permit or variance from the Town. The Amended Complaint and the documents referenced therein further indicate that ABY paid a $107,500.00 contract deposit, but that it never made a down payment. (*See* Am. Compl., Ex. CCC.) Indeed, under the contract, ABY agreed to make a single payment of $4.3 million towards the purchase price of the Property on the closing date. (Am. Compl., Ex. H at 2–3, 10.)

With that in mind, together with the fact that GBC terminated the contract on May 16, 2019, due to ABY breaching the same after failing to appear at the closing date, and that GBC commenced no foreclosure proceedings, it can be reasonably inferred that ABY made no payment towards either the Property's purchase price, taxes, or insurance premiums. Hence, after having "failed to honor the contract" and "paid neither taxes nor insurance premiums" by May 16, 2019, ABY lost equitable title to the Property. *Hadlick*, 545 N.Y.S.2d at 818. It follows then, that upon GBC's termination of the contract, ABY no longer had any legally cognizable interest in the Property, and that insofar as the appeal and variance application remained pending before the ZBA, the only one who could continue to pursue the same was the sole owner of the Property—GBC.

But on the same day it terminated its contract with ABY, while the appeal and variance application remained pending before the ZBA, GBC also simultaneously informed the ZBA that it was "revok[ing] any consent to land use applications" relating to the Property. (Am. Compl. ¶ 111, Ex. DDD.) In other words, as the sole owner of the Property, and the only one with a legally cognizable interest in the same, GBC effectively withdrew or voluntarily dismissed the appeal and variance application before the ZBA on May 19, 2019. Such conclusion is further supported by the fact that the ZBA never in fact issued a formal denial to ABY, and instead, only sent ABY a

letter informing it that it would not continue entertaining the appeal and variance application. (*See id.* ¶ 124, Ex. KK.)

Accordingly, as the ZBA did not issue a final decision on the appeal and variance application because GBC voluntarily withdrew the same, the Court concludes that ABY fails to sufficiently establish an injury in fact arising from the denial of its building permit application "that is sufficiently concrete and particularized to satisfy Article III." *Sunrise Detox V, LLC*, 769 F.3d at 122.

E.   *ABY Also Fails to Sufficiently Establish its Second Alleged Injury In Fact Based on Causation*

And regarding the second alleged injury in fact, even when drawing all inferences in its favor, the Court is of the view that ABY fails to sufficiently allege how the Town Defendants' conduct caused both ABY to breach the contract and GBC to terminate the same. At the core of ABY's relevant allegations is that the Town Defendants denied ABY's building permit application and delayed the ensuing appeal long enough so that potential lenders would be discouraged from providing financing to ABY to purchase the Property, and for GBC to become impatient and terminate the contract. (*See* Am. Compl. ¶¶ 108, 174.) ABY further alleges, in relevant part, that CUPON participated in a conspiracy with the Town Defendants by mounting a campaign to dissuade the REAC from approving ABY's application to receive tax-exempt bonds. (*See id.* ¶¶ 64, 66.) However, even when construing the Amended Complaint in ABY's favor, ABY's breach of contract and GBC's termination of the same are not directly traceable to the Town Defendants' conduct.

"[T]he 'case or controversy' limitation of Art. III . . . requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party[.]" *Simon v. E. Kentucky Welfare Rts.*

*Org.*, 426 U.S. 26, 41–42 (1976). "[I]ndirectness of injury, while not necessarily fatal to standing, may make it substantially more difficult to meet the minimum requirement of Art. III: To establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Id.* at 44–45 (internal quotation marks omitted); *see also California v. Texas*, 141 S. Ct. 2104, 2117 (2021) ("[W]here a causal relation between the injury and challenged action depends upon the decision of an independent third party[,] . . . standing is not precluded but it is ordinarily substantially more difficult to establish.") (internal quotation marks omitted) (quoting *Lujan*, 504 U.S. at 562)). This is because the Supreme Court has "refus[ed] to endorse standing theories that rest on speculation about the decisions of independent actors[.]" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (internal quotation marks and citation omitted).

To satisfy that burden, the plaintiff must show at the least "that third parties will likely react in predictable ways." *Id.* It is well-settled that plaintiffs "need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test. This is true even in cases where the injury hinges on the reactions of the third parties . . . ." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 104 (2d Cir. 2018). In other words, the plaintiff must sufficiently allege that "a defendant's actions had a 'determinative or coercive effect upon the action of someone else' who directly caused the alleged injury." *Toretto v. Donnelley Fin. Sols., Inc.*, 523 F. Supp. 3d 464, 474 (S.D.N.Y. Mar. 5, 2021) (quoting *National Council of La Raza v. Mukasey*, 283 F. App'x 848, 851 (2d Cir. 2008)). At the pleading stage, this is not "an onerous standard[,]" *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016), and is a "relatively modest" burden to meet, *Bennett v. Spear*, 520 U.S. 154, 171 (1997).

To first illustrate why ABY's breach of contract is not directly traceable to the Town Defendants, consider certain relevant provisions in the contract between ABY and GBC. To begin, the contract provides that ABY agreed to pay a total of $4.3 million at the closing date of December 31, 2018, "by certified or bank check payable as [GBC] may direct, or by wire transfer of immediately available funds to a bank account designated by [GBC]." (Am. Compl., Ex. H at 2–3, 10.) ABY also represented and warranted to GBC that

> [it] ha[d] the capacity and authority to execute th[e] Agreement and perform [its] obligations . . . under th[e] Agreement. All action necessary to authorize the execution, delivery and performance of th[e] Agreement by [ABY] ha[d] been taken and such action ha[d] not been rescinded or modified. Upon the execution and delivery of th[e] Agreement, th[e] Agreement [would] be legally binding upon [ABY] and enforceable against [ABY] in accordance with all of its provisions. . . .

(*Id.*, Ex. H at 8.) The contract also provides that "if [ABY] fail[ed] to timely close th[e] transaction on the Closing Date for reasons other than [GBC's] default or the failure of any of the express conditions to ABY's performance, then th[e] Agreement [would] terminate . . . ." (*Id.*, Ex. H at 13.) Finally, the contract provides that it constitutes "the entire agreement" between ABY and GBC and that it could not "be changed, modified, waived or terminated orally but only by an agreement in writing signed by" ABY and GBC. (*Id.*, Ex. H at 14.) But most notably, while the contract provides that ABY "*may* obtain financing to complete the transaction" (*id.*, Ex. H at 15 (emphasis added)), it contains neither a "financing contingency clause"[11] nor any provision conditioning the closing of the purchase subject to the approval of any building permit application or variance.

---

[11] A financial contingency clause, also known in real estate transactions as a "mortgage contingency clause," "protects a contract vendee from being obligated to consummate the transaction in the event . . . financing cannot be obtained in the exercise of good faith and through no fault of the purchaser . . . ." *Creighton v. Milbauer*, 594 N.Y.S.2d 185, 189 (1st Dep't 1993).

In sum, under the contract, ABY agreed—well before it even submitted its December 26, 2018 permit application—to pay GBC the *full amount* of the purchase price ($4.3 million) *in a single payment* on the closing date (December 31, 2018), *regardless* of whether ABY needed financing to do so, or whether ABY would be unable to operate the Property for its intended purpose pending approval by the Town. Thus, even when drawing all inferences in ABY's favor, the Town's denial of ABY's permit application has no bearing on the self-imposed contractual duties that ABY itself agreed to perform in its October 17, 2018 contract with GBC. *See, e.g.*, *Venetoklis Fam. Ltd. P'ship v. Kora Devs.*, LLC, 902 N.Y.S.2d 665, 666 (2d Dep't 2010) ("Generally, parties to a contract for the sale of real property, like signatories of any agreement, are free to tailor their contract to meet their particular needs and to include or exclude those provisions which they choose. Absent some indicia of fraud or other circumstances warranting equitable intervention, it is the duty of a court to enforce rather than reform the bargain struck[.]" (citing *Grace v. Nappa*, 46 N.Y.2d 560, 565 (1979)).

Yet, ABY alleges that the Town Defendants' conduct influenced the REAC, Investors Bank, and other lenders to provide it with means of financing. ABY alleges that "[a]s a direct result of the Building Inspector's denial of ABY's Building Permit Application and the ZBA's undue delay in scheduling a hearing, Investors Bank revoked its Letter of Intent to provide ABY with financing to purchase the Property." (Am. Compl. ¶ 108.) ABY further alleges that it "was unable to obtain alternative means of financing the acquisition of the Property because lenders feared that ABY would not be able to overcome the Town's manifest hostility and clear interest in preventing an Orthodox-Jewish school from 'invading' their Town." (*Id.*) ABY further alleges in a footnote that David Teiler, a senior underwriter at Alliance Private Capital, a commercial real estate mortgage brokerage firm, has confirmed that "[i]n order that ABY be able to [purchase the

Property], and subject to ABY obtaining the necessary building permits from the Town, Alliance Private Capital is ready, willing, and able to arrange bank financing to ABY to fund the acquisition of the Property." (*Id.* at 41, n.45; *id.*, Ex. Z ¶ 5, ECF No. 30-28.)

Nonetheless, ABY still fails to sufficiently allege how the Town Defendants' conduct had a "determinative or coercive" effect on these third parties. First, as mentioned above, the contract clearly indicates that ABY agreed, *well before submitting its permit application to the Town*, to purchase the Property from GBC *regardless* of whether ABY (1) obtained permission from the REAC to receive tax-exempt bonds, or any financing, for that matter; or (2) needed a permit or variance from the Town for its intended use of the Property. Indeed, in the contract, ABY itself represented and warranted to GBC that "[a]ll action necessary to authorize the execution, delivery and *performance* of th[e] Agreement by [ABY] ha[d] been taken and such action ha[d] not been rescinded or modified." (Am. Compl., Ex. H at 8 (emphasis added); *see also id.*, Ex. G at 18 (Rabbi Fink saying that ABY "[was] not waiting for financing" because it would "be getting funding without financing" and averring that ABY had applied to the IDA for bonding to "*help* fund this deal." (emphasis added)).) Simply put, ABY bound itself to close the purchase of the Property through a single payment of $4.3 million—which it represented and warranted to have taken all action necessary to authorize its delivery to GBC—*even if* it received no financing whatsoever *and* was unable to operate an Orthodox Jewish school in the Property.

Indeed, considering the relevant allegations together with the contract between ABY and GBC, ABY's inability to obtain financing appears to arise not from the Town refusing to grant ABY a permit, but from the REAC and the lenders' independent decision to impose an approved building permit or variance as a prerequisite. *See Turaani v. Wray,* 440 F. Supp. 3d 733, 738–39 (E.D. Mich. 2020) *aff'd*, 988 F.3d 313 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 225 (2021); *see also*

*Crawford v. United States Dep't of Treasury*, 868 F.3d 438, 457 (6th Cir. 2017) (noting that "several of Plaintiffs' alleged harms arise not from [foreign financial institutions] acting under the command of [Foreign Account Tax Compliance Act] or an [intergovernmental agreement], but rather from the [foreign financial institutions'] voluntary choice to go above and beyond the [Foreign Account Tax Compliance Act] and the [intergovernmental agreements]."). Moreover, ABY "includes no allegations that the [Town Defendants] applied force or coercion, or otherwise called upon legal authority to command" either the REAC, Investors Bank, Alliance Private Capital, or other lenders to impose such prerequisite. *See Turaani,* 440 F. Supp. 3d at 738–39.

If anything, the Amended Complaint and the documents referenced therein indicate that ABY painted itself into a corner by promising the earth to GBC without including in the contract either a "financing contingency clause" or a provision conditioning the closing of the purchase subject to the approval of any building permit application or variance. *See, e.g.*, *In re Brown Pub. Co.*, 486 B.R. 46, 52 (Bankr. E.D.N.Y. 2013) ("While there is no evidence of whether BMC obtained a commitment for backup financing, the Court notes that there is no financial contingency provision in the May 4 APA or the Amended BMC APA and the absence of financing would not excuse BMC from closing."); *DiScipio v. Sullivan*, 816 N.Y.S.2d 576, 578 (3d Dep't 2006) ("[W]here impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused. . . . In addition, this contract contains no mortgage contingency clause.") (internal citations omitted); *Beth Equities v. Silgo Greenwich Assocs.*, 636 N.Y.S.2d 309, 310 (1st Dep't 1996) ("[I]t is clear that plaintiff was not prevented from closing on the scheduled 'time of the essence' date due to renovations in the building by the ground floor tenant or reluctance of the lender, such conditions not being made part of the contract. Nor did the contract have any financing

contingency clause which might have excused plaintiff's failure to perform."). In short, ABY cannot excuse its failure to close the purchase of the Property on its inability to obtain financing under the terms it itself negotiated and agreed with GBC.

To be sure, construing the Amended Complaint in its favor, ABY sufficiently alleges a causal connection between CUPON's conduct and ABY's inability to obtain permission to receive tax-exempt bonds from the REAC. Namely, it can be reasonably inferred that there is a substantial likelihood that the REAC decided to reschedule its determination of whether ABY could receive tax-exempt bonds after CUPON celebrated its alleged successful efforts to obstruct ABY's IDA application. (*See* Am. Compl. ¶¶ 64, 66.) But even so, the same is not true with respect to the Town Defendants as alleged.

Nowhere in the Amended Complaint does ABY "include[] [any] allegations that the [Town Defendants] applied force or coercion, or otherwise called upon legal authority to command" the REAC to reschedule its determination and make it contingent on the Town's approval of ABY's building permit or variance application. *See Turaani*, 440 F. Supp. 3d at 738–39. Nor does ABY sufficiently allege that there was substantial likelihood that the Town Defendants' conduct would indirectly influence the REAC because on December 6, 2018, the REAC in fact scheduled the hearing for January 15, 2019, despite Hoehmann's public comments about ABY potentially needing variance to operate its school in the Property at the Town's November 27, 2018 public meeting. (*Compare* Am. Compl., Ex. G at 10, *with id.* ¶ 52 n.22.) Instead, as mentioned above, drawing all inferences in ABY's favor, it can be reasonably inferred that CUPON's conduct instigated the REAC to reschedule its determination. (*See* Am. Compl. ¶¶ 64, 66.) And finally, nor does ABY allege that the Town Defendants and CUPON began their alleged conspiracy before the REAC postponed its determination so that it could be reasonably inferred that CUPON's conduct

was also attributable to the Town Defendants. In fact, ABY alleges that Defendants' alleged conspiracy between Defendants began when Hoehmann attended CUPON's inaugural meeting of its chapter in Nanuet on January 10, 2019—weeks after the REAC postponed its determination. (*Id.* ¶ 206.)

Hence, when construing the Amended Complaint and the documents referenced therein in ABY's favor, at best, ABY sufficiently alleges only that CUPON's conduct (not the Town Defendants') determinatively influenced the REAC to postpone its determination decision, and ultimately, deprived ABY of its ability to receive tax-exempt bonds.

On a similar basis, ABY also fails to sufficiently allege how the Town Defendants caused GBC to terminate the contract after ABY's breach. Indeed, despite the contract lacking a "financing contingency clause," or a provision conditioning the closing of the purchase subject to the approval of any building permit application or variance, the Amended Complaint and the documents referenced therein indicate that GBC agreed to amend the contract in writing multiple times notwithstanding ABY's inability to close the purchase of the Property as agreed. Specifically, ABY and GBC not only amended the contract to adjourn the closing date, (*see* Am. Compl. ¶109, Exs. AA & BB (noting that the December 31, 2018 closing date was adjourned to April 15, 2019, and then to May 16, 2019), but also so that GBC would return ABY its $107,500.00 deposit despite GBC terminating the contract based on ABY's default, (*compare id.*, Ex. H at 12 (providing that if ABY failed to timely close the transaction on the closing date such that the contract was terminated, then the $107,500.00 contract deposit would be delivered to GBC "as agreed upon liquidated damages"), *with* id., Ex. CCC (noting that GBC returned ABY its deposit after ABY's default caused GBC to cancel the contract on May 16, 2019).)

To that end, these multiple amendments by agreement invite speculation as to whether there was a substantial likelihood that the Town Defendants' delay of the appeal—that is, when taking as true ABY's allegations that the survey requirement was unnecessary—influenced GBC to terminate the contract on May 16, 2019. In other words, the Amended Complaint contains no allegations as to why the delay of the appeal had a "determinative or coercive effect" on GBC so that it stopped agreeing with ABY to amend the contract despite its multiple previous agreements to do the same. It is not as if ABY sufficiently alleged that the Town Defendants acted in such manner knowing GBC had any reason to stop agreeing to adjourn the contract (*i.e.*, some financial hardship or some type of deadline) or that they communicated with GBC about ABY's permit application and its ability to perform its contractual duties so that the Town could later purchase the Property. In fact, the documents ABY received in response to its FOIL request indicate that communications between the Town Defendants and GBC occurred in June 2017 and February 2018 (before ABY and GBC entered into the contract in October 2018), and in June 2019 (after GBC terminated the contract in May 2019). (*Id.*, Exs. NNN, OOO, PPP, & QQQ.)

Hence, even when drawing all inferences in ABY's favor, ABY fails to sufficiently allege how the Town Defendants' conduct "constrained or influenced" GBC's decision to stop agreeing to amend the contract and to terminate it on May 16, 2019. *Carver v. City of New York*, 621 F.3d 221, 226 (2d Cir. 2010). Accordingly, the Court concludes that ABY has failed to sufficiently establish standing for its second alleged injury in fact with respect to the Town Defendants' conduct. Consequently, the Court dismisses all of ABY's claims against the Town Defendants and its § 1985 conspiracy claim against all Defendants.

And insofar as ABY sufficiently alleges an injury in fact with respect to CUPON's conduct influencing the REAC, such injury relates only to ABY's state law claim of tortious interference

with a contract. As such, the Court declines to exercise supplemental jurisdiction over such claim against CUPON because there remains no independent jurisdictional basis.

"The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims"). Additionally, where the federal claims are dismissed at an early stage in the litigation, the Second Circuit has generally held that it is inappropriate for the district court to exercise supplemental jurisdiction. *See, e.g., Giordano v. City of New York,* 274 F.3d 740, 754 (2d Cir. 2001); *Seabrook v. Jacobson,* 153 F.3d 70, 72 (2d Cir. 1998); *Castellano v. Bd. of Trs. of Police Officers' Variable Supplements Fund,* 937 F.2d 752, 758 (2d Cir. 1991).

Therefore, the Court dismisses the entirety of ABY's Amended Complaint without prejudice. However, the Court grants ABY leave to replead its state law claims against CUPON in the appropriate forum.

## II.   **ABY's Motion for Leave to File a Supplemental Pleading**

Lastly, as noted above, while the instant motions remained pending, on October 27, 2021, ABY filed a premotion conference seeking leave to file a supplemental pleading under Federal Rule of Civil Procedure 15(d). (ECF No. 54.) However, because the Court dismissed ABY's Amended Complaint in its entirety—including those claims seeking only monetary damages under federal law for lack of standing, the Court denies ABY's motion for leave to file a supplemental pleading as moot.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' motions to dismiss (ECF Nos. 42 and 45), DISMISSES ABY's Amended Complaint without prejudice with leave to refile consistent with this Opinion and Order, and DENIES ABY's motion for leave to file a supplemental pleading as MOOT (ECF No. 54). The Clerk of the Court is directed to terminate the motions at ECF Nos. 42, 45, and 54, and this action.

Dated: July 12, 2022
      White Plains, NY

SO ORDERED:

NELSON S. ROMÁN
United States District Judge